# In The Matter Of:

*Graziosi  vs*

*Metlife Investors USA Insurance Company*

---

*Kathleen M. M. Medeiros*

*June 12, 2012*

---



Tel: (401)946-5500
1-888-44DEPOS(443-3767)
Fax (401)946-9228

JGrenier@alliedcourtreporters.com
www.AlliedCourtReporters.com

*Min-U-Script® with Word Index*

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION


```
****************************
KELLIE WHITE GRAZIOSI,      *
Plaintiff                   *
                            *
    VS.                     *              C.A. NO:
                            *          3:11-CV-00080-CAR
                            *
METLIFE INVESTORS USA       *
INSURANCE COMPANY           *
                            *
Defendant and Interpleader  *
Counterclaim Plaintiff      *
                            *
    VS.                     *
                            *
EUGENE TARASZKA and ANN     *
TARASZKA, Individually;     *
and KEN TARASZKA, M.D. as   *
Administrator of the        *
Estate of DR. STEVEN        *
TARASZKA                    *
                            *
Interpleader Defendants     *
****************************
```


        DEPOSITION OF KATHLEEN M. M. MEDEIROS,

witness in the above-entitled cause, taken on

behalf of the Plaintiff, pursuant to notice,

before Sally Brassard, CSR, a Notary Public in and

for the State of Rhode Island and Providence

Plantations, at the Law Office of Pierce Atwood,

LLP, 10 Weybosset Street, Providence, Rhode

Island, on June 12, 2012, scheduled at 10:00 a.m.

2

1      APPEARANCES:


2

       FOR THE PLAINTIFF:
3      PRESTON & MALCOM, P.C.
       BY:  PAUL L. ROSENTHAL, JD, MBA
4          VIA TELEPHONE:  JEREMY V. KILBURN, ESQUIRE
       110 Court Street
5      Post Office Box 984
       Monroe, Georgia  30655
6      (770) 267-2503
       plr@alcovylaw.com

7


8      FOR THE DEFENDANT AND PLAINTIFF-IN-INTERPLEADER
       MET LIFE INVESTORS USA INSURANCE COMPANY:
9      SMITH MOORE LEATHERWOOD, LLP
       BY:  ELIZABETH J. BONDURANT, ESQUIRE
10     Atlantic Center Plaza
       1180 W. Peachtree Street NW, Suite 2300
11     Atlanta, Georgia 30309-3482
       lisa.bondurant@smithmoorelaw.com

12


13     ALSO PRESENT VIA TELEPHONE:

14     ATTORNEYS FOR INTERPLEADER DEFENDANTS EUGENE
       TARASZKA, ANN TARASZKA, AND KEN TARASZKA:
15     MOFFETT LAW FIRM, P.C.
       BY:  F. GLENN MOFFETT, JR., ESQUIRE
16     6065 ROSWELL ROAD, N.E.
       NORTHSIDE TOWER, SUITE 625
17     ATLANTA, GEORGIA  30328-4018

18
       GRAY, RUST, ST. AMAND, MOFFETT & BRIESKE, LLP
19     BY:  WAYNE S. MELNICK, ESQUIRE
       950 EAST PACES FERRY ROAD
20     1700 ATLANTA PLAZA
       ATLANTA, GEORGIA  30326
21     wmelnick@grsmb.com

22


23


24


25

3

1                          I-N-D-E-X

2

3            DEPOSITION OF KATHLEEN M. M. MEDEIROS

4                                                      PAGE

5

6        Examination by Mr. Rosenthal..............    5

7

8

9                          E-X-H-I-B-I-T-S

10

11       PLAINTIFF'S          DESCRIPTION           PAGE
         NO.

12       1   MetLife Investors Policy (36 pgs).....    34

13       2   MetCare Lite: View Case (4 pgs).......    40

14       3   Letter to Kellie 1 Graziosi (1 pg)....    45

15       4   MetCare Lite: View Case (4 pgs).......    46

16       5   MetCare Lite: View Case (3 pgs).......    50

17       6   MetCare Lite: View Case (12 pgs)......    52

18       7   Letter from Burke Johnson (1 pg)......    52

19       8   Letter to Burke Johnson, Esquire (1pg)   55

20       9   MetCare Referral (1 pg)...............    59

21       10  Georgia Death Certificate (5 pgs).....    64

22       11  Letter to Kellie Graziosi (1 pg)......    70

23       12  Letter to Burke Johnson, Esq. (1 pg)..    72

24       13  Letter from Burke Johnson (1 pg)......    77

25

4

1                    E-X-H-I-B-I-T-S
                          (Cont.)
2

3       PLAINTIFF'S          DESCRIPTION              PAGE
        NO.
4
        14  Fax from Jeremy Kilburn, Esquire
5           (3 pgs)...............................    79

6       15  Letter from F. Glenn Moffett, Jr.
            (1 pg)...............................     84
7
        16  Memo of Record (1 pg).................    86
8
        17  Memo of Call (1 pg)...................    90
9
        18  Letter from F. Glenn Moffett, Jr.
10          (2 pgs)...............................    91

11      19  Letter to Jeremy Kilburn, Esq (1 pg)..   95

12      20  Letter to F. Glenn Moffett, Jr. (1 pg)   97

13      21  Letter to Kathleen Medeiros with
            attachments (22 pgs).................    102
14
        22  Letter from F. Glenn Moffett, Jr.
15          (1 pg)...............................    106

16      23  Consolidated Disbursement Initiative
            (3 pgs)...............................   108
17
        24  Letter to Kathleen Medeiros with
18          attachments (20 pgs).................    117

19      25  Referral Work Sheet (2 pgs)..........    118

20      26  Inter Office Referral Sheet - Claim
            Evaluation (5 pgs)...................     119
21
        27  BOSS Claims Case Comment (17 pgs).....   122
22
        28  Adverse Claimant Situation (2 pgs)....   127
23

24

25

Kathleen M. M. Medeiros - June 12, 2012

5

1                  (DEPOSITION COMMENCED AT 10:03 A.M.)

2                       KATHLEEN M. M. MEDEIROS,

3           having first been duly sworn by the Notary Public,

4           testified as follows:

5                  THE COURT REPORTER:  Please state and

6           spell your last name for the record.

7                  THE WITNESS:  Kathleen M. M. Medeiros,

8           (M-e-d-e-i-r-o-s).

9                  MR. ROSENTHAL:  Guys, just as a

10          preliminary matter, if ya'll don't plan on talking

11          until later, would ya'll mind going on mute so

12          then we don't keep getting feedback, and then if

13          ya'll need to say something, then just take it off

14          of mute and join in.

15                 MR. MELNICK:  No problem.

16                 MR. ROSENTHAL:  Thank you.

17                    EXAMINATION BY MR. ROSENTHAL:

18   Q.     Good morning, Ms. Medeiros.

19          A.   Good morning.

20   Q.     Let me make sure I get the pronunciation correct.

21          A.   Medeiros.

22   Q.     Medeiros, just real simple.  Okay.  My name is

23          Paul Rosenthal, I'm going to be asking you some

24          questions --

25          A.   Uh-huh.

Kathleen M. M. Medeiros - June 12, 2012

6

1   Q.     -- today.

2                   MS. BONDURANT:  Just let him ask the

3          questions, okay, she can't hear him if you're

4          talking while he's speaking.  I'm sorry, but that

5          way we can get that on the record right off the

6          bat.

7                   MR. ROSENTHAL:  No problem.

8   Q.     This will be your deposition in the instant case

9          that's pending in the Middle District Court,

10         United States District Court, Graziosi versus

11         MetLife, et al.  Do you understand why you're here

12         today?

13         A.  Yes, I do.

14  Q.     I want to ask you a few preliminary questions, go

15         over a couple of ground rules, then we'll kind of

16         get into the meat of things.  First off on ground

17         rules, any time you need to take a break, please

18         tell me.  Any time you need to talk to counsel,

19         that's fine, we can take a break.

20                  Additionally, as we go along, if I ask a

21         question and you don't understand it, please ask

22         me to re-ask the question or rephrase the

23         question.  I'm going to proceed forward under an

24         assumption today, that if I ask you a question and

25         you provide me with an answer, then I will assume

Kathleen M. M. Medeiros - June 12, 2012

7

 1          that you understood the question that I asked.  Is

 2          that a fair assumption for me to make?

 3          A.  Yes.

 4    Q.    And, also, just as Ms. Lisa just indicated, let me

 5          just finish the question.  I'll give you all the

 6          time in the world that you need to answer it, but

 7          that way, the record is clear for the court

 8          reporter who's taking it down.  First off, just

 9          your address, please, for the record?

10          A.  My home?

11    Q.    Home address would be fine.

12          A.  9 Levesque (L-e-v-e-s-q-u-e) Street in

13          Warwick, Rhode Island.

14    Q.    Okay.  And how long have you lived there?

15          A.  Thirty years.

16    Q.    Okay.  Are you currently on any prescription

17          medication?

18          A.  Yes, I am.

19    Q.    Okay.  Is it any type of medication that would

20          prevent you from having all of your senses about

21          you today to be able to testify truthfully and

22          honestly to the questions that I'm asking?

23          A.  No.

24    Q.    Is there any other reason why you couldn't testify

25          truthfully, honestly, and accurately today?

Kathleen M. M. Medeiros - June 12, 2012

8

1         A.  No.

2    Q.   Could you tell me, briefly, just about your

3         educational background since high school?

4         A.   Since high school, I attended College of Our

5         Lady of the Elms in Chicopee, Massachusetts, and I

6         graduated with a bachelor's degree.  My major was

7         theoretical math.  I then went back to school and

8         went to the Community College of Rhode Island and

9         got a certificate in accounting.

10   Q.   Okay.  And when did you get the certificate in

11        accounting?

12        A.   I think it was probably, around, 2001.

13   Q.   Okay.

14        A.   I don't really recall.

15   Q.   Did you get that certificate while you were

16        actively employed?

17        A.   Oh, yes.

18   Q.   Okay.  All right.  Let's do it this way:  If you

19        can just give me a brief employment history since

20        you graduated from Our Lady with the bachelor's in

21        math.

22        A.   I started work for MetLife in September of

23        1976 in Aurora, Illinois as a Death and Disability

24        Approver.  I transferred out here in August of

25        1978.  I worked for the Change Unit.

Kathleen M. M. Medeiros - June 12, 2012

9

1    Q.    What is the Change Unit?

2          A.   That's the unit that does policy changes,

3          conversions, reinstatements.

4    Q.    Have you been employed with MetLife or some

5          affiliate continuously since September of 1976?

6          A.   Yes, I have.

7    Q.    Wow, almost 36 years.

8          A.   Thirty-six years.

9    Q.    Congratulations.

10         A.   I think.

11              MS. BONDURANT:   The theoretical math major

12         should be able to figure that out.

13         A.   I don't know if congratulations is in order.

14   Q.    I understand.

15         A.   And, then, I left the change unit and became a

16         supervisor in 1988, I think, for Check-o-Matic and

17         Metromatic.

18   Q.    And what are those divisions?

19         A.   Check-o-Matic is the unit that does the

20         automatic drafts from your checking account for

21         premium payment, and Metromatic was the unit that

22         sold products through payroll deduction.

23   Q.    Okay.

24         A.   In 1991, I transferred to the claims unit as a

25         senior approver.

Kathleen M. M. Medeiros - June 12, 2012

1    Q.    And is this specifically, this claims unit, is

2          this life insurance claims?

3          A.  Yes.

4    Q.    Okay.  I'm sorry, I don't know if MetLife has

5          other lines other than life insurance.  I assume

6          that they do.

7          A.  Yes, we do.

8    Q.    Okay.  So, the change unit that you worked in back

9          in the late '70s, was that a life insurance

10         division?

11         A.  Yes.

12   Q.    And then the Check-o-Matic/Metromatic, was that

13         all lines, or just life insurance?

14         A.   Strictly life.

15   Q.    So, you, except for the disability work, I guess

16         at the beginning, it was -- that's life as well?

17         A.  Yes.

18   Q.    Okay.  So, in your entire 35 plus years at

19         MetLife, you've worked in a life insurance line

20         division?

21         A.  Yes.

22   Q.    Okay.  So, in '91, you became -- you went to the

23         claims unit?

24         A.  Yes.

25   Q.    And have you been there ever since?

Kathleen M. M. Medeiros - June 12, 2012

1          A.  Yes, I have.

2     Q.   And what is your current position in the claims

3          unit of MetLife?

4          A.  Senior Claim Approver.

5     Q.   And has that title remained basically the same

6          since '91?

7          A.  Yes.

8     Q.   Okay.  Generally, tell me what are your roles and

9          responsibilities as a senior claim approver for

10         MetLife?

11         A.  My current responsibilities?

12    Q.   Yes.

13         A.  Currently, I do death claims.  I'm in training

14         for death claims for the franchise for New England

15         Financial, which we acquired in 1991, I think.

16    Q.   Okay.  I'm sorry, you're in training or you do

17         training?

18         A.  I'm in training to learn the work for New

19         England Financial, and I still do help out with

20         MetLife death claims on a regular basis.

21    Q.   How long have you been in training for the New

22         England Financial network?

23         A.  Last November, November of 2011.

24    Q.   Okay.  For the relevant time period of this case,

25         let's say November of 2010 until today, was one of

1       your roles and responsibilities processing death

2       claims of MetLife policies?

3       A.  That was my primary responsibility during that

4       time.

5   Q.  Okay.  And then just recently in November of last

6       year, your primary role shifted to the training?

7       A.  Yes.

8   Q.  Okay.  Have you ever testified before, given a

9       deposition?

10      A.  Yes, I have.

11  Q.  Can you tell me about those times?

12      A.  One was a disability claim, one was a death

13      claim in Alabama.  I thought there was a third

14      deposition, I don't recall.

15  Q.  Were these depositions conducted -- were you

16      deposed because of your employment at MetLife?

17      A.  Yes.

18  Q.  Okay.  Did either of these -- well, let's start

19      with the first one, the disability claim.  Do you

20      remember when that was?

21      A.  I want to say mid-to-late '90s.

22  Q.  And were there issues of whether or not a claim

23      had been paid timely in that case?

24      A.  No.

25  Q.  What were the basic issues in that case?

Kathleen M. M. Medeiros - June 12, 2012

13

1          A.   Our denial of premium waiver.

2     Q.   And then on the death claim in Alabama, when was

3          that case?

4          A.   Around, 2004.

5     Q.   Okay.   And what were the issues in that death

6          claim case in Alabama, if you recall?

7          A.   It was a beneficiary disagreeing with the

8          beneficiary designation.

9     Q.   Was there some issue with who had been designated

10         as a beneficiary in that case?

11         A.   Yes.

12    Q.   Okay.   What was that issue?

13         A.   There were two beneficiary's names, the

14         insured mother's and the insured's aunt.   The

15         mother contended that the change of beneficiary

16         was fraudulent because the aunt should not be a

17         beneficiary.

18    Q.   So there were two different forms listing two

19         different primary beneficiaries?

20         A.   No, there was a beneficiary change form on

21         file listing them both as beneficiaries.

22    Q.   I see, okay.   All right, and in the third case, do

23         you recall when or where, or the substance?   If

24         you don't, that's okay.

25         A.   Oh, I think it was we were going to be deposed

Kathleen M. M. Medeiros - June 12, 2012

14

1        and the matter was settled, and I wasn't.

2   Q.   Okay, all right.  One more preliminary thing I

3        have to ask you:  Have you ever been arrested

4        before?

5        A.  No.

6   Q.   Okay, good answer.

7               MR. ROSENTHAL:  Another preliminary thing.

8        We reserve objections except as to form, I assume,

9        is that agreeable?

10              MS. BONDURANT:  That's okay.

11  Q.   Okay.  Mrs. Medeiros, I don't want you to tell me

12       about any conversations you've had with legal

13       counsel.  Other than that, I would like for you to

14       tell me what you did to prepare for today's

15       deposition.

16       A.  Basically, just went over the case because it

17       has been some time since I worked it.

18  Q.   When you say you went over the case, what does

19       that mean?  What did you do to go over the case?

20       A.  I reviewed my letters, the letters I received,

21       and the notes that were on file.

22  Q.   And are these the notes in a MetLife computer

23       system, or is there a physical file?

24       A.  They're in the MetLife computer system.

25  Q.   Okay.  Does that system have a particular name

Kathleen M. M. Medeiros - June 12, 2012

1           that you use, that you go by?

2           A.   There's two of them.  One is called CDI, and

3           that's Consolidated Disbursement Initiative and

4           BOSS (B-O-S-S).  I don't know what that stands

5           for, but it's what holds all our documents.

6    Q.    Okay.  And both of these systems are what is used

7           to manage MetLife policies and claims made on

8           them?

9           A.   Those two systems are used by the claims unit

10          to evaluate and pay claims?

11   Q.    Okay.  When did you first learn that you were

12          going to be deposed?

13          A.   I want to say about two weeks ago.

14   Q.    All right.  Other than reviewing the letters that

15          you sent, letters that you received and notes in

16          the file, have you done anything else in

17          preparation for today's deposition?

18          A.   Nope, that's about it.

19   Q.    Okay.  Other than conversations with legal

20          counsel, I don't want to know about that, have you

21          had any conversations with anyone about this

22          deposition today?

23          A.   No.

24   Q.    Tell me just generally in your own words, if you

25          can, what role did you have in the processing of

Kathleen M. M. Medeiros - June 12, 2012

16

1          the claim at issue in this case that was submitted
2          by Ms. Graziosi for life insurance proceeds
3          related to the death of a Dr. Steven Taraszka?
4          A.  In my normal course of work, I went in and I
5          was assigned the case to work.
6  Q.    Is it fair to say that you were the claims person
7          for this particular file?
8          A.  I was the claims person who hit "Enter" and
9          got that claim.
10 Q.    Okay, all right.  I want to ask you some questions
11         generally, not specifically about this case, and
12         then we'll get into that, into the specifics of
13         the case in particular here in a minute.  Tell me
14         about -- overall generally, obviously, you've been
15         with MetLife for a long time.  Tell me about the
16         training that you have received in regards to
17         processing and handling claims for life insurance
18         proceeds, I guess, since '91 when you went into
19         the claims unit.
20         A.  Since 1991, basically all my training has been
21         one-on-one with the consultant and, in 1991, I sat
22         down with a consultant who's no longer with the
23         company, and learned disability waiver.  We call
24         it disability, it's premium waiver, and I was
25         strictly doing that for about two or three years,

Kathleen M. M. Medeiros - June 12, 2012

17

1           and then I moved over and started doing death

2           claims.

3    Q.     And who specifically, if you recall, have you

4           received training from regarding the processing

5           and handling of death claims?

6           A.   Daniel Houle (H-o-u-l-e) and Don Ferencko

7           (F-e-r-e-n-c-k-o), and Diane Gruslan.

8    Q.     What are or were these individual's titles or

9           roles?

10          A.   Consultant.

11   Q.     Consultant.  I've heard you refer to that term and

12          I have seen it in the documents before.  Tell me,

13          if you can, in your own words, what is a

14          consultant within MetLife?

15          A.   There's all levels of responsibility and you

16          go up from, you know, clerks, to approvers, to

17          senior approvers.  When we get a case that is

18          beyond the realm of our authority or

19          responsibility, it goes to the consultant.

20          They're the next level up.

21   Q.     As a claims -- as a senior claims approver, is the

22          consultant your direct supervisor?

23          A.   I would not call them my direct supervisor

24          because I do have a direct supervisor, but they

25          are the next level of expertise with regards to

18

1           processing the work.

2    Q.    Okay.  For the relevant period of time at issue in

3          this case, November of 2010 until April 15th,

4          2011, who was the consultant that you would refer

5          cases to?

6    A.    Oh, you're asking me to remember stuff.  Dan

7          Houle was still with the company, and then Kathy

8          Kurtz became a consultant.  I think Kathy was the

9          one I worked with primarily on this.

10   Q.    All right.  You mentioned that you have a

11         different direct supervisor.  For the relevant

12         period of time, and when I say that, I'm meaning

13         from November of 2010 until let's just say summer

14         of 2011, who was your direct supervisor during

15         that period of time?

16   A.    Sharon Orlandi (O-r-l-a-n-d-i).

17   Q.    What was her title?

18   A.    Supervisor.

19   Q.    Creative, okay.  Other than this one-on-one

20         training that you've discussed, have you received

21         any other formal training in regards to the

22         processing or handling of claims for life

23         insurance proceeds during your employ at MetLife?

24   A.    When they installed -- as they installed new

25         systems, we would go for classroom, you know,

1           training of the CDI system, the BOSS system, the

2           other systems, as everything went electronic.  It

3           was a classroom review on how to use it.

4    Q.     Okay.  Anything else?

5           A.  No.

6    Q.     Okay.  And for the record, when I refer to

7           MetLife, I'm referring to the defendant in the

8           case, MetLife Investors USA Insurance Company.  Is

9           MetLife Investor USA Insurance Company your direct

10          employer?

11          A.  No, my direct employer is MetLife.

12   Q.     Is MetLife.  What is the difference between

13          MetLife and MetLife Investors USA Insurance

14          Company, if you know?

15                 MS. BONDURANT:  Let me just object to the

16          form of the question to the extent it calls for

17          legal conclusions and relationships about which

18          she may not have knowledge.

19   Q.     If you know?

20          A.  I don't.

21   Q.     Okay.  Your paycheck says MetLife on it?

22          A.  Yeah, it's got the Snoopy on there.

23   Q.     Okay.  Do there exist any handbooks or guidelines

24          related to the handling and processing of death

25          claims?

Kathleen M. M. Medeiros - June 12, 2012

20

1      A.   There exists guidelines.

2  Q.   And where are these guidelines?

3      A.   Now they are present on a database.

4  Q.   Is the database one of these softwares that you

5      mentioned?

6      A.   No.

7  Q.   A separate database?

8      A.   Yes.

9  Q.   And as a senior claims approver, how do you know

10      how to access this database of guidelines?

11      A.   It's an icon on my Lotus notes.  That's our

12      e-mail system.

13  Q.   And what is contained within these guidelines on

14      this database, on an icon, on your Lotus notes?

15      A.   It's the administrative library of everything

16      in one place.

17  Q.   Within this administrative library, are there

18      guidelines relating to specific -- strike that.

19      In this administrative library that you referred

20      to, I assume it's electronic.  You pull it up on

21      your computer?

22      A.   Yes.

23  Q.   In this administrative library that you pull up on

24      your computer, are there guidelines that give you

25      direction on how to handle certain types of

Kathleen M. M. Medeiros - June 12, 2012

21

1          situations with death claims?

2          A.  Clarify.

3     Q.   Well, let's start off more simply:  What's in this

4          administrative library on this computer?

5          A.  Guidelines, state law with regards to certain

6          things such as, like, the state statutes for minor

7          beneficiaries, the state statutes for settlement

8          interests, the state statutes for divorce.  You

9          know, all those state statutes stuff that we need

10         to have are available in one place.  If there's

11         any procedure memos that come down from claims

12         advisory, they're in there.

13    Q.   What is a procedure memo?

14         A.  It's a memo that comes down from claims

15         advisory that usually precedes some kind of

16         change.  Such as, a procedure memo comes down:

17         The state of Hawaii has changed their interest

18         rate, attached is an updated settlement interest

19         rate for all states.  So, it's a memo that

20         predates some change in laws that comes down to us

21         just to put us on notice, like, an FYI.

22    Q.   Does this administrative library have state

23         information regarding the processing of death

24         claims on life insurance policies for the state of

25         Georgia?

Kathleen M. M. Medeiros - June 12, 2012

22

```
 1          A.   No, it does not.
 2   Q.     Do you know why not?
 3          A.   If there's any specific state statute that
 4          applies to the payment of a death claim, they are
 5          programmed into the payment system and are noted
 6          on our claim forms.
 7   Q.     Okay.  So, why would this administrative library
 8          for your example have information about a change
 9          in interest rate for Hawaii, for example, but not
10          have information about laws specific or relative
11          to Georgia?
12                  MS. BONDURANT:  Let me just object to the
13          form of the question to the extent that it may
14          require her to give information that she's not
15          competent or knowledgeable about, because I don't
16          think she developed that library.  She can testify
17          what she knows, but beyond that, I want to make
18          sure there's an objection on the record.
19          A.   I used that as an example.  Every time a state
20          interest rate is updated, they update the entire
21          chart with all the states on it, but the procedure
22          memo, or the cover memo would say:  There's been a
23          change in this state, here is an updated, and all
24          states are updated.
25   Q.     But specifically as to Georgia, you are not aware
```

1          of any state specific guidelines for the

2          processing of Georgia-based life insurance claims

3          on this admin library that you referenced?

4          A.   Not that I know of, no.

5    Q.   Other than this admin library that you referenced,

6          are there any other written policies and

7          procedures for how to process and handle the

8          payment of claims related to the life insurance

9          policies?

10                 MS. BONDURANT:  Let me just object to the

11          form of the question.  You said any other process

12          or procedures, I think she characterized them as

13          guidelines.  So, just to the extent that you

14          mischaracterized her testimony, as guidelines and

15          procedures may not be the same.  She said they

16          were guidelines.

17                 MR. ROSENTHAL:  All right.  I'll strike

18          that.  I'll rephrase the question.

19   Q.   Other than this admin library, is there anywhere

20          else you go, in your role as a senior claims

21          approver, for direction on how to handle and

22          process claims related to life insurance policies?

23          A.   If I needed to, I do have some books on my

24          desk that just have notes in them.  Like, somebody

25          would put together -- especially for new people

```
 1           coming in -- okay, this is a policy, this is this,
 2           this is this, you know, like that.  If I needed
 3           to, I do have stuff on my desk that I refer to.
 4    Q.     And the stuff on your desk, do you know who
 5           produced those books, who created them?
 6           A.  Well, one of them is one I put together.  A
 7           couple of them are ones that I put together for my
 8           own use.  I have disability ones, which are just
 9           copies of pages of policies regarding to the
10           disability provision.  Then, there is one that was
11           put together for senior approvers that was put
12           together to train new seniors, and I only go in
13           there to look up one thing, and that's casual
14           connection states.  That's the only time I ever
15           use it.
16    Q.     Does that particular book have a title?
17           A.  No.
18    Q.     Do you know who created that particular book, the
19           senior claims training book that you've just
20           referenced?
21           A.  Diane Gruslan put it together.
22    Q.     Do you know when she created it?
23           A.  Well, after I became -- I was doing senior
24           work.
25    Q.     Is Diane Gruslan still employed with MetLife?
```

Kathleen M. M. Medeiros - June 12, 2012

1          A.  Yes, she is.

2     Q.   Describe for me, if you can, what is a beneficiary

3          of a life insurance policy with MetLife required

4          to do in order to obtain payment on the policy

5          whenever the insured dies?

6          A.   They are required to complete a claimant

7          statement.  Correction, they should complete a

8          claimant statement.  It's, you know -- and submit

9          either a certified or a copy of the insured's

10         death certificate, depending on the coverage would

11         determine if we need it certified.

12    Q.   Are there times when life insurance proceeds are

13         distributed to beneficiaries without a claimant

14         statement being completed?

15         A.  Yes.

16    Q.   When do those occasions occur?

17         A.   You get a letter in:  My name is Mary Jones,

18         my husband died.  Here's my address, here's his

19         death certificate, we pay it.

20    Q.   So, there are times when the claimant statement is

21         not fully completed, but MetLife still pays the

22         policy out?

23         A.   Yes.

24    Q.   Okay.  And then you stated that the death

25         certificate, sometimes a photocopy is okay and

Kathleen M. M. Medeiros - June 12, 2012

26

1       sometimes it has to be a certified copy, and

2       there's some sort of demarcation line.  What is

3       the distinction between when a certified copy of a

4       certificate is required versus when a photocopy of

5       a death certificate would be sufficient?

6       A.  If the face amount of all coverage is under

7       $50,000, we can accept a photocopy.

8  Q.   And, otherwise, it requires a certified copy?

9       A.  Yes.

10 Q.   Okay.  Other than a claimants statement and

11      producing a death certificate, certified or not

12      depending upon the face value of the policy, is

13      there anything else that a beneficiary is required

14      to do to obtain payment on a life insurance policy

15      once the insured has died?

16      A.  Oh, definitely.  It depends on several

17      factors, if additional information is needed.

18 Q.   What are those other several factors?

19      A.  If beneficiary is a trust, we have a

20      certification of trust and trustee form that needs

21      to be completed.

22 Q.   How about if the beneficiary is an individual?

23      A.  If it's an individual -- if it's an individual

24      and the policy is not contestable, the claimant

25      death certificate is all we need.

Kathleen M. M. Medeiros - June 12, 2012

27

1    Q.    Okay.  What does it mean for a policy to be
2          contestable?
3          A.  Death occurs within the first two policy
4          years.
5    Q.    I see, okay.  So, if the beneficiary is an
6          individual and the death does not occur within the
7          first two years of the policy, then the only thing
8          that's required to submit a claim for payment
9          under the policy by the beneficiary is to fill out
10         the claimant statement and submit a copy, a
11         certified copy in this case, when the policy is
12         greater than $50,000 of the death certificate; is
13         that correct?
14         A.  Yes.
15   Q.    Does MetLife have any procedures in place for
16         handling life insurance claims when a third-party
17         who is not the primary beneficiary objects to the
18         payment under the policy?
19         A.  Procedures?
20   Q.    Yes.
21         A.  No, we do not.
22   Q.    Do they have any written policies in place
23         relating to handling life insurance claims when a
24         third-party who is not the primary beneficiary
25         objects to the payment of the policy?

Kathleen M. M. Medeiros - June 12, 2012

1          A.  Are you saying policies, such as, procedures?

2     Q.   Well, is there anything -- are there any written

3          guidelines or directives, or memos, that give

4          direction on how to handle a life insurance claim

5          when there's a third-party who is not a primary

6          beneficiary objecting to the payment of the

7          policy?

8          A.  Yes, there was -- there is a guideline of

9          suggested handling.

10    Q.   What do you mean by suggested handling?

11         A.  Well, when you get it in, you know, these are

12         some steps you can take to, you know, facilitate

13         the case.

14    Q.   But you don't have to take those steps?

15         A.  No.

16    Q.   Okay.  Who has that discretion on determining what

17         steps to take or not take in handling a case where

18         there's a third-party objecting to the payment of

19         the claim for the primary beneficiary?

20         A.  The senior approver.

21    Q.   Okay.  Who makes a decision on whether or not to

22         pay the primary beneficiary in a case where a

23         third-party has objected to payment of the claim

24         to that primary beneficiary?

25         A.  It depends.

Kathleen M. M. Medeiros - June 12, 2012

29

1   Q.    What does it depend upon?

2         A.  Each case is different and, although, they

3         kind of flow the same way, the results are always

4         different.  It's all dependent on the situation.

5         It could be the senior approver makes the

6         decision.  It could be the consultant makes the

7         decision, or it could be the consultant has to

8         refer it up to the corporate for claims advisory.

9   Q.    So, above the consultant is corporate or claims

10        advisory in terms of decision-making?

11        A.  Yes.

12  Q.    And you're located here in an office in

13        Providence; is that correct?

14        A.  Yes.

15  Q.    Okay.  And is the consultant that you work with

16        for the relevant time period also here in

17        Providence?

18        A.  Yes.

19  Q.    Okay.  And where is corporate, is that New Jersey?

20        A.  Yes.

21  Q.    Okay.  Is that where claims advisory is located,

22        also?

23        A.  Yes, it is.

24  Q.    Okay.  So, if there's a decision that can't be

25        made by the senior claims approver, or the

30

1            consultant in Providence, then it would be

2            referred up to claims advisory, which is in New

3            Jersey?

4       A.   Yes.

5   Q.   Okay.  When a third-party objects to payment of a

6            life insurance policy proceeds to a primary

7            beneficiary, does MetLife conduct any

8            investigation on its own as to any issues raised

9            by the third-party?

10      A.   No.

11              MS. BONDURANT:  Let me just object, sorry,

12           after the fact to the form of that question.  I

13           think it's broad, overly broad.  I mean, I can't

14           imagine that she could answer for every single

15           scenario that would come up, so I object to the

16           form of the question.

17  Q.   In your time period as a senior claims approver,

18           have you ever, when a third-party has objected to

19           the payment of a policy to a primary beneficiary,

20           conducted any sort of investigation into the

21           claims raised by that third-party?

22      A.   No.

23  Q.   Since you've been a senior claims approver in

24           1991, how many instances have you dealt with where

25           some third-party has objected to the payment of a

Kathleen M. M. Medeiros - June 12, 2012

1            policy to the primary beneficiary?

2            A.   Too many to number.

3    Q.   Too many to number.  So, it's pretty frequent?

4            A.   Yes.

5    Q.   In those situations where third-parties have

6            objected to the payment of the policy to the

7            primary beneficiary, what do you do?  What have

8            you done as a senior claims approver when that

9            third-party call, or e-mail, or correspondence

10           comes in saying, we object to the payment to the

11           primary beneficiary?

12           A.   Being very, very general because each case is

13           different, I review the full application, if

14           there's any beneficiary changes.  I review all our

15           records first.  Then, I see if the objecting party

16           is a party of interest, a family member, you know,

17           somebody that has an interest in this deceased.

18           You know, not just somebody next door, and then I

19           write out to them and tell them who the

20           beneficiary is, and that I encourage -- this is in

21           general -- to see if an amicable agreement can be

22           reached with all parties and, if not, we'd have to

23           be restrained from making payment.

24   Q.   Why do you tell these third parties that MetLife

25           would have to be restrained from making payment

Kathleen M. M. Medeiros - June 12, 2012

32

1          when there's this third-party objector?

2          A.   Because we are legally obligated to make

3          payment to the beneficiary.

4    Q.    In this case, prior to April 15th, 2011, was

5          MetLife ever restrained from paying the policy

6          proceeds to Kellie Graziosi?

7                    MS. BONDURANT:   I object to the form of

8          the question to the extent it calls for a legal

9          conclusion.

10   Q.    If you know the answer, prior to April 15th, 2011,

11         was MetLife ever restrained, legally, from paying

12         the policy proceeds to the primary beneficiary,

13         Kellie Graziosi?

14         A.   I don't think so.

15   Q.    Under what circumstances, as a senior claims

16         approver, have you had occasion where MetLife has

17         withheld payment, life insurance proceed payment,

18         because of some third-party objector?  How

19         frequently has that occurred in your role as a

20         senior claims approver since 1991?

21         A.   Too many to number.

22   Q.    Who makes the decision to withhold that payment in

23         those situations?

24         A.   Initially, the senior approver.

25   Q.    And, then, if not the senior approver, it goes up

33

1           the chain that we talked about, consultant or

2           claims advisory?

3           A.   Yes.

4    Q.   Does the senior approver have authority or

5           responsibility -- do you, as senior approver, do

6           you have the authority or responsibility to make

7           the decision that there's some sort of question

8           about who the money should be paid to so the money

9           should be interplead into court?

10          A.   That's not my responsibility.

11   Q.   That's someone above you?

12          A.   Yes.

13   Q.   Is it -- I want to make sure I understood your

14          testimony correctly.  Has it been your standard

15          practice -- has it been your standard practice, as

16          a senior claims approver for MetLife, that when

17          some third-party person objects to payment, you

18          inform that third-party who the beneficiary of the

19          policy is?

20                  MS. BONDURANT:  Object to form of the

21          question to the extent you've characterized it as

22          standard.  I think you probably are asking her

23          questions that you need to put the facts of this

24          case to her.  Standard is overly broad.

25                  MR. ROSENTHAL:  I'll rephrase the

34

1          question, strike it.

2    Q.    Since 1991 as a senior claims approver, you

3          indicated to me that when third parties would

4          object to payments, you would notify them or tell

5          them who the beneficiary is; is that correct?

6          A.  Yes, I do.

7    Q.    Okay.  Why would you do that, generally, not

8          specifically to this case, but why would you tell

9          these third parties who the beneficiary was?

10         A.  Basically, just to put everybody on the same

11         page.

12   Q.    Is there any sort of written policy, procedure,

13         guideline, memorandum that you have received from

14         MetLife, as a senior claims approver, directing

15         you to do that?  To tell these third parties who

16         are the beneficiaries and put everybody on the

17         same page?

18         A.  No, there is not.

19   Q.    All right.  I want to turn our attention to the

20         case at issue here, and I am going to be showing

21         you some documents and I will try and move quickly

22         through some of these.  Take a look at what I have

23         marked as Plaintiff's 1.

24                 (PLAINTIFF'S EXHIBIT 1 MARKED FOR I.D.)

25                 MR. MELNICK:  Can you give me a Bates

Kathleen M. M. Medeiros - June 12, 2012

35

1        Number or some kind of identifier on the document?

2                MR. ROSENTHAL:  I will.  This is going to

3        be Plaintiff's 1.  It's document 5-1 that was

4        filed with the complaint in the federal case.  It

5        is -- I believe that she'll testify it is the

6        MetLife 2006 policy.  Most of them have the

7        Bates-stamp, this one does not because it was

8        attached to the complaint.  It's listed as pages 2

9        through 37 from document 5-1 in case 3:11-CV-80.

10                MR. MELNICK:  Okay.

11                MR. ROSENTHAL:  Okay, sorry about that.

12                MR. MELNICK:  Just so I'm clear, which

13        Exhibit Number is it?

14                MR. ROSENTHAL:  I apologize, Wayne, I

15        don't have the exhibit cover sheet attached with

16        it.

17                MR. MELNICK:  Okay.  If we're talking

18        about the policy, then I think I know which

19        document you're talking about.

20                MS. BONDURANT:  There is a Bates labeled

21        copy of a policy in the documents that MetLife

22        produced.  I don't have it with me, but if you

23        want to just --

24                MR. ROSENTHAL:  When we take a break, I'll

25        make sure that we identify exactly what it is.  I

Kathleen M. M. Medeiros - June 12, 2012

36

1           think almost all the rest of them are

2           Bates-stamped.

3                   MR. MELNICK:  Okay.

4                   MR. ROSENTHAL:  Sorry about that, Ms.

5           Medeiros.

6    Q.    Plaintiff's 1, do you recognize the document?

7           A.  Yes, I do.

8    Q.    Can you describe the document for me?

9           A.  It's the policy, actual physical policy.

10   Q.    And that's the policy at issue in this case?

11          A.  Yes.

12   Q.    And what is the policy number of the case, what is

13          the number identified on Plaintiff's 1?

14          A.  206153777USU.

15   Q.    Is this the policy that you dealt with from

16          November 2010 until June 2011 regarding the death

17          of Steven Taraszka and payment of life insurance

18          proceeds relating thereto?

19          A.  If that's the number on my correspondence

20          then, yes, that would be it.

21   Q.    Well, do you recognize this policy?  Have you seen

22          it before?

23          A.  No, I have not.

24   Q.    Okay.  So, you've never reviewed the underlining

25          life insurance policy that the claim was made on?

Kathleen M. M. Medeiros - June 12, 2012

37

 1          A.   I have reviewed the application.

 2    Q.    Okay.  So, the application is different than the

 3          policy?

 4          A.   Yes.

 5    Q.    Okay.  All right.  Flip over to the top right-hand

 6          corner, it's identified as pages 32 of 37 through

 7          37 of 37, the last five pages of Plaintiff's 1.

 8          A.   Yes.

 9    Q.    Take a look at those pages of Plaintiff's 1 and

10          tell me if you recognize those.

11          A.   I recognize the form, yes.

12    Q.    Have you reviewed this particular form in this

13          case?

14          A.   I probably did to verify the beneficiary.

15    Q.    Okay.  And how would you verify the beneficiary?

16          A.   I would bring it up on my system, bring up the

17          application, and go to the page that has the

18          beneficiaries designated.

19    Q.    Is that page included in Plaintiff's 1?

20          A.   Yes, it is.

21    Q.    Can you direct me to that, please?

22          A.   Well, if you use the numbers at the top, it's

23          page 34.

24    Q.    Page 34 of 37?

25          A.   Yes.

1    Q.    Okay.  And on page 34 of 37, who is identified as

2          the primary beneficiary on this policy?

3          A.  Kellie W. Graziosi.

4    Q.    Okay.  And as senior claims approver for MetLife,

5          this is how you would determine by looking at this

6          document who is the primary beneficiary?

7          A.  This is one step.

8    Q.    Okay.  What are the other steps?

9          A.  I would check our electronic beneficiary

10         system to make sure it still shows Ms. Graziosi as

11         the beneficiary.  If it does not, I would look for

12         a beneficiary change.

13   Q.    In this case, did you do that?

14         A.  Yes, I did.

15   Q.    And what were you able to determine as to who was

16         the primary beneficiary on this policy, the policy

17         that we have here as Plaintiff's 1, policy

18         20615377USU?

19         A.  Kellie Graziosi.

20   Q.    Okay.  In your review of the file -- you told me

21         earlier that you reviewed the file to prepare for

22         today, but at the time of it handling this claim,

23         in review of the file, did you find anything else

24         that would indicate that there was any other

25         primary beneficiary on this policy other than

Kathleen M. M. Medeiros - June 12, 2012

39

1       Kellie Graziosi?
2       A.  I would have to say no.
3    Q.  You're familiar with the fact that the insured of
4        this policy is a Steven Taraszka; correct?
5        A.  Yes.
6    Q.  And that he died in November of 2010?
7        A.  Yes.
8    Q.  At the time of his death in November of 2010, who
9        was the primary beneficiary on this policy?
10       A.  Kellie Graziosi.
11   Q.  Generally, what does MetLife do to require -- what
12       does MetLife require for someone to change who the
13       beneficiary is on a policy?
14       A.  That's interesting.  I know there's been some
15       updates but, presently, there is a form available
16       on, you know, metLife.com from our customer
17       service area that you can fill out and name a
18       beneficiary, a contingent, a trust, whatever.
19       It's a couple of pages, they sign it, and submit
20       it for approval.
21   Q.  Who has the authority to change beneficiaries of a
22       life insurance policy with MetLife?
23       A.  The policy owner.
24   Q.  In this case, was the policy owner Dr. Steven
25       Taraszka?

40

 1        A.  Yes.

 2   Q.   Are you aware of whether or not MetLife ever

 3        received any instruction from Dr. Steven Taraszka

 4        to change the primary beneficiary of this policy

 5        to anyone other than Kellie Graziosi?

 6        A.  As far as I know, no.

 7   Q.   Do you know when MetLife was notified that Dr.

 8        Steven Taraszka had died?

 9        A.  I think it might have been the end of November

10        or December.

11   Q.   Okay.  I'm going to ask you to take a look at what

12        I've marked as Plaintiff's 2.

13               (PLAINTIFF'S EXHIBIT 2 MARKED FOR I.D.)

14   Q.   All right.  Ms. Medeiros, I'm showing you

15        Plaintiff's 2 and, for the record, Plaintiff's 2

16        is MetLife 358 to 360.  Have you seen this

17        document before?

18        A.  Yes.

19   Q.   Okay.  Can you describe this document for me?

20        A.  This is the documentation of a call to the

21        customer service center of 800-638-5000.

22   Q.   Is this a type of document that you regularly see

23        in your duties and role as a senior claims

24        approver?

25        A.  No, it is not.

Kathleen M. M. Medeiros - June 12, 2012

41

| | | |
|---|---|---|
| 1 | Q. | Okay.  It's not.  All right, so, how is this |
| 2 | | document -- when would you see this document? |
| 3 | | A.  We don't see the document in this format, all |
| 4 | | right.  We would see the document -- a call to the |
| 5 | | 800 number would come down to us if a referral was |
| 6 | | necessary.  If the customer service rep was unable |
| 7 | | to answer their questions or process the |
| 8 | | transaction they wanted, they would send a |
| 9 | | referral over to the appropriate administrative |
| 10 | | unit. |
| 11 | Q. | I see, and for clarification, it's 358 to 361, |
| 12 | | it's four pages, I apologize.  Okay.  So, on |
| 13 | | Plaintiff's 2, the information contained within |
| 14 | | Plaintiff's 2, would you see that in your normal |
| 15 | | operations as a senior claims approver, the |
| 16 | | information about a phone call coming in, and it |
| 17 | | needing some sort of action? |
| 18 | | A.  This, we would never see. |
| 19 | Q. | Okay.  When have you seen this document before? |
| 20 | | A.  I've seen documents like this on a regular |
| 21 | | basis, but this particular case, I saw yesterday. |
| 22 | Q. | I see.  Okay, all right.  Does this document |
| 23 | | indicate that a call came in concerning the death |
| 24 | | of Dr. Steven Taraszka?  Are you able to review |
| 25 | | this document and understand it based upon your |

Kathleen M. M. Medeiros - June 12, 2012

```
 1          duties and roles as a senior claims approver?
 2          A.  Yes, I am.
 3   Q.     What does this call log indicate in terms of
 4          information coming in?
 5          A.  David Morgan called in as a broker and called
 6          in just to report the death of the insured.
 7   Q.     And what date does it indicate that the call came
 8          in on Plaintiff's 2?
 9          A.  November 22nd.
10   Q.     But you wouldn't have actually taken this call, it
11          would have come into some sort of 800 call center?
12          A.  Yes.
13   Q.     Once the information came into MetLife on November
14          22nd that Dr. Taraszka had passed away what, then,
15          would MetLife do next to facilitate payment under
16          this policy?
17              MS. BONDURANT:  Let me just object to the
18          form of the question to the extent it may be
19          beyond, you know, her knowledge.  I mean, you can
20          ask her what she would do once she got assigned
21          the claim, but I don't know if you're asking her,
22          generally, what MetLife does after somebody calls
23          in.  I don't know if she can testify to that.  I
24          mean, she can tell you what she knows, but I
25          object to it being overly broad.
```

Kathleen M. M. Medeiros - June 12, 2012

43

1   Q.   You can answer.  I'm just trying to understand.
2        After a call comes in and someone has died, what
3        happens next, if you know?
4        A.  It would depend on the caller.  You know, if
5        someone calls in to report the death of a family
6        member, the 800 number will take the information
7        down, enter the claim on the system and send out
8        claim forms.  When a broker or an agent calls in,
9        they enter the claim but, usually, we assume that
10       the broker or the agent is going to go out and
11       take care of getting the forms in.
12              MS. BONDURANT:  For the record, that's why
13       I object.  It's overly broad to ask her just
14       generally what happens with every single claim
15       that comes in.  They're all handled differently
16       depending on the circumstances, and I want to make
17       sure the record is clear as to that point.  So,
18       generally -- the standard question asking for
19       generally and standard, I think, are
20       objectionable.
21  Q.   Okay.  Do you know David Morgan, the broker, in
22       this case?
23       A.  No, I do not.
24  Q.   Have you ever dealt with him before, prior to this
25       case, if you know, if you recall?

44

1          A.   I don't recall.

2    Q.    Okay.  When did you first learn of the claim at

3          issue here in this case that Dr. Steven Taraszka

4          had died and that MetLife had a policy insuring

5          his life?

6          A.   I was probably asked to work on the MLI USA

7          queue in the BOSS system, and when I went to hit,

8          "get next case," this one came up.

9    Q.    So, it would have been randomly assigned to you?

10         A.   Random, yes.

11   Q.    And can you just explain what you just said, the

12         MLI USA queue?

13         A.   The BOSS system is replaced, physical files,

14         all right, that's where all of our correspondence

15         is scanned in and indexed by policy number, and

16         they're all categorized by the type of policy and

17         amounts, to determine who would handle it.

18         Whether be a initial processor, a correspondent or

19         a senior, and it also would go by company.

20              You have the MetLife, you have New England,

21         you have MLI USA, and they're all different --

22         they're different access, they're different

23         queues.  That's what they call them, is queues.

24         So, I was asked to work on the -- probably asked

25         to work on the MLI USA queue, which usually does

1          not have many policies in it and, in doing so,

2          that came up random.

3     Q.   So, this was an MLI USA policy?

4     A.   Yes.

5     Q.   So, when you say queue, you mean as in standing in

6          line queue?

7     A.   Yeah, they call them the queues.

8     Q.   Got it, okay.  When you first received this

9          assignment of this claim, what did you do?  The

10         claim at issue here on Dr. Steven Taraszka's life.

11    A.   Whatever piece of correspondence came in, I

12         worked on it.

13    Q.   I'm going to show you what I'm marking as

14         Plaintiff's 3.

15              (PLAINTIFF'S EXHIBIT 3 MARKED FOR I.D.)

16    Q.   It's MetLife 96, for the record.  Take a look at

17         this document and tell me if you recognize it.

18    A.   It's a letter I sent out.

19    Q.   Okay.  And when did you send this letter out?

20    A.   December 8th.

21    Q.   And who did you send this letter to?

22    A.   Kellie Graziosi.

23    Q.   Okay.  And why did you send this letter?

24    A.   Well, there obviously had to be something that

25         came in, asking me to do it.

Kathleen M. M. Medeiros - June 12, 2012

46

1   Q.   Okay.  So, you wouldn't have sent this letter out
2        sort of unannounced?  You would have sent it at
3        the request of someone?
4        A.   Right.
5   Q.   Do you recall if she called in to you requesting
6        that?
7        A.   Well, after review from the case, I think it
8        was a call from David Morgan that prompted me to
9        send it out.
10  Q.   Do you recall on what day that call came in from
11       David Morgan?
12       A.   Somewhere around December 8th.
13              MR. ROSENTHAL:  I'm going to show you what
14       I'll mark as Plaintiff's 4.
15              (PLAINTIFF'S EXHIBIT 4 MARKED FOR I.D.)
16  Q.   Plaintiff's 4, for the record, MetLife 354 to 357.
17       Take a look at Plaintiff's 4 and tell me if you
18       can -- if you recognize that document, number one.
19       A.   Well, it was a call taken by the customer
20       service center, and by looking at the top, there
21       was a referral sent down, which means I did get a
22       referral.  They look different when we get them,
23       all right, they're not as jumbled as this.  Oh, it
24       was David Graziosi who called.
25  Q.   And if you look on the last page, page 4 of 4.

```
 1          A.  That's wrong.
 2    Q.    You recall Mr. Morgan calling in.  Is it possible
 3          that there's just a typo.  Mr. Morgan called in
 4          and then you sent out a new packet?
 5          A.  Right.  Because, here, they're saying field
 6          representative, and then they're saying, David
 7          Morgan, and it says, "Please send claim form to
 8          the beneficiary," and that was on the 6th, so it
 9          was from him.
10    Q.    So, Mr. Morgan calls in asking for a claim packet,
11          and then you send it out directly to Ms. Graziosi?
12          A.  Yes, I did.
13    Q.    And that's what is Plaintiff's 3.  It was a cover
14          of -- it was your letter to her sending out the
15          claims packet on December the 8th?
16          A.  Yes.
17    Q.    All right.  After you sent out the claims packet
18          on December 8th under cover of Plaintiff's 3, what
19          did you do next on this claim for the life
20          insurance proceeds of Dr. Steven Taraszka?
21          A.   I would have pended the case until the next
22          piece of correspondence came in.
23    Q.    What does that mean?
24          A.   That we take the BOSS system and we set a call
25          up that, okay, we wrote out, that gives me credit
```

```
 1          for doing work, and that if we don't receive a
 2          prompt reply in thirty days, then, we follow-up.
 3    Q.    When -- in this case, when would calls -- how
 4          would people related to this case know to call you
 5          versus just calling the 800 number?  I'm trying to
 6          understand how calls would come directly to you
 7          versus coming into this 800 number and getting a
 8          call log like we've looked at?
 9    A.    They would have to have my number off some
10          piece of correspondence.
11    Q.    And I assume that your correspondence, like,
12          Plaintiff's 3, does it have your direct dial on
13          it?
14    A.    Yes, it does.
15    Q.    Okay.  All right.  In December of 2010, do you
16          recall -- who did you speak with, outside of
17          MetLife, about this case other than -- well, who
18          did you speak with, outside of MetLife, in
19          December of 2010?
20    A.    I'd have to see the file to recall who I spoke
21          to when.
22    Q.    Okay.  Does the file have some sort of notes or
23          records of yours that indicate whom you spoke with
24          and on what day?
25    A.    Anytime I take a phone call on a case, I
```

Kathleen M. M. Medeiros - June 12, 2012

49

```
 1          document it.
 2   Q.    And when you document it, where does that record
 3          go, which program does it go into?
 4          A.   If I'm working on a paper case, there is a
 5          paper file initialed by me that's put in the case,
 6          a typed memo, and I also note both CDI and BOSS in
 7          the comments area that I took a call.
 8   Q.    When is a file considered a paper case?
 9          A.   When, you know, there's a possibility of
10          extensive handling.
11   Q.    Okay.  And the policy at issue here, it became a
12          paper case; correct?
13          A.   Normal practice for me is that if a case
14          appears to be an adverse situation, I establish a
15          paper file.
16   Q.    Okay.  When did you establish a paper file in this
17          case?
18          A.   I'd have to look at my file.
19   Q.    When did you determine that there was an adverse
20          situation on this policy?
21          A.   I would say the possibility was when I got the
22          first letter.
23   Q.    And which letter are you referring to?
24          A.   An attorney's letter.
25   Q.    Okay.  First letter from an attorney?
```

1        A.   From an attorney.

2   Q.   Okay.  Have you ever spoken with Kellie Graziosi

3        directly?

4        A.   Not that I recall.

5   Q.   Have you ever spoken with any Taraszka family

6        member directly?

7        A.   No, I don't think so.

8   Q.   Okay.  So, you've spoken with lawyers, and I know

9        that just from looking at it, and David Morgan,

10       but in terms of like the actual parties

11       themselves, Ms. Graziosi or any of the Taraszka

12       family members, have you ever had phone

13       conversations directly with any of them, to your

14       knowledge?

15       A.   To my knowledge, no.

16  Q.   Okay.  Plaintiff's 5.

17            (PLAINTIFF'S EXHIBIT 5 MARKED FOR I.D.)

18  Q.   For the record, Plaintiff's 5, MetLife 351 to 353.

19       Just briefly on this, another one of these call

20       log documents.  Would you have seen this call log

21       document when the call, or shortly after the call

22       came in?

23       A.   No, I would not.

24  Q.   Okay.  And how do you know which ones you would

25       have seen versus which ones you wouldn't have

1        seen?
2        A.   Under view case, you'll see this handling of
3        the case, and under contact, there's nothing else.
4        If this was sent up to us, you would see a
5        referral like you did on the call from David
6        Morgan.  You'll see under contact, you'll see that
7        a message was referred.
8    Q.   Okay.  So, if we can pull out Plaintiff's 4 and 5,
9        just kind of compare them to make sure I
10       understand this.  So, in Plaintiff's 4 -- let me
11       make sure I have your testimony correctly -- you
12       know that you saw Plaintiff's 4 because of the
13       line that says, Referral, 00000-24608-784?
14   A.   Yes.
15   Q.   Does that number have some sort of significance
16       that relates to you or --
17   A.   I think it's the number of the referral that
18       came down.
19   Q.   I see.  So, when it says referral, you would have
20       seen it, but if it doesn't say referral, then at
21       the time the call -- or shortly after the call
22       came in, you would not have gotten knowledge of
23       it?
24   A.   No, it was handled by the CSR.
25   Q.   Okay.  How about Plaintiff's 6?

Kathleen M. M. Medeiros - June 12, 2012

52

```
 1              (PLAINTIFF'S EXHIBIT 6 MARKED FOR I.D.)
 2              MR. ROSENTHAL:  For the record,
 3         Plaintiff's 6 is MetLife 339 to MetLife 350.
 4    Q.   Do you recognize this document?
 5         A.  Well, it's another call to the 800 number, and
 6         it looks like there was an inquiry sent down --
 7         no, there wasn't any.  It was a death claim
 8         inquiry, but it doesn't look like anything came
 9         down to us.
10    Q.   Okay.  So, this call that appears to be from Burke
11         Johnson on December 21, the records don't seem to
12         indicate that you would have gotten some sort of
13         knowledge, or e-mail, or note from this phone
14         call?
15         A.  We would not have gotten anything.
16    Q.   Okay.  Take a look at Plaintiff's 7.
17              (PLAINTIFF'S EXHIBIT 7 MARKED FOR I.D.)
18    Q.   MetLife 95 is Plaintiff's 7.  Have you seen this
19         before?
20         A.  Yes.
21    Q.   Okay.  And describe this document for me, if you
22         can.
23         A.  It's a letter that came in and was in our
24         system that, again, I was the one who hit "next,"
25         and got it.  It's a letter from Burke Johnson for
```

Kathleen M. M. Medeiros - June 12, 2012

53

 1         request to defer payment.
 2  Q.    At the top, there's some handwritten notes that
 3         say -- appear to say:  Received via fax, 12/22/10.
 4         Do you recognize that handwriting?
 5         A.  No, I do not.
 6  Q.    Okay.  Do you recognize the fax number that this
 7         number appears to have been sent to -- purports to
 8         have been sent to up towards the top under via
 9         certified mail?
10         A.  Oh, 827-3407, yes.
11  Q.    And is that a fax number that comes into the
12         office where you work?
13         A.   That is the fax number for MetLife Claims.
14  Q.    Okay.  Just, also, what's the office location
15         where you work?
16         A.  Warwick, Rhode Island.
17  Q.    Okay.  What's the address?
18         A.  700 Quaker Lane, Warwick, Rhode Island.
19  Q.    Okay.  Great, thank you.  That fax would come to
20         that office?
21         A.  Yes.
22  Q.    Do you recall when you received this document,
23         when you personally received this document, saw it
24         for the first time?
25         A.   Sometime after December 27th.

54

1   Q.   What is the ACS marking indication there on the

2       top of this?

3       A.  That's the vendor who handles all our work.

4       They open the mail, they take the faxes and have

5       them scanned into the system and, then, they're

6       accessible through the BOSS system to us.

7   Q.   So, letters that come in, you don't ever

8       physically see them right off the bat, they just

9       show up as a scanned image on your computer?

10       A.  If they're faxed or regular mail, I see them

11       as a scanned-in image.

12   Q.   Do you recall when you saw this after December

13       27th?

14       A.  Sometime after December 27th.

15   Q.   As a result of this letter coming in, what did you

16       do in regards to the handling and the processing

17       of this claim for the life insurance proceeds of

18       Dr. Steven Taraszka?

19       A.  I probably sent him a letter.

20   Q.   Okay.  Let me ask you this:  These phone

21       conversations that you have, not the ones with the

22       800 number but the ones you direct dial, are those

23       phone conversations electronically recorded?

24       A.  On my phone, no, they are not.

25   Q.   Are they on the 800 number, if you know?

1          A.   I thought they all were.  Don't quote me on

2          that.

3    Q.    All right.  But as to the phone conversations that

4          you had on your phone, if you know, are they

5          recorded?

6          A.   No, they are not.

7    Q.    Okay.  All right.  Let me show you what is

8          Plaintiff's 8.

9                    (PLAINTIFF'S EXHIBIT 8 MARKED FOR I.D.)

10   Q.    MetLife 94.  Do you recognize Plaintiff's 8?

11         A.   It's a letter that I wrote through the system.

12   Q.    Okay.  Why did you write this letter?

13         A.   It was in response to the letter from Burke

14         Johnson dated the 21st, because I acknowledged it

15         in my first sentence.

16   Q.    Okay.  Prior to receiving the letter on December

17         21st -- strike that.  Prior to writing the letter,

18         Plaintiff's 8 that is dated December 22nd, had you

19         spoken with Mr. Burke Johnson?

20         A.   I don't know.  I'd have to see my file.

21   Q.    All right.  Let me ask the question this way:  The

22         second paragraph towards the end of that sentence,

23         it says:  Payment will be deferred until this

24         matter can be rectified.  What was -- why did you

25         write that sentence that said the payment will be

Kathleen M. M. Medeiros - June 12, 2012

1      deferred until this matter can be rectified?

2      A.  Because of the statements in his letter asking

3      us to defer payment because there is an ongoing

4      investigation.

5   Q.   Okay.  Anything else?  Was there any other reason,

6      other than the fact that Plaintiff's 7 says that

7      there's an ongoing investigation and that they ask

8      you to defer payment?  Any other reason why you

9      indicated in your December 22nd letter,

10     Plaintiff's 8, that payment will be deferred until

11     the matter can be rectified?

12  A.   As far as I recall, that would be the only

13     reason.

14  Q.   So, at this point, on December 22nd, 2010, when

15     you indicated to Burke Johnson that payment on the

16     policy number referenced in that letter,

17     Plaintiff's 8, would be deferred until the matter

18     could be rectified, did you or MetLife have any

19     other knowledge about why payment should be

20     deferred as referenced in Mr. Johnson's letter to

21     you, Plaintiff's 7?

22  A.   No, we did not.

23  Q.   At that point when you received this letter, the

24     December 21 letter, and then you wrote back to

25     Mr. Johnson, did you -- what did you do next in

1          terms of processing this claim?

2          A.  I sent the letter and pended the file until

3          the next piece of correspondence came in.

4     Q.   Did you start any investigation to determine

5          whether or not payment should be made?

6          A.  No, I did not.

7     Q.   Did you investigate -- did you ask your supervisor

8          or anybody above you, you know, to do something

9          differently in terms of investigating the

10         circumstances surrounding the death of Steven

11         Taraszka, as referenced in Plaintiff's 7?

12         A.  No, I did not.

13              MS. BONDURANT:  Hey, Paul, when you get to

14         a stopping point, I want a rest room break.

15              MR. ROSENTHAL:  Okay, give me just a

16         minute and we'll do that.

17    Q.   Okay.  So, now, let me go back, and I'm not trying

18         to trip you up or trick you, I promise you, but

19         based upon the dates of these letters, is it a

20         fair assumption that you got this quicker than

21         December 27th?

22         A.  Yes, and I don't -- this is when it was

23         scanned in.  Unless I had it, it actually came to

24         my desk, I don't know.  I can't tell you.  I'd

25         have to look at my file to determine -- since this

1              is a fax, where's the other one, the original?  Is

2              this the original and I got the fax?  I'm probably

3              responding to the fax and this is the original.

4    Q.    Okay.  But, basically shortly after the letter was

5              received, you responded to Mr. Johnson and said,

6              we're going to defer payment until the matter can

7              be rectified?

8        A.   Right.

9    Q.    And you made that decision based solely upon his

10             statements contained in Plaintiff's 7, that

11             there's an ongoing investigation in the

12             circumstances surrounding the death of Steven

13             Taraszka, and that we hereby request that MetLife

14             defer payment on life insurance benefits at issue

15             pending the outcome of this investigation?

16       A.   Yes.

17   Q.    There's no other reason for you to make that

18             determination to defer payment, except for that

19             statement contained in Plaintiff's 7?

20       A.   Yes.

21             MR. ROSENTHAL:  All right, let's take a

22             break.

23             (A SHORT RECESS WAS TAKE AT 11:17 A.M.)

24   Q.    Ms. Medeiros, at or at the time this letter came

25             in, do you recall whether or not you had a phone

1          conversation with Mr. Johnson?
2          A.   I'd have to see the file because it would be
3          noted in the file.
4     Q.   And you keep saying that you'd have to see the
5          file, and I know that several things have been
6          produced and some of those pages maybe in here and
7          we'll get to them, but when you say the file, is
8          that a physical file?
9          A.   Everything that's been printed down -- I'd
10         have to see the steps that are in the file, you
11         know, to say if I received a call when.  I know
12         there's a few phone calls in there, but I don't
13         recall off the top of my head who I spoke to when.
14    Q.   I understand, but when you say that you need to
15         see the file, do you mean by looking at the
16         computer system at your desk, or looking in a
17         physical file of paper?
18         A.   Either one.
19    Q.   Okay.  All right.  Let me show you Plaintiff's 9.
20         This is a little different looking form, so I'm
21         not sure if it's one that came in to you or not.
22         Plaintiff's 9 is MetLife 93.
23              (PLAINTIFF'S EXHIBIT 9 MARKED FOR I.D.)
24    Q.   Take a look at this and tell me if you recognize
25         it.

Kathleen M. M. Medeiros - June 12, 2012

60

1        A.  Yes.  See these, when it's referred, this is

2        what it looks like.

3   Q.   Okay.

4        A.  So, when your case -- teleservicing notes,

5        when they do a referral, this is the way it comes

6        down.

7   Q.   So, these other call logs that we're looking at

8        like, Plaintiff's 2 or Plaintiff's 4, Plaintiff's

9        5, if you, as the senior claims approver got the

10       referral, then --

11       A.  It would look like this.  This is what we get

12       if there's a referral.

13  Q.   It looks like Plaintiff's 9?

14       A.  Yes, it looks like 9 when it's referred.

15  Q.   Okay.  So, now, specifically going to Plaintiff's

16       9, have you seen this document before?

17       A.  I would have, yes.

18  Q.   Okay.  All right.  Tell me, when did you see this

19       document first?

20       A.  It would have been when I was working the

21       case.  I would have to say I probably saw it,

22       because if I remember correctly other than, you

23       know, when it was first entered, I was the only

24       one who saw the case, worked the case.

25  Q.   And are these notes of a phone conversation that

1          you had or that someone else had?

2          A.   This is a note of the conversation that the

3          customer service rep had with David Morgan, and

4          she is sending it down.  I had a conversation, and

5          he wants somebody to get back to him.

6     Q.   I see.  So, these notes are her notes taken from a

7          phone conversation with David Morgan?

8          A.   Yes.

9     Q.   And then you received this document --

10         A.   Yes.

11    Q.   Through your computer system?  After you received

12         it, what did you do, if anything?

13         A.   I'd have to, again, see my file, but I would

14         have to have responded one way or another.  It's

15         not something I would just ignore.

16    Q.   Okay.  And at the end of these notes, it says:

17         Explained, will send a referral to see what can be

18         done.  Can you explain to me what that means, if

19         you know?

20         A.   That the customer service rep noted above told

21         him that she would send a referral down to the

22         claims unit and get back to him to see what can be

23         done.

24    Q.   Which is, sending it to you?

25         A.   And then she sent it down to us, and this is

1          what I got.
2     Q.   And in this contact, it talks about not providing
3          information to anyone other than the named
4          beneficiary, or him, as the agent.  Have you --
5          strike that.  When you received this
6          documentation, Plaintiff's 9, did you change the
7          way that you communicated with persons relating to
8          this claim other than the named beneficiary or
9          their agent?
10    A.   No, I did not.
11    Q.   Why not?
12    A.   Because we're on notice for a legal
13         representative of the insured's family, you know,
14         protesting payment, or questioning anything we're
15         doing and, so, I'm giving them the opportunity as
16         an interested party on behalf of the family, okay,
17         what are your concerns before we proceed with this
18         claim?
19    Q.   What contractual obligations, if any, under the
20         policy did MetLife have with the family of Dr.
21         Steven Taraszka?
22              MS. BONDURANT:  Objection to the form of
23         the question.
24    A.   Contractual, none.
25    Q.   You told me earlier that the owner of the policy

63

1          was Dr. Steven Taraszka; correct?

2          A.  Yes.

3     Q.   And that the primary beneficiary of the policy was

4          Kellie Graziosi?

5          A.  Yes.

6     Q.   Did MetLife have any type of relationship with any

7          of the family members of Dr. Steven Taraszka, if

8          you know?

9          A.  Not that I know of.

10    Q.   Okay.  But, regardless, because they had in

11         Plaintiff's 7 said that they were investigating

12         the circumstances surrounding Dr. Steven

13         Taraszka's death, you were going to defer payment

14         and engage in conversation with them about that

15         investigation?

16              MS. BONDURANT:  Object to the form of the

17         question.

18         A.  Yes.

19    Q.   After you received Plaintiff's 9 through your

20         computer system, did you call David Morgan and

21         talk with him directly?

22         A.  I may have.  I know I did talk to him at one

23         time.  Whether it was in response to this

24         particular memo, I'm not sure.

25    Q.   When you spoke with him, did you talk about this

64

1              issue of not communicating with individuals other
2              than the named beneficiary and him, as the agent,
3              on the file?
4         A.   Exactly what was said, I cannot recall.
5    Q.   Take a look at Plaintiff's 10.
6                   (PLAINTIFF'S EXHIBIT 10 MARKED FOR I.D.)
7    Q.   Plaintiff's 10 is MetLife 88 through 92.  I know
8              these may be a little bit out of order, Ms.
9              Medeiros, but this is how they came to us.  Take a
10             look at Plaintiff's 10 and tell me if you
11             recognize it.
12        A.   Yes, I do.
13   Q.   Can you identify Plaintiff's 10, these five pages
14             for me, please?
15        A.   The death certificate for Dr. Taraszka, the
16             claim form from Ms. Graziosi, and it looks like it
17             was overnighted to us.  Yes, it was, it was from
18             the agent.
19   Q.   Okay.  So, the last page is just a copy of the
20             FedEx ticket?
21        A.   Yeah, it's a copy of the UPS second day air.
22   Q.   Okay.  When -- have you seen this Plaintiff's 10
23             before?
24        A.   When it was received.
25   Q.   Do you recall when that was?

Kathleen M. M. Medeiros - June 12, 2012

65

1        A.  Well, it was received in our office on January

2        10th.

3   Q.   And how do you know that?

4        A.  It is stamped, January 10th.

5   Q.   Okay, I see.  That's on MetLife 90, the third page

6        at the top in the middle, is that the designation,

7        ACS?

8        A.  Yes.

9   Q.   Okay.  So you would have seen it sometime on or

10       shortly after January 10th, 2011?

11       A.  Yes, I would.

12  Q.   Okay.  When this claim form came in on this file

13       for this policy insuring the life of Steven

14       Taraszka, what did you do next?  What would you

15       have done with this Plaintiff's 10 when it came

16       in?

17       A.  On this particular case, since there was

18       already on file a letter from an attorney, I would

19       have written both parties a letter.

20  Q.   Okay.  And why would you have done that?

21       A.  MetLife has already been put on notice that

22       there is some concerns about this policy, and at

23       this time, I took the opportunity to advise the

24       beneficiary that we've been contacted by an

25       attorney who is, you know, concerned about payment

1           of this policy, and I wrote to the attorney and I
2           said:  We've received a claim, how do you intend
3           to proceed?  Can you reach an agreement, or how do
4           you intend to proceed?
5    Q.     Okay.  When this claim form came in, did you
6           review it, the death certificate, the claim form,
7           those sorts of things, did you review these
8           documents?
9           A.  Oh, yes, I would review everything that came
10          in because if something were missing, I would take
11          the opportunity when I'm writing the letter to ask
12          for it rather than wait and, say, by the way, we
13          need this.  I review it and, then, if I need
14          anything, I take care of that when I write out the
15          letter.
16   Q.     At or near the time that this document,
17          Plaintiff's 10 came in to you in January 2011, did
18          you review this document to determine whether or
19          not everything was in order, or there was anything
20          needed or missing?
21          A.  If I recall, everything was in order with
22          regards to the death certificate and the claim
23          form.
24   Q.     Okay.  And, so, when you received Plaintiff's 10
25          sometime in early January 2010, was there anything

Kathleen M. M. Medeiros - June 12, 2012

67

```
 1              else in terms of paperwork submission that Ms.
 2              Graziosi needed to do in order to -- in order for
 3              payment to be made on the life policy at issue
 4              here?
 5         A.   On her part, there would be nothing that she
 6              would need to do.
 7    Q.   So, this claim form in Plaintiff's 10 was
 8              sufficient and satisfactory for her to get payment
 9              under the policy?
10         A.   Yes.
11    Q.   And the tendering of this death -- the certified
12              copy of the death certificate was sufficient for
13              her to get payment under the life policy?
14         A.   Yes.
15    Q.   Okay.  Did you review the death certificate itself
16              to determine anything in particular that would
17              affect your decision on paying the claim?
18         A.   I would review the death certificate for date
19              of birth, to make sure it is on our insured, that
20              the date of death is correct in our records, and I
21              go down and check the manner of death to make sure
22              that it's not pending, or if it's not a homicide.
23    Q.   Okay.  And were you able to determine what was
24              indicated as the manner of death on this death
25              certificate?
```

68

1      A.   Yes.

2  Q.   And what manner of death was indicated on Dr.

3       Steven Taraszka's death certificate?

4      A.   Accident.

5  Q.   Okay, Plaintiff's 10.  With the manner of death

6       being indicated as an accident on the death

7       certificate, would there be any reason, based upon

8       that indication, for payment to be deferred once

9       the death certificate indicated that the cause of

10      death was accident?

11     A.   If we were not on notice of the information

12      that I had, the attorney's letter and their

13      concerns, if we were not on notice, everything

14      would be fine.

15 Q.   Okay.  So, if the attorneys hadn't -- if Mr.

16      Johnson hadn't put you on notice that they were

17      investigating the circumstances surrounding Dr.

18      Steven Taraszka's death and that they had asked

19      you to defer payment, if they hadn't done that via

20      Plaintiff's 7 back on December 21st, 2010, then

21      once Plaintiff's 10 came in, the claim form and

22      the death certificate, you would have then

23      processed the payment for Ms. Graziosi?

24     A.   In all probability, yes.

25 Q.   Once Plaintiff's 10 came in and you had that

Kathleen M. M. Medeiros - June 12, 2012

1           letter, Plaintiff's 7, about investigating the
2           facts and circumstances surrounding the death of
3           Dr. Steven Taraszka, did you initiate any sort of
4           investigation as to the cause of death of Dr.
5           Steven Taraszka?
6           A.  No, I did not.
7    Q.     Do you know if anyone at MetLife did anything to
8           determine what the cause of Dr. Steven Taraszka's
9           death was?
10          A.  No.  Primarily, I was the only one handling
11          it.
12   Q.     Since 1991, as a senior claims approver, have you
13          ever dealt with a file where MetLife would deal
14          with some sort of disputed claim and then they
15          would, on their own, investigate causes of death
16          independently of a coroner or some sort of law
17          enforcement agency?
18          A.  We do investigate deaths.  It's normal in
19          cases that have to be investigated, and it has
20          nothing to do with it being an adverse.  We have
21          investigative staff that would do any inquiries
22          that we need.
23   Q.     So, this type of case where some family members
24          sent a letter saying don't pay, you call that an
25          adverse case?

70

1          A.  On this particular case, it's just a term that
2          we would use, but in this particular case, we're
3          getting an attorney coming in on behalf of his
4          family.  So, we're looking at a party of interest,
5          and he's coming in saying, we have some concerns
6          surrounding his death, could you defer payment?
7          You know, and being an attorney and representing a
8          family, that's what we did.
9     Q.   But in terms of investigating the actual death
10         itself, you said you primarily worked the file.
11         Do you have any knowledge if MetLife, or anyone on
12         MetLife's behalf, investigated the death of Dr.
13         Steven Taraszka?
14         A.   No, and there would be no reason to
15         investigate it from MetLife's point of view at
16         that time, no.
17    Q.   Why would there be no reason for MetLife to
18         investigate the cause of death of Dr. Steven
19         Taraszka?
20         A.  Because it's ruled an accident and everything
21         else is in order.
22    Q.   Okay.  Plaintiff's 11.
23              (PLAINTIFF'S EXHIBIT 11 MARKED FOR I.D.)
24    Q.   MetLife 86.  Take a look at Plaintiff's 11 and
25         tell me if you recognize this document.

Kathleen M. M. Medeiros - June 12, 2012

71

```
 1        A.   This is a letter I sent.
 2   Q.   Okay.  Do you recall sending this document?
 3        A.   Yeah, I sent it.
 4   Q.   And what's the date of the document?
 5        A.   January 11th.
 6   Q.   Okay.  Who did you send the document to?
 7        A.   Ms. Kellie Graziosi.
 8   Q.   Okay.  And why did you send her this letter?
 9        A.   In response to the receipt of her claim and
10        the letter from Attorney Johnson.
11   Q.   Okay.  And what did you tell Ms. Graziosi in this
12        letter?
13        A.   Basically, that we were contacted by Attorney
14        Johnson who is representing the insured's estate,
15        and he has asked us to defer any payments because
16        he's making inquiries into the death of the
17        insured, and that we are notifying Attorney
18        Johnson that her claim had been received.
19   Q.   Okay.  There, at the end of that second paragraph
20        in that last sentence, you say:  Attorney Johnson
21        is being notified that we have received your claim
22        and are ready to proceed.  What do you mean by the
23        words, "are ready to proceed" in this letter,
24        Plaintiff's 11?
25        A.   Well, that would be stated in my letter to
```

Kathleen M. M. Medeiros - June 12, 2012

72

1           Attorney Johnson that what are you going to send

2           in?  We have a claim here that is in good order.

3     Q.    So, at the time that you sent this letter, January

4           11th, 2011, Ms. Graziosi's claim was in good order

5           to be paid except for the fact that Mr. Johnson

6           had said, no, please don't pay, we're

7           investigating the death?

8     A.    Right, right.

9     Q.    Plaintiff's 12.

10                (PLAINTIFF'S EXHIBIT 12 MARKED FOR I.D.)

11    Q.    Plaintiff's 12 is MetLife 87.  Take a look at this

12          document and tell me whether or not you recognize

13          it.

14    A.    It's a letter that I sent to Attorney Johnson.

15    Q.    Dated the same day, January 11th, 2011?

16    A.    Yes.

17    Q.    Okay.  And why did you send this letter to

18          Attorney Johnson on January 11th, 2011?

19    A.    I put him on notice that we received a claim

20          from Ms. Graziosi and that's, obviously, in good

21          order, ready to make payment, and I asked if they

22          had any objections for us to proceed.  If he still

23          wishes to defer payment, you know, we need to be

24          restrained.

25    Q.    Okay.  So, in that first sentence, second

Kathleen M. M. Medeiros - June 12, 2012

73

1        paragraph, the last half of it says:  We are

2        legally obligated to make payment.  What did you

3        mean by that statement in Plaintiff's 12?

4        A.   She's the beneficiary, the claim is in good

5        order.  She's met her obligations of sending in a

6        certified death certificate and a claim form.

7   Q.   So, the claim is ready to be paid?

8        A.   The claim is ready to be paid.  If you still

9        object, you know, let us know.  We're not just

10       going to go pay it.  I'm going to give him -- he

11       has concerns, so I'm going to let him know that

12       the claim is received, what are you going to do

13       about it?

14  Q.   Look back over to Plaintiff's 1 for a second for

15       me, if you can.  If you know, I'd like for you to

16       point to me -- we identified this as the life

17       insurance policy on Dr. Taraszka.  If you know

18       what's contained in there, can you point to me

19       where in the policy it indicates or states that

20       MetLife has the discretion to wait on a

21       third-party as to whether or not to pay a claim

22       after an insured has passed away, and the

23       beneficiary has submitted the appropriate

24       documentation for payment?

25              MS. BONDURANT:  I object to the form of

Kathleen M. M. Medeiros - June 12, 2012

74

1          the question.

2    Q.    You can answer, if you know.

3               MS. BONDURANT:  I object to the form of

4          the question to the extent that the law allows

5          MetLife that obligation or that right.  She can

6          testify about what the policy says, but I want to

7          make sure the record is clear that there's

8          applicable law that allows MetLife to do what it

9          did.

10   A.    There's very little in here about death

11        benefits.  It basically just says what we pay.

12   Q.    Okay.

13   A.    It doesn't give what requirements are needed

14        to make payment.

15   Q.    Okay.  So, is Plaintiff's 12, basically, if I've

16        got this right, Plaintiff's 11 and Plaintiff's 12

17        were sent out on the exact same day?

18   A.    Yeah.

19   Q.    One to the beneficiary and one to these objecting

20        third-party individuals?

21   A.    Yes.

22   Q.    Through their lawyer?

23   A.    Through their lawyer.

24   Q.    And you tell Ms. Graziosi everything is in order,

25        please be patient.  You tell Mr. Johnson, Ms.

Kathleen M. M. Medeiros - June 12, 2012

1          Graziosi's claim is in order and ready to be paid,
2          please let me know if you have an objection.  Or
3          if he wishes to defer payments, we will need to be
4          legally restrained.  Why did you tell Mr. Johnson
5          in the January 11th letter that MetLife would need
6          to be legally restrained if they wished for
7          payments to Ms. Graziosi to be deferred?
8     A.   I don't know.  Basically a statement, if you
9          wish to proceed with this, you're going to have to
10         give us some kind of legal basis for us to
11         continue to defer it.
12   Q.   So, basically on January 11th, you were telling
13         Mr. Johnson that if this third-party objector, the
14         Taraszka family wanted MetLife to not pay, they
15         were going to have to give MetLife some sort of
16         legal basis to not do it?
17    A.   Yes.
18   Q.   Did any of the Taraszka family, through counsel,
19         ever provide MetLife any of these legal basis, to
20         use your words, to not pay Ms. Graziosi?
21              MS. BONDURANT:  Objection to the question,
22         to the extent it calls for a legal conclusion.
23   Q.   If you know?
24    A.   I got another letter, I think this time from a
25         different attorney.  I'd have to review the basis

1        of that letter.

2    Q.   Other than the letters that you got from the

3         attorneys, did you receive anything else that says

4         MetLife is restrained from paying these proceeds

5         to Ms. Graziosi?

6             MS. BONDURANT:  Object to the form of the

7         question.  To the extent she even knows what

8         legally restrained means.  In the context you're

9         using it, I think it calls for a legal conclusion.

10        She can tell you what she got, and what she did,

11        and that's all she can tell you.  She cannot

12        interpret legally restrained or tell you what that

13        complaint that came -- whether that was restrained

14        or not what she thought it was.

15            So, you know, I think you're crossing the

16        line here.  She's not a lawyer, she's handling the

17        claim.  You can ask her what she intended and what

18        she got, but you can't ask her for a legal

19        interpretation of what legally restrained meant or

20        what the contents of that complaint that she got

21        did, vis-à-vis, MetLife.

22   Q.   I'm using your words, Ms. Medeiros.  You used the

23        words, legally restrained.  You told Mr. Johnson

24        that in order to defer any payments, we will need

25        to be legally restrained.  What did you mean by

Kathleen M. M. Medeiros - June 12, 2012

77

1          that in the last sentence of your letter, January
2          11th, Plaintiff's 12?
3          A.  Usually, basically some kind of a court
4          document which we did get in.
5     Q.   So, you got in a court document and because you
6          got in a court document, that meant that --
7          A.  It is out of my hands.
8     Q.   It's out of your hands, okay.  Plaintiff's 13.
9                  (PLAINTIFF'S EXHIBIT 13 MARKED FOR I.D.)
10    Q.   MetLife 85.  Take a look at this document and tell
11         me if you recognize it.
12         A.  It was a letter received by us on January
13         24th.
14    Q.   Okay.  And do you recall receiving this document
15         while working on this file, the Taraszka policy?
16         A.  If it's in the file then, yes, I did review
17         it.
18    Q.   Okay.  Did you have any -- let me ask it this way:
19         In January of 2011, did you have phone
20         conversations with Mr. Burke Johnson, or was this
21         all just communicated via letters?
22         A.  Honestly, I don't know if I ever talked to
23         Mr. Johnson.  I'd have to see my phone memos that
24         are in the case if I spoke to him.
25    Q.   All right.  In this letter, it indicates that

78

1          there's discussion of continuing to investigate

2          the death of Dr. Taraszka and, again, requesting

3          MetLife to defer payment of the life insurance

4          pending the outcome of this investigation.  As a

5          result of receiving this letter, what did you do

6          in regards to processing the claim of Ms. Graziosi

7          submitted on the life of Dr. Taraszka?

8          A.  I would have responded to this and I would

9          continue to defer payment.

10  Q.    Okay.  Does Plaintiff's 13 contain any new or

11         different information than Plaintiff's 7, as to

12         the basis or the reasons for deferring payment?

13         A.  No, it says that they're continuing to

14         investigate his death.

15  Q.    Okay.  But you would still continue to defer the

16         payment?

17         A.  Yes.

18  Q.    Did you ever -- well, let me strike that.  After

19         receiving Plaintiff's 13, did you ever ask Mr.

20         Johnson or anyone else on behalf of the Taraszkas

21         for specific information as to, you know, why they

22         were investigating the death, or why MetLife

23         should defer payment?

24         A.  I'd have to see my letter.

25  Q.    Okay.  I think we'll get to it.

Kathleen M. M. Medeiros - June 12, 2012

79

1      A.   Yeah, I know you will.

2  Q.   Okay.  When you got this letter, Plaintiff's 13,

3       sometime late January 2011, did you have any new

4       information about the death of Dr. Taraszka, or

5       anything that would change other than the lawyer

6       showing up saying, please defer payment?  Was

7       there anything different that would change the

8       fact that the claim was in order and payment was

9       ready to be made to Ms. Graziosi?

10          MS. BONDURANT:  Objection to the form of

11       the question to the extent that -- it seeks to

12       suggest that a lawyer showing up again was not

13       sufficient basis for her to defer payment.

14          MR. ROSENTHAL:  Okay, I'll rephrase the

15       question.

16  Q.   Other than -- when you received this letter,

17       Plaintiff's 13, again, other than these lawyers

18       asking you to defer payment, was there any other

19       reason to not pay Ms. Graziosi?

20      A.   As far as I recall, no.

21  Q.   Let's take a look at Plaintiff's -- actually,

22       let's skip that.  Okay, Plaintiff's 14.

23          (PLAINTIFF'S EXHIBIT 14 MARKED FOR I.D.)

24  Q.   Plaintiff's 14 is MetLife 82 to 84.  Have you seen

25       this document, Plaintiff's 14?

80

1          A.   Yes.

2     Q.   Okay.  Can you identify this document for me?

3          A.   It's a letter from Attorney Kilburn who

4               represents Kellie Graziosi.

5     Q.   And do you recall receiving this letter sometime

6               on or around January 20th?

7          A.   Yes, I must have gotten the original.

8     Q.   If we can look on the second page, MetLife 83, the

9               fax number there at the top:  (401) 827-2925, do

10              you recognize that fax number?

11         A.   Yes.

12    Q.   And what fax number is that?

13         A.   That is the fax machine in the New England

14              Financial area, but it's a fax machine that

15              everybody has access to.

16    Q.   So, is that a fax machine that you would have had

17              access to?

18         A.   That's a fax machine that I have access to.

19    Q.   Okay.  Do you recall reading this letter when you

20              received it?

21         A.   Yes.

22    Q.   And do you recall that in this letter, Mr. Kilburn

23              on behalf of Ms. Graziosi demanded that the

24              payments be made on the policy at issue in this

25              case?

Kathleen M. M. Medeiros - June 12, 2012

81

```
 1        A.  Yes.
 2   Q.   And after you received this January 20th letter
 3        demanding that payment be made on the policy, did
 4        MetLife make payment on the policy to Ms.
 5        Graziosi?
 6        A.  No, we did not.
 7   Q.   And why not?
 8        A.  Because we were still on notice from the
 9        attorneys for the family of the deceased, and
10        there was still some questions with regards to the
11        circumstances of his death, and at that time, I'm
12        not going to put Metropolitan in the position of a
13        possible double payment, so we continued to defer
14        payment to see if an agreement could be reached,
15        or what the next step was going to be.
16   Q.   You said there were still questions surrounding
17        the circumstances of Dr. Taraszka's death?
18        A.  That's what we're getting from letters, from
19        Mr. Johnson.
20   Q.   Other than the letters from Mr. Johnson, when you
21        received this letter from Mr. Kilburn, Plaintiff's
22        14, had you received any documentation to
23        substantiate this allegation that there were
24        questions surrounding the circumstances of Dr.
25        Steven Taraszka's death?
```

1          A.   Based on my memory, I'm going to say no, but

2               if I look at my case comments, I can confirm that.

3     Q.   Did you have any specific phone conversations with

4               anyone in this case about the questions

5               surrounding the circumstances surrounding Dr.

6               Taraszka's death?

7          A.   If there were phone calls, I know there was

8               one to the agent, the broker.  I know there were

9               other phone calls.  They had to be from the law

10              firm because we would not have spoken to family

11              members because they were represented by legal

12              counsel.

13    Q.   When you received this January 20th letter from

14              Mr. Kilburn, Plaintiff's 14 at that point, other

15              than the death certificate which we looked at

16              earlier --

17         A.   Yes.

18    Q.   -- did you have -- the death certificate that we

19              looked at in Plaintiff's 10, did you have any

20              other written documentation or information that

21              addressed how Dr. Steven Taraszka died, other than

22              the certified copy of the coroner's report?

23         A.   Not that I recall.

24    Q.   Did you, as the senior claims approver handling

25              this claim, ever receive any written or

1          substantiated documentation or information that

2          indicated that Dr. Steven Taraszka died any way

3          other than as indicated in the coroner's report,

4          Plaintiff's 10?

5      A.   When I was handling the case I do not recall

6          receiving any additional information.

7  Q.   Okay.  Did you ever ask for any additional

8          information?

9      A.   No, I did not.

10 Q.   Did anyone representing the Taraszkas ever

11         indicate to you that -- strike that.  Did anyone

12         representing the Taraszkas ever expound upon this

13         issue that Mr. Johnson raised in his letter, that

14         they were investigating the death of Dr. Taraszka?

15         Did they ever tell you what that meant, or what

16         they were investigating?

17     A.   I don't want to answer that until I see -- you

18         know, I don't recall, so I'd rather say I don't

19         recall and look at my notes to make sure that I

20         give the correct information.  I have to see what

21         I said, who I spoke to, because one thing is my

22         phone memos, I do put down all the information

23         that I discussed.

24 Q.   And I think I've got those in here but I may not

25         have them all, so I'm just trying to find out.

Kathleen M. M. Medeiros - June 12, 2012

84

1          All right, but to the best of your recollection as
2          of the time of receiving Plaintiff's 14, the only
3          written documentation you recall dealing with how
4          Dr. Taraszka died was the coroner's report,
5          Plaintiff's 10?
6          A.   There's no coroner's report.  I just have the
7          death certificate.
8    Q.    Death certificate, I'm sorry, death certificate.
9          A.   Yes, I just had the death certificate, yes.
10   Q.    I may have been calling it the wrong -- the
11         determination on the death certificate that said
12         that he died by accident?
13         A.   Right.
14   Q.    Anything else that showed how he died?
15         A.   No, I did not have any reports from the
16         coroner.
17   Q.    Okay.  Plaintiff's 15.
18              (PLAINTIFF'S EXHIBIT 15 MARKED FOR I.D.)
19   Q.    Plaintiff's 15 is MetLife 81.  Have you seen this
20         document before?
21         A.   Yes.
22   Q.    Okay.  Do you recall receiving it sometime in late
23         January 2011?
24         A.   Yes.
25   Q.    Okay.  Can you identify this document for me?

85

1          A.   It's a letter from Attorney Moffett confirming
2               a conversation.
3     Q.   Okay.
4          A.   That I called him back on behalf of the
5               parents of Steven Taraszka.  This is telling us
6               they object to any payment to Ms. Graziosi or
7               anyone else until a court of appropriate
8               jurisdiction so orders.
9     Q.   Okay.  And at this point when you received this
10              letter, what did you do?
11         A.   Chances are, I sent the letter out
12              acknowledging receipt and saying, you know, we're
13              continuing to defer.
14    Q.   Did this letter provide any more basis or
15              reasoning for why the payment should be deferred,
16              other than that they object?
17         A.   Well, it put us on notice that there's
18              probably going to be a matter brought to court.
19    Q.   Why is that?
20         A.   Because it says, until a court of appropriate
21              jurisdiction so orders.
22    Q.   All right.  So, because of this letter,
23              Plaintiff's 15, from Mr. Moffett, it was your
24              decision on behalf of MetLife to continue to defer
25              payment to Ms. Graziosi that you had indicated was

Kathleen M. M. Medeiros - June 12, 2012

86

1           in order and ready to be paid?

2           A.  Right.  We have an attorney for the family

3           coming in, indicating the possibility of court

4           action.  So that continues to put the brakes on

5           the claim.  We have to continue to defer it.

6   Q.   Phone records.

7           A.  Oh, my infamous phone records.

8                   MS. BONDURANT:  Don't just make comments

9           that later could be construed in a way that you

10          didn't intend for them to be construed.

11  Q.   This is -- MetLife 80 is 16.

12                  (PLAINTIFF'S EXHIBIT 16 MARKED FOR I.D.)

13          A.  All right.  This was before the letter of

14          January 4th, okay.

15                  MS. BONDURANT:  He didn't ask you a

16          question.

17  Q.   Can you identify this document, Plaintiff's 16,

18          which is MetLife 80 for me.

19          A.  This is my personal way of documenting phone

20          calls for a case.  Since this was what I call a

21          paper file, this is how I put phone memos in my

22          case.

23  Q.   Okay.  And did you create this document,

24          Plaintiff's 16?

25          A.  Yes, I did.

Kathleen M. M. Medeiros - June 12, 2012

87

| | | |
|---|---|---|
| 1 | Q. | And did you create this document in the normal and |
| 2 | | ordinary course of business as a senior claims |
| 3 | | approver for MetLife? |
| 4 | | A.  Yes, I did. |
| 5 | Q. | And there appears to be some initials at the |
| 6 | | bottom of this page.  Do you recognize those |
| 7 | | initials? |
| 8 | | A.  Yes, I do. |
| 9 | Q. | And are those your initials? |
| 10 | | A.  Yes, they are. |
| 11 | Q. | And there appears to be a date indication of |
| 12 | | 1/24/11, I assume, of January 24, 2011.  Do you |
| 13 | | recall creating this document at or around that |
| 14 | | date? |
| 15 | | A.  That would be the date of all these calls. |
| 16 | Q. | Okay.  All right.  And at the top, there's some |
| 17 | | numbers.  Can you identify those numbers for me, |
| 18 | | the 206153? |
| 19 | | A.  That's the policy number. |
| 20 | Q. | That's the policy number of Dr. Taraszka that |
| 21 | | we're dealing with? |
| 22 | | A.  Yes. |
| 23 | Q. | Tell me what is this document and why did you |
| 24 | | create it? |
| 25 | | A.  I think in response to the letter from |

1          Attorney Kilburn, I called Attorney Johnson for an

2          update, and I left a message for them to call me

3          back.  I then received a call back saying that the

4          family has retained the Moffett Law Firm because

5          Attorney Johnson is only an estate attorney and it

6          was going into litigation, then the agent called

7          for an update.  I left a message to call me and,

8          then, Attorney Moffett called, that he'd been

9          retained by the family and they will be filing

10         suit, and I called him back and said that I needed

11         a letter of representation, and that's how I ended

12         the call.

13    Q.   So, you called Attorney Johnson because of the

14         letter from Attorney Kilburn of January 20th?

15         A.  I would assume so.

16    Q.   Okay.  All right.  And, then, in the aftermath of

17         that is when you received this call from Glenn

18         Moffett indicating to you that he had been

19         retained by the family and the estate of the

20         insured?

21         A.  Yes.

22    Q.   And your notes from that phone call indicate in

23         that second sentence that:  Will be filing suit

24         naming MetLife?

25         A.  This was a message I had on my phone mail,

Kathleen M. M. Medeiros - June 12, 2012

89

1           yes.
2    Q.    This was, like, a voicemail that you received?
3          A.  The way I wrote this, that had to be a
4          voicemail because it then says:  I returned the
5          call to Attorney Moffett.
6    Q.    Okay.  Oh, I see, and in the next paragraph you
7          said, returned call, okay, but your notes that you
8          took at the time of taking down that voicemail
9          indicate that you state that Mr. Moffett stated to
10         you that they will be filing suit naming MetLife?
11         A.  Yes.
12   Q.    Okay.  When you received these calls at or around
13         January 24th, or voice mails, was there any
14         additional factual information concerning the
15         circumstances surrounding Dr. Steven Taraszka's
16         death?
17         A.  No, there was not.
18   Q.    Were there any other discussions or information
19         provided to you about why payment should be
20         deferred, other than that they were objecting and
21         that they were investigating the death?
22         A.  No, there was just the information presented
23         in the letters.
24   Q.    Okay.  Just the information presented in the
25         letters and then these notes from your phone calls

1          but no, you know, details about why the payment

2          should not be made because she killed him or

3          anything like that?

4          A.   No, we're just on notice from an attorney that

5          they object to us making payment, and we would

6          just defer until this matter is resolved.

7     Q.   Okay.  Plaintiff's 17.

8              (PLAINTIFF'S EXHIBIT 17 MARKED FOR I.D.)

9     Q.   MetLife 79.  Can you identify this document for

10         me?

11         A.   It's memo of a call I received on policy

12         20615377 on Dr. Taraszka, and it's a call I

13         received from Attorney Kilburn.  I received a

14         call, it's a voicemail, and I returned the call

15         and explained what I'm doing on the case, and I

16         told him I was going to be writing it out, and he

17         requested that I fax over a copy of my letter to

18         expedite when I write it.

19    Q.   And this is a memo that you created at or near the

20         time of this phone call?

21         A.   Yes, it is.

22    Q.   And those are your initials at the bottom of

23         Plaintiff's 17?

24         A.   Yes, they are.

25    Q.   And the date, January 25th, 2011, is that the date

Kathleen M. M. Medeiros - June 12, 2012

91

1          that this document would have been created?

2          A.  Yes, it is.

3    Q.    And also the date that these calls occurred?

4          A.  Yes.

5    Q.    Okay.  And in this memo, you made mention that you

6          explained to Mr. Kilburn that we are on notice

7          that MetLife will be named in a suit regarding the

8          proceeds from this policy; correct?

9          A.  Yes.

10   Q.    Plaintiff's 18.

11               (PLAINTIFF'S EXHIBIT 18 MARKED FOR I.D.)

12   Q.    Plaintiff's 18 is MetLife 77 and 78.  Take a look

13         at Plaintiff's 18 and tell me whether or not you

14         recognize it.

15         A.  Yes, I do.

16   Q.    Okay.  Tell me how you recognize this document.

17         A.  It's addressed to me and it has my name stamp

18         on it, which means that I received it directly.

19         It was not scanned into the system.

20   Q.    Okay.  All right.  And would you have received it

21         on the date of this stamp here over on the

22         right-hand side of the document?

23         A.  Yes.

24   Q.    January 31, 2011?

25         A.  Yes.

Kathleen M. M. Medeiros - June 12, 2012

92

1   Q.   Okay.  Do you recall why you received this
2        document?
3        A.   It was a supplement to the letter of January
4        24th.
5   Q.   In this letter Mr. Moffett, again, was talking to
6        you about objecting to voluntary payments being
7        made by MetLife.  As of the date of the receipt of
8        this letter dated January 31st, except for these
9        communications from the lawyers and this alluding
10       to legal proceedings happening, Ms. Graziosi's
11       payment was ready to be made under the policy;
12       correct?
13       A.   Yes, it was.
14  Q.   Okay.  And in this letter, Mr. Moffett indicated
15       that they were preparing legal proceedings that
16       would request a restraining order against MetLife
17       paying any proceeds?
18       A.   Yes.
19  Q.   On the second page, Mr. Moffett indicated that it
20       was a pleasure to talk with you by telephone
21       recently.  Do you know which phone conversation he
22       was referring to?  Is that the one from your
23       previous notes that we looked at, Plaintiff's 16?
24       A.   That would have to be it, yes.
25  Q.   Okay.  So, when this letter, Plaintiff's 18, came

93

1       in, did you do anything differently on the file

2       other than continue to defer payment because

3       lawyers for the family had raised issues of legal

4       proceedings?

5       A.   I would continue to defer and, possibly, sent

6       a letter of acknowledgment.

7    Q.   What about any further investigation as to the

8       cause of Dr. Taraszka's death?

9       A.   No.

10   Q.   At this point when you received this letter,

11      January 27th letter received on January 31st, had

12      you received any other documentation or evidence

13      other than just letters from lawyers about the

14      cause of Dr. Taraszka's death?

15      A.  No.  No, I did not.

16   Q.   Okay.  Let me ask the question this way:  On all

17      these letters coming from the lawyers for the

18      Taraszkas, was there ever any issue raised about

19      there being a change of beneficiary form or some

20      sort of paperwork that wasn't processed where one

21      of the Taraszka family members should have been

22      the beneficiary instead of Ms. Graziosi?

23      A.   Not that I recall, no.

24   Q.   In fact, let me ask the question this way:  At any

25      point, do you know of anyone other than Kellie

94

1           Graziosi that submitted a claim for payment under
2           the life insurance policy at issue in this case?
3           A.  No, I do not.
4    Q.    Did the Taraszkas ever request a claim form to
5           submit a payment?
6           A.  Not that I know of.
7    Q.    Okay.  So, based upon your knowledge as being the
8           senior claims approver handling the case, the only
9           claim form submitted is the one that we looked at
10          earlier from January 10th of 2011?
11          A.  Yes.
12   Q.    Do you have any working knowledge as a senior
13          claims approver of the Georgia Slayer statute?
14          A.  I'm not familiar with the Georgia Slayer
15          statute.  I do know what a Slayer statute is.
16   Q.    And we talked a long time ago, and I'm sorry to
17          jump, about that admin library that has, you know,
18          information that you can reference about paying
19          claims in different states.
20          A.  Yes.
21   Q.    Did that admin library have any information about
22          Slayer statutes?
23          A.  No, that is not in there.
24   Q.    Okay.  So, your knowledge of a Slayer statute, is
25          that just general knowledge on what a Slayer

Kathleen M. M. Medeiros - June 12, 2012

95

1          statute is?

2          A.   It's just general knowledge as to what it is.

3     Q.   Not necessarily state by state on how it works?

4          A.   No, I do not have state by state.

5     Q.   At any time of your handling of this claim, were

6          there ever any discussions with anyone outside of

7          MetLife about the Georgia Slayer statute or its

8          applicability in this case?

9          A.   No.

10    Q.   Plaintiff's 19 is MetLife 76.

11               (PLAINTIFF'S EXHIBIT 19 MARKED FOR I.D.)

12    Q.   Take a look at this and tell me if you recognize

13         it, Ms. Medeiros.

14         A.   This is a letter I sent to Attorney Kilburn in

15         response to his letter of the 20th and our

16         conversation of the 25th.

17    Q.   And your conversation of the 25th is your notes,

18         are Plaintiff's 17, from that conversation?

19         A.   Right.

20    Q.   All right.  Why did you send this letter to

21         Attorney Kilburn, Plaintiff's 19?

22         A.   To confirm our payment -- I mean, to confirm

23         our conversation and to put in writing what we

24         discussed.

25    Q.   Okay.  And this is dated February 1, 2011.  Is

96

1           that when you would have sent it?

2           A.   Yes.

3    Q.    Okay.   In this letter you indicate that

4           Mr. Moffett has contacted you regarding the

5           proceeds and that Mr. Moffett has informed you

6           that he will prepare legal proceedings, which will

7           be filed to request that a restraining order be

8           issued against MetLife?

9           A.   Yes.

10   Q.    And because of that, you then say, therefore, we

11          are unable to proceed with your client's claim at

12          this time?

13          A.   Yes.

14   Q.    So, on February 1 of 2011, you inform Ms. Graziosi

15          through her counsel, Mr. Kilburn, that you would

16          not be making payment on the policy at that time?

17          A.   Correct.

18   Q.    She had submitted the claim on January 10th, and

19          then on February 1st, you informed her that you

20          would not be making payment at that time?

21          A.   Right, correct.

22   Q.    And the reason why you would not be making payment

23          at that time is why?

24          A.   Because we're on notice of pending legal

25          action.

Kathleen M. M. Medeiros - June 12, 2012

97

1    Q.    Okay.  Plaintiff's 20 is MetLife 75.

2                (PLAINTIFF'S EXHIBIT 20 MARKED FOR I.D.)

3    Q.    Have you seen this document before, Ms. Medeiros?

4          A.  Yes, it's a letter I wrote to Attorney

5          Moffett.

6    Q.    February 1, 2011 as well; correct?

7          A.  Correct.

8    Q.    And what is the purpose of this letter?

9          A.  It was in response to Attorney Moffett's two

10         letters, a confirmation that we will continue to

11         defer payment pending receipt of court documents,

12         and I explained, again, that Ms. Graziosi was the

13         beneficiary and, I, for some reason made reference

14         that the medical examiner ruled the death as an

15         accident and that a claim is ready in order for

16         payment.  I also responded to his request for

17         copies of our files.

18   Q.    In this second paragraph is what I want to look

19         at.  You told Mr. Moffett on February 1st, 2011

20         that we will continue to defer payment on this

21         policy pending receipt of an order restraining us

22         from making payment.

23         A.  Yes.

24   Q.    Okay.  Did you ever receive an order restraining

25         MetLife from making payment on the policy at

1         issue?

2              MS. BONDURANT:  I object to the form of

3         the question to the extent it calls for a legal

4         conclusion.

5              MR. ROSENTHAL:  You can answer, if you

6         know.

7  Q.   I'm using you words, Ms. Medeiros.  Did you or

8         anyone from MetLife, if you know, receive an order

9         restraining MetLife from making payment on the

10        policy?

11        A.  I don't know.

12 Q.   What did you mean by your second sentence of the

13        second paragraph where you said:  "Please note,

14        Ms. Kellie Graziosi was named beneficiary of this

15        policy at issue, and based on the ruling by the

16        medical examiner that the manner of death was an

17        accident, this claim is in order for payment"?

18        A.  Well, I confirmed that she was the beneficiary

19        and there was no changes, and I don't know where

20        I'm getting that.  There had to be something I'm

21        missing.

22 Q.   What do you mean there's something you're missing?

23        A.  There could be notes in my file as to the

24        reference to the cause of death was ruled by the

25        coroner as an accident.

Kathleen M. M. Medeiros - June 12, 2012

99

1   Q.   Well, you told me back on Plaintiff's 10 that the
2        death certificate said that the cause of death was
3        an accident?
4        A.   Right.  I don't know what was brought up to
5        confirm that.  So, I'm just going to have to say I
6        don't know.
7   Q.   Okay.  All right.  But, at this point in time,
8        February 1, 2011, did you have any other
9        documentation, evidence, or information that would
10       indicate anything other than that Dr. Taraszka's
11       death was an accident?
12       A.   No, we did not.
13  Q.   And in the last sentence of that second paragraph,
14       says:  "Please furnish the basis for your request
15       withholding payment."  What did you mean by that
16       sentence that you sent to Mr. Moffett back in
17       February of last year?
18       A.   An explanation as to why.  You know, that's
19       all I can say.
20  Q.   An explanation as to why what?
21       A.   Why they want us to continue to withhold
22       payment.
23  Q.   Did you ever receive that explanation from
24       Mr. Moffett or anyone else on behalf of the
25       Taraszkas?

Kathleen M. M. Medeiros - June 12, 2012

100

1          A.  I don't know, I don't know.
2    Q.    I asked you earlier in the beginning if you've
3          ever been deposed before and you told me about two
4          or three times.  Just, generally, have you been
5          involved in legal proceedings before?
6          A.  Yes.
7    Q.    Tell me about that.
8          A.  I testified at a capital one murder as keeper
9          of the records for MetLife, and I testified in a
10         federal case for MetLife.
11   Q.    Both of these were live testimony?
12         A.  Yes.
13   Q.    What was that federal case about?
14         A.  It was a case questioning the issue of the
15         policy.  Basically, the person was not insurable,
16         but since it was over two years, we couldn't do
17         anything and they were -- something about the
18         beneficiary did not have a vested interest in the
19         insured, and the only way they could prosecute, I
20         think, was for mail fraud.
21   Q.    Okay.  All right.  So, other than those two live
22         witness testimonies and those couple depositions
23         that we talked about, have you been involved in
24         legal proceedings otherwise, either for MetLife or
25         individually?  Have you ever sued anyone or been

Kathleen M. M. Medeiros - June 12, 2012

101

```
 1        sued?
 2        A.  No, no.
 3   Q.   Okay.  Have you ever been, like, the
 4        representative for MetLife in a lawsuit that sits
 5        at the table in court?  You know, sits at the
 6        table with the lawyers in court?
 7        A.  No.
 8   Q.   Okay.  In your work as a senior claims approver,
 9        do you regularly handle lawsuits and legal
10        pleadings, and those sort of things that come in?
11        A.  No, I do not.
12   Q.   What do you do with legal pleadings when they come
13        in?
14        A.  I refer to my consultant.
15   Q.   So, you don't refer directly to some in-house
16        lawyer, you send it to the consultant?
17        A.  Yes.
18   Q.   And then if it needs to go to legal counsel, they
19        handle it?
20        A.  They refer it to claims advisory and claims
21        advisory handles it.
22   Q.   So, there's a couple of steps?
23        A.  You have to go up the steps.
24   Q.   So, if legal proceedings come in, your job is to
25        send it to the consultant?
```

102

 1         A.  Yes.

 2    Q.    Why are they called the consultant?

 3         A.  It's just a title.

 4    Q.    Okay.  Let me show you Plaintiff's 21.

 5              (PLAINTIFF'S EXHIBIT 21 MARKED FOR I.D.)

 6    Q.    Plaintiff's 21 is MetLife 74 -- hang on, MetLife

 7         53 through 74.  I've got them a little bit out of

 8         order.  MetLife 74 is on the top and then MetLife

 9         53 through 73 follows.  Okay, do you recognize

10         Plaintiff's 21?

11         A.  Yes, I do, I received it.

12    Q.    Okay.  Can you identify it for me?

13         A.  It's a letter from Attorney Moffett that was

14         received via Federal Express so it was not

15         scanned.  I received the original.

16    Q.    And that's the date down there, February 4th,

17         2011?

18         A.  That's the date I received it, yes.

19    Q.    And that's your stamp from when you would have

20         received the document?

21         A.  Yes.

22    Q.    Okay.  All right.  This document, why did you

23         receive this document?

24         A.  It was in response to previous letters.  Here

25         is a courtesy copy of a lawsuit they're preparing

Kathleen M. M. Medeiros - June 12, 2012

103

1          to file.

2    Q.    Okay.  All right.  And after you received -- and

3          this MetLife 53 to 73, the pages that follow,

4          those pages were attached to this February 1

5          letter; correct?

6          A.  I would say so, yes.

7    Q.    And when this Plaintiff's 21 came in to your

8          office, what did you do with it, if anything?

9          A.  I referred it to my consultant, "please

10         continue."

11   Q.    What do you mean, "please continue"?

12         A.  It's your responsibility now.

13   Q.    Okay.  So, when you say, "please continue," it

14         means --

15         A.  You know, adverse claim.  We have received

16         court papers, please continue.

17   Q.    Okay.  When this Plaintiff's 21 came in, did you

18         read the lawsuit itself?

19         A.  I might have reviewed, you know, scanned

20         through it, but when I see that it is a civil

21         action and it's going to be filed in the courts,

22         with the volume of work I have I, you know, just

23         sit and read it.  I look at the top what it is, I

24         maybe go a few pages and I know it's beyond my

25         realm of authority, so I would refer it up.

104

1  Q.   To your consultant?

2       A.  To my consultant.

3  Q.   And at the time at issue, November 2010 until

4       summer of 2011, the consultant that you reported

5       to, was that Kathy Kurtz?

6       A.  This particular case, yes, went to Kathy.

7  Q.   Any reason why this particular case went to Kathy

8       versus other cases going to someone else?

9       A.  I think at that time there were two

10      consultants.  At that time there were two.  It was

11      Dan Houle and Kathy, and they divided the work by

12      alphabetical breakdown.  I think Dan did A-K and

13      Kathy did L-Z, based on the last names.  So,

14      that's why she would have gotten it.

15 Q.   So, Dr. Taraszka --

16      A.  So, if I remember correctly, they were on an

17      alphabetical split at that time.

18 Q.   So, Kathy Kurtz would have been the consultant

19      that you referred this document up to?

20      A.  Yes.

21 Q.   Did you review -- you said that you reviewed the

22      top of the document and then the first few pages

23      in, did you ever review to see whether or not

24      MetLife Investors USA Insurance Company was named

25      as a defendant in the case?

```
 1              MS. BONDURANT:  Object to the form of the
 2        question to the extent it calls for a legal
 3        conclusion.
 4              MR. ROSENTHAL:  You can answer.
 5   Q.   Did you review the top of the page to see if
 6        MetLife was named as a party?
 7   A.   No, I just reviewed the civil court action in
 8        the District Court, sending in by an attorney a
 9        copy of a letter saying here's a copy of the
10        lawsuit we intend to file.  I looked on here and
11        we've got civil action going to the U.S. District
12        Court for the Middle District of Georgia, and I
13        referred it up.
14   Q.   Did you ever do any follow-up work to see whether
15        or not this case was actually filed?
16   A.   No, I did not.
17   Q.   Do you know if anyone at MetLife did?
18   A.   To be honest with you, once it goes to claims
19        advisory, we really do not know what goes on with
20        it after that.
21   Q.   Okay.  So, if your consultant might have done
22        something, you might have knowledge of it, but if
23        it had gone up to claims advisory in New Jersey,
24        you pretty much wouldn't know what happens at that
25        point?
```

Kathleen M. M. Medeiros - June 12, 2012

106

```
 1        A.  No, I wouldn't know what happened.
 2  Q.    Let me just do it simply this way:  The second
 3        page of Plaintiff's 21, MetLife 53, are the words
 4        MetLife Investors USA Insurance Company contained
 5        anywhere at all on MetLife 53?
 6        A.  I don't see it.
 7  Q.    Plaintiff's 22.
 8              (PLAINTIFF'S EXHIBIT 22 MARKED FOR I.D.)
 9  Q.    Plaintiff's 22 is MetLife 103.  Can you identify
10        this document for me?
11        A.  This is a letter I sent to Attorney Moffett to
12        acknowledge receipt of his letter and the action
13        that's being filed, and to let him know it was
14        being referred up.
15  Q.    Okay.  So, once this letter came in -- I'm sorry,
16        Plaintiff's 21 came in, you were referring it up,
17        and it was going to be out of your hands at that
18        point?
19        A.  Yes.
20  Q.    So, prior to the February 21 letter coming in, you
21        were handling the claim and making decisions about
22        deferring payment because the lawyers had shown
23        up?
24        A.  Yes.
25  Q.    But then once the letter with the lawsuit attached
```

1          came in, you sent it on up the chain and it was

2          out of your hands?

3          A.  Yes.

4    Q.    And the reason why you did it at that point in

5          time was because you received a copy of what

6          purported to be a lawsuit?

7          A.  Yes.

8    Q.    Okay.  So, if it had just been another letter but

9          didn't have a lawsuit document or something that

10         looks like a lawsuit document attached to it, you

11         would have still kept the claim?

12              MS. BONDURANT:  Object to the form of the

13         question to the extent that'd be pure speculation.

14         What was in that letter might make all the

15         difference, so, I don't think --

16         A.  I'd have to see a letter to decide what kind

17         of action I would take.

18   Q.    Okay.  But, in regards to this letter, because it

19         had what purported to be a lawsuit attached to it,

20         that's why you referred it on up to the next

21         level?

22         A.  Yes.

23              MS. BONDURANT:  Let's go off the record.

24              (DISCUSSION WAS HELD OFF THE RECORD)

25   Q.    All right.  Plaintiff's 23 is MetLife 328 to 330.

```
 1              (PLAINTIFF'S EXHIBIT 23 MARKED FOR I.D.)
 2   Q.   Ms. Medeiros, take a look at this and tell me if
 3        you recognize it.
 4        A.  Yes, I do.
 5   Q.   And I know that it's kind of in a convoluted form,
 6        but that's how we received it, so I'm giving it to
 7        you how we received it just to make things clean
 8        for the record.  Can you take a look at this
 9        document and tell me if you can identify it for
10        me?
11        A.  This is the note area on our CDI system where
12        we just keep notes of what's going on, and
13        everybody that picks up the case knows who's
14        working on it and what they're doing on it.
15   Q.   Okay.  And are these the notes for the case at
16        issue here, the policy at issue, Dr. Taraszka's
17        policy?
18        A.  Yes, it is.
19   Q.   Okay.  All right.  And have you seen this
20        document, or the computer screen version of it
21        before?
22        A.  Yes, I have.
23   Q.   Okay.  And did you participate in the creation of
24        this document?
25        A.  Yes, I did.
```

Kathleen M. M. Medeiros - June 12, 2012

109

1   Q.   All right.  Can you explain the document for me
2        just in detail about what the columns are and what
3        they mean?
4        A.  Basically, it is a screen on our payment
5        system that allows you to put notes on there, what
6        you have done so that somebody who picks the case
7        up, they can be up-to-date by just looking at
8        these notes.  It gives you the date the note was
9        created, what the note is, and who put the note
10       on.
11  Q.   And so over there in the Associate Name column, if
12       it says Medeiros next to it, that would be a note
13       that you would have created?
14       A.  Those are my notes, yes.
15  Q.   And, then, if it says somebody else, that person?
16       A.  Right.
17  Q.   Let's just go through these names so I can figure
18       out who everyone is.  Who's Lyons?
19       A.  Shelby Lyons, she now goes by Shelby Cote
20       (C-o-t-e).
21  Q.   And what is her job title?
22       A.  Senior approver.
23  Q.   Okay.  All right.  And then there's you, and then
24       flipping over to the next page, Mallard?
25       A.  Senior approver.

Kathleen M. M. Medeiros - June 12, 2012

110

1    Q.    And could you identify the person?

2          A.   Carol Mallard.

3    Q.    Okay.  And then Babcock?

4          A.   Sandra Babcock.

5    Q.    And what is her job title?

6          A.   Senior approver.

7    Q.    And then Kurtz?

8          A.   Kathryn.

9    Q.    And that is a consultant?

10         A.   Yes.

11   Q.    And then -- okay, that's it.

12         A.   That's it.

13   Q.    So, these are people who have made notes on this

14         file?

15         A.   Yes.

16   Q.    I want to ask you about some of these notes.

17         A.   Okay.

18   Q.    This December 1 note from Ms. Lyons:  Kellie

19         Graziosi is primary beneficiary per the

20         application.  Why would that note have been made,

21         if you know?

22         A.   When we receive a case, we're the first person

23         to handle the case.  We have certain

24         responsibilities, and our responsibilities are to

25         check all our systems to make sure that the

1          deceased does not have any coverage with any of

2          our franchises and, second, we are to go in and

3          review all our files to put on a system who the

4          beneficiary is and what their relationship is.

5               So, I'm assuming here that when this came in,

6          we have a problem with entering MLI USA policies

7          into the system, they don't go over with the

8          correct carrier so they have to be just fixed,

9          it's an overnight thing, so that's why Shelby

10         might have gotten it to fix the entry.

11    Q.   Okay.

12         A.  So, she went in to check the beneficiary.  She

13         did the product and policy search and she sent the

14         large claim notification.

15    Q.   What does large claim notification mean?

16         A.  Anytime we get a claim in the million or more,

17         we send a notification of a large claim and that's

18         so that when it comes time for payment, the

19         references are there.

20    Q.   Okay.  All right.  And then the next entry is from

21         you:  First notice letter and claim form sent.

22         What does that mean?

23         A.  That means that's in response to the call from

24         the agent -- what's his name, David Morgan.  I

25         sent a customary letter to invite claim and I was

Kathleen M. M. Medeiros - June 12, 2012

112

1          going to send it through the system but it wasn't

2          working, so I made a note that the system wasn't

3          working.  I sent it through Word.

4    Q.    Okay, just like a Word document?

5          A.  Yes, I did a Word document instead of a Met

6          pack, which Met pack are these letters.

7    Q.    Your form?

8          A.  These letters, I don't sign them.  I can't

9          sign them.

10   Q.    And then we had talked and you said, "I need to

11         look at my file, I need to look at my notes."  Is

12         this document, Plaintiff's 23?  I know it's not

13         your computer screen, but is this what is meant by

14         looking at your notes?

15         A.  Yes, these are the notes.

16   Q.    Okay.  I don't want to rehash ones that we've

17         already talked about but, just briefly -- so, on

18         December 22nd, you got a letter, which was the

19         Burt Johnson letter, and these are just your notes

20         from having done that?

21         A.  Right.

22   Q.    Okay.  What did you mean on the -- and this is the

23         one that's kind of broken up on the page.  On the

24         January 14th entry at 11:38 a.m.:  David Morgan -

25         Agent of Record called for status.  I explained

1         the status of the claim.  Not happy.  Requested
2         name and phone number for attorney - provided.
3     A.  He wanted to know why it wasn't paid and I
4         explained to him that we were on notice from
5         attorneys for the family, that they had some
6         concerns, and he was not pleased with that because
7         it's his client, and I gave him Mr. Johnson's name
8         and phone number.
9   Q.  Okay.  And, then, on January 24, it says:  Adverse
10        claim - paper file established.  What does that
11        mean?
12    A.  Okay, on that point that I got the letter from
13        Mr. Moffett, I established a paper file.
14  Q.  Why did you do that, just when it's a bigger file
15        it needs a paper file?
16    A.  Okay.  At that point, I got the letter from
17        Attorney Moffett that they will be filing suit, so
18        at that point I established a paper file because
19        if we have any litigation come in, I have to print
20        everything off anyway because it's to go up to
21        corporate.
22  Q.  I see.  It's just the way you have to process and
23        handle claims when lawyers and lawsuits and things
24        come in?
25    A.  Yeah.  You put a note on the system so that

114

1           anybody else who gets calls in, they know there's

2           a paper file.

3    Q.     Okay.  All right.  What about this January 31st

4           entry from Babcock?

5           A.  Okay.  Correspondence was received on the case

6           I'm working, and she put it in my personal hold

7           and sent me a note that it came in.

8    Q.     What does your personal hold mean?

9           A.  In the BOSS system, it's like your file.  You

10          know, nobody can get into it.

11   Q.     So, that you would see the correspondence and the

12          documentation, she sent it into your electronic

13          hold box?

14          A.  Right, if it was a normal claim coming in and

15          we didn't have a situation like this, she got it,

16          Sandy would have handled it, but there's ownership

17          on this type of situation, so she referred it to

18          me to continue.

19   Q.     Then, down on February 4th at 1:55 p.m., there's

20          an entry from you talking about receiving a copy

21          of the Moffett letter with -- receiving the

22          Moffett letter with a copy of the action to be

23          filed with the courts.  Case to consultant to

24          continue.  What does that mean?

25          A.  I referred it up to my consultant to continue.

Kathleen M. M. Medeiros - June 12, 2012

115

1    Q.    And it's out of your hands at that point?

2          A.  It's out of my hands.

3    Q.    And it looks like half-an-hour later, Ms. Kurtz

4          made an entry and says:  Case referred to advisory

5          for pending legal action.

6          A.  Yes.

7    Q.    Do you see that type of notation regularly on

8          files that you're handling?

9          A.  Yes, it's an indication in the file where it

10         is.

11   Q.    So, what does that mean where it says:  Case

12         referred to advisory for pending legal action?

13         A.  That she took the paper file and sent it to

14         New Jersey.

15   Q.    Okay.  To claims advisory?

16         A.  Yes.

17   Q.    Okay.  The February 15th, 2011, 10:58 a.m. entry,

18         it's again one slit on the page:  Make no

19         payments, case to Law Department.  Did you make

20         that entry?

21         A.  No, Kathy Kurtz did.

22   Q.    Do you know why that entry was made?

23         A.  No, I do not.

24   Q.    Okay.  Let me ask this question:  On February 15th

25         an entry was made and said:  Make no payments.

Kathleen M. M. Medeiros - June 12, 2012

116

1        Prior to that, there were no entries that said
2        make no payments even though payment was being
3        deferred.  Can you explain why there wasn't a
4        similar entry back when you received that December
5        letter from Mr. Johnson, December 22nd letter from
6        the estate?  Why was there no similar entries that
7        said make no payments, if you know?
8        A.   That's not a normal comment I would put on a
9        file.
10   Q.   Okay.  But nowhere on this CDI document,
11        Plaintiff's 23, is there a comment talking about,
12        payments are being deferred?
13        A.   No, there's not.
14   Q.   Okay.  Why is that, that that's not put on this
15        type of documentation?
16        A.   This is the type of policy that would only be
17        handled by a senior, and when you have the
18        notation that it's an adverse claim, it's
19        understood.
20   Q.   So, one, it's an adverse claim when a lawyer shows
21        up and says, don't pay, then it becomes an adverse
22        claim and you don't pay?
23             MS. BONDURANT:  Object to the form of the
24        question to the extent it's overly broad.
25        A.   It's when somebody comes in protesting, has a

117

```
 1          valid interest protesting.
 2   Q.    And by valid interest, you mean related to the
 3          insured somehow?
 4          A.  A party of interest, yes.
 5   Q.    What do you mean by a party of interest?
 6          A.  That's very broad.  It's very hard to explain
 7          exactly because there's so many different
 8          circumstances.
 9   Q.    All right.  Plaintiff's 24 is MetLife 531 -- we're
10          missing a page, hang on one second.  Plaintiff's
11          24, the first page is MetLife 552 and then the
12          second page and, thereafter, is MetLife 531 to
13          549.
14                  (PLAINTIFF'S EXHIBIT 24 MARKED FOR I.D.)
15   Q.    Take a look at Plaintiff's 24 and tell me if you
16          recognize it, Ms. Medeiros.
17          A.  Honestly, I don't recall it.
18   Q.    Okay.  You don't recall receiving this back in
19          March?
20          A.  No, I do not.
21   Q.    Would someone else have received it in your office
22          and just you never have seen it?
23          A.  I guess I did see it because I got a letter,
24          and I referred it to the consultant.
25   Q.    Okay.  So, you were looking back at Plaintiff's 23
```

1           at a note entry?

2           A.  Yes.  But, basically, I do not recall the

3           letter.

4   Q.   Okay.  Do you recall seeing what purports to be a

5           lawsuit attached to it or enclosed with it, behind

6           it?

7           A.  No, I do not.

8   Q.   Okay.  I'm going to show you Plaintiff's 25,

9           MetLife 104 and 105.

10                  (PLAINTIFF'S EXHIBIT 25 MARKED FOR I.D.)

11  Q.   And these may not be in the order that you're used

12          to seeing them, that's why I'm asking you about

13          them because I'm trying to understand what they

14          are.  Plaintiff's 25, two pages, MetLife 104 and

15          105; do you recognize these?

16          A.  Yes, I did.

17  Q.   Can you identify them for me?

18          A.  Well, your MetLife 105, that's my referral --

19          oh, that's my referral from March 7th, that letter

20          that was received on March 3rd, the letter from

21          Attorney Moffett, Number 24.

22  Q.   Plaintiff's 24.

23          A.  Yes, that's me just referring it back to her,

24          it says:  Additional correspondence from the

25          attorney for the family of the insured.  So, I

119

1         just referred it to Kathy because it was out of my

2         hands.

3    Q.   So, then, Plaintiff's 104 and 105 don't

4         necessarily belong together?  I think they both

5         said referral on them and that may have been why.

6         A.  Yeah, they do not belong together.

7    Q.   Okay.  What is MetLife 104, the first page of

8         Plaintiff's 25?

9         A.  This must be -- I can't speak for Kathy, but

10        it looks like it might have been her referral to

11        advisory with a follow-up because it says right on

12        the top, follow-up.

13   Q.   So, you didn't create the first page --

14        A.  No, this is what the consultants -- the form

15        the consultants fill out to refer cases to

16        advisory.

17   Q.   Okay.  Got it.  Plaintiff's 26, Plaintiff's 26 is

18        MetLife 98 through 102.  Take a look at this and

19        tell me if you recognize this?

20              (PLAINTIFF'S EXHIBIT 26 MARKED FOR I.D.)

21        A.  Yes, I do.

22   Q.   Identify or describe this for me, if you can,

23        please.

24        A.  Okay.  Your MetLife 99 through 101 do not

25        belong with these two, okay, just to let you know.

120

1          The cover sheet is my referral to the consultant

2          of my file.  Copy of action being filed to the

3          court.  I've obtained a full copy of a duplicate

4          policy, and I'm referring it to her to continue

5          handling it.

6    Q.    And then 99 through 101 don't relate?

7          A.  No.

8    Q.    What is 99 through 101?

9          A.  That's just a large claim notification.

10   Q.    Which is what we talked about before where --

11         A.  Right.

12   Q.    Why is a large claim notification sent?

13         A.  Basically, to put certain areas on notice and

14         to make sure that the reserves are there when the

15         payment is made.

16   Q.    All right.  And page 101, is that part of this

17         large claim notification, or is that something

18         separate?

19         A.  That would have been sent -- that's from

20         Regina to Kathy, so that would have been sent

21         after her referral.

22   Q.    Okay.  All right.  So, this e-mail from Regina to

23         Kathy about a legal hold, that's not something you

24         would have handled?

25         A.  No.

121

1   Q.   Okay.  All right.  And, then, 102 is where --

2        A.  I would not have handled it.

3   Q.   You wouldn't have handled that, either.  That's

4        where it went up beyond you?

5        A.  Yes.

6   Q.   So, then, if I've got this correct, let me make

7        sure I get this correct, I've got them all out of

8        order and I apologize.  Plaintiff's 26, MetLife 98

9        is where you referred up the copy of that February

10       1 letter and lawsuit, the one we looked at a while

11       back?

12       A.  Yes.

13  Q.   And then MetLife 102 is where Ms. Kurtz referred

14       it on up to the next level?

15       A.  It would have been on top of this, yes.

16  Q.   And then going back to Plaintiff's 25, these are

17       -- which is MetLife 105, is where you referred up

18       the March lawsuit documentation you received and

19       then MetLife 104, which is the first page of

20       Plaintiff's 25, is where Ms. Kurtz then referred

21       it up?

22       A.  Yes.

23  Q.   So, when those two different lawsuit copies came

24       in, whether they were filed or not, whether you

25       read them or not, whatever, that's when these

1              referral sheets were created by both you and Ms.

2              Kurtz sending these things up the chain?

3         A.   Yes.

4    Q.   And after they go up the chain, you don't know

5              what happens with them?

6         A.   No, I do not.

7    Q.   Okay.  Let's take a look at Plaintiff's 27.

8                   (PLAINTIFF'S EXHIBIT 27 MARKED FOR I.D.)

9    Q.   Plaintiff's 27 is MetLife 555 through 571.  These

10             are the documents that were produced.  These are a

11             portion of the documents that we've just received

12             yesterday in case -- I don't know if Moffett and

13             Melnick have these or not.

14                  MR. MELNICK:  We have them.

15   Q.   Okay.  Take a look at these documents, it's

16             multiple pages which appear to be screen

17             printouts, and tell me if you recognize these,

18             Plaintiff's 27.

19        A.   Yes, I do.

20   Q.   Can you identify these documents for me?

21        A.    This is the case comment or note screens on

22             the BOSS system.

23   Q.   Okay.  All right, and are these the case comments

24             for the policy at issue here, Dr. Steven

25             Taraszka's policy?

123

 1        A.  Yes, they are.

 2   Q.   Okay.  And I know there's a redacted section, I'm

 3        not getting into that, okay, I'm not worried about

 4        that, but are these the types of records that you

 5        see and regularly review when you're handling

 6        claims?

 7        A.  These are people who put notes on the file as

 8        to what's going on.

 9   Q.   So, these are basically screen shots of the notes

10        that are taken in the computer system?

11        A.  Yes.

12   Q.   Okay.  Now, let me ask the question this way:  I

13        heard you say a whole bunch while we've been here

14        today, "I need to refer to my notes, I need to

15        refer to my notes."  Between Plaintiff's 23, which

16        is the CDI system, and Plaintiff's 27, which are

17        these BOSS notes, are there any other notes that

18        you haven't seen today?

19        A.  No.

20   Q.   Okay.  And that may have been a loaded question.

21        I know there were some typed-up phone memo

22        conversations, but are there any other notes that

23        you recall from this Steven Taraszka life

24        insurance policy file that you haven't now seen me

25        produce and put in front of you?

Kathleen M. M. Medeiros - June 12, 2012

124

1        A.  No, this is it.

2    Q.   Okay.  All right.  Let me just look through these.

3         I think a lot of these are duplicative, kind of

4         repeat what we already said, but let me look

5         through these, and I may ask you a few questions.

6         A.  Uh-huh.

7    Q.   Okay.  And I don't want to get you in trouble with

8         your bosses, but all those notes that I looked at

9         kind of appear to be the same thing, the notes

10        that we looked at on the other CDI records.  Why

11        are there two systems, BOSS and CDI?

12        A.  CDI came into existence first.  We worked that

13        system for a couple of years before we went

14        paperless and we entered the BOSS system.  At one

15        time, we were instructed to put the notes on both

16        systems.  That has since changed.  You only have

17        to put the notes on BOSS.  I still put them on

18        both systems, all right, so you'll find there's a

19        lot of duplicates, but there are a few notes that

20        were in BOSS that are not on CDI.

21   Q.   Okay, but those may have been notes that were in

22        your phone memos?

23        A.  No, they're notes from other approvers.

24   Q.   From other approvers, I see.  Okay, and MetLife

25        555 and MetLife 560 and then, again, MetLife 570,

Kathleen M. M. Medeiros - June 12, 2012

125

1          those are the sort of screen shots of all of the

2          different notes?

3          A.   Those are the screen shots, and if you notice

4          up here, "Next Ten," they can only put ten on each

5          screen.  So, next ten, and then you have in

6          between, and then you have the last ten, the last

7          screen.  So, you can only have ten per screen, and

8          it will keep moving down.

9    Q.    I see.

10         A.   And any note that does not have a sequence of

11         periods after, there's no note to open.

12   Q.    I see.

13         A.   So, that's why the notes that are open are the

14         ones that have periods that were too long, just to

15         be stated on that one screen.

16   Q.    I see.  So, if it's underlined with the ... then

17         there's a note behind it, but if it's not, then

18         it's just a one-line comment?

19         A.   That's all the comment that's there.

20   Q.    Okay.  All right.  Well, I don't see any of these

21         notes or comments that are anything that we

22         haven't talked about, so I'm not going through the

23         individual ones, but I do want to ask you this:

24         We've looked at a lot of documents that came out

25         of your file that you've handled, or MetLife's

Kathleen M. M. Medeiros - June 12, 2012

126

1           file that you handled for them and, in particular,

2           we looked at Plaintiff's 23 and Plaintiff's 27

3           that were these electronic notes.

4               We also looked at typed phone record memos.

5           Is there anything in any of the file, any

6           documentation, evidence, anything in any of the

7           file that indicates in any way that Dr. Taraszka

8           died any other way other than by accident as shown

9           on the death certificate?

10          A.  No, there is not.

11   Q.     Do you recall having a conversation with anyone

12          outside of MetLife on this file about how Dr.

13          Taraszka died?

14          A.  No, I don't.

15   Q.     Do you recall whether or not Mr. Johnson ever

16          said, "We think Kellie Graziosi killed Dr.

17          Taraszka, and that's why we don't want you to make

18          payment, or that's why we want you to defer

19          payment"?

20          A.  Honestly, I don't recall.

21   Q.     How about Mr. Moffett, do you ever recall in a

22          conversation with Mr. Moffett, him indicating that

23          we believe or the family believes that Dr.

24          Taraszka was killed by Kellie Graziosi, and that's

25          why we don't think you should make payment?

127

```
 1          A.  No, I don't recall.
 2     Q.   Are there any other notes, or references, or data
 3          entries that were made in this file when you
 4          worked it that we haven't looked at today that you
 5          recall?
 6          A.  No, I've seen everything.
 7     Q.   Okay.  All right.  Let's look at this Plaintiff's
 8          28.
 9               (PLAINTIFF'S EXHIBIT 28 MARKED FOR I.D.)
10     Q.   Plaintiff's 28 is MetLife 553 and 554.  Have you
11          seen this document before, Ms. Medeiros?
12          A.  Yes, I have.
13     Q.   Can you identify this document for me?
14          A.  It's just something that says, adverse claim
15          situation.
16     Q.   When have you seen this document before?
17          A.  About a week ago.
18     Q.   Okay.  Prior to a week ago, had you seen it?
19          A.  No.
20     Q.   Do you know who created this document?
21          A.  Yes, I do.
22     Q.   Okay, who created it?
23          A.  Diane Gruslan.
24     Q.   And is she one of the consultants?
25          A.  She's no longer in the claims unit.
```

Kathleen M. M. Medeiros - June 12, 2012

128

1  Q.   At the time she created it, was she a consultant?

2       A.  Yes, she was.

3  Q.   Do you know when she created it?

4       A.  I do not recall.

5  Q.   Okay.  How do you know that she created this

6       document?

7       A.  When she was a consultant in the claims unit,

8       she decided to put together some kind of, you

9       know, notes to help in the training of a senior

10      approver.

11 Q.   Okay.  And is this one of the types of notes that

12      she put together to help train a senior approver?

13      A.  Yes.

14 Q.   And you are a senior approver?

15      A.  Yes, I am.

16 Q.   And you have received training as a senior

17      approver?

18      A.  Yes, I have.

19 Q.   But, prior to a week ago, you'd never seen this

20      document before?

21      A.  Right, because I don't use the manuals -- I'm

22      sorry, the guidelines that she sent out.

23 Q.   Okay.  When did Ms. Gruslan send out these

24      guidelines or manuals?

25      A.  I do not recall.

129

1   Q.   What were the circumstances around which you came

2        to see Plaintiff's 28 for the first time about a

3        week ago?

4        A.   Out of curiosity, just to see if there was

5        anything in those notes, you know, senior notes

6        that pertained to it.

7   Q.   So, you went looking to see --

8        A.   I went looking to see if there was anything.

9   Q.   And where did you go look?

10       A.   In my big binder of all the stuff she put

11       together.

12  Q.   So, that was a binder, it wasn't, like, on that

13       computer system we talked about?

14       A.   This system stuff is not on the computer

15       system, no, it's not.

16  Q.   So, you went looking into binders.  Is this binder

17       located in your office?

18       A.   It's on my desk.

19  Q.   And in this binder, you went flipping through it

20       as a result of knowing that you were going to be

21       deposed about this case?

22       A.   Yes, just to see if there was anything.

23  Q.   Okay.  And then that's when you found this?

24       A.   Yes.

25  Q.   But prior to handling the claim of Ms. Graziosi

Kathleen M. M. Medeiros - June 12, 2012

130

1           because of Dr. Taraszka's death, you had not seen

2           this document before?

3           A.  No, I did not.

4    Q.     But this document was available to you prior to

5           handling the claim?

6           A.  I guess so.

7    Q.     It was on your desk?

8           A.  I guess so.

9    Q.     Well, did this document just appear on your desk

10          last week, or had it been there for some time?

11          A.  It had been there for some time.

12   Q.     Was it there prior to November of 2010?

13          A.  It had been there, yes.

14   Q.     Longer than that?

15          A.  From whenever she put all the notes, you know,

16          and suggestions together, she gave everybody a

17          copy.

18   Q.     When she put all these notes and suggestions

19          together, was that -- can you estimate for me a

20          time when that occurred?  Was it more than two

21          years ago?

22          A.  Yes.

23   Q.     Was it more than five years ago?

24          A.  Possibly.

25   Q.     So, it's been at least a few years?

131

1        A.  Yes.

2    Q.   And when she put these notes together, did she

3         give the binder a title or a name?

4        A.  No, she did not.

5    Q.   I heard you refer to them as senior notes.  Is

6         that some sort of nomenclature that they've been

7         called in the office?

8        A.  It basically would, you know, explain exactly

9         what a senior does.  A senior has a lot more

10        responsibility and handles a lot more complex

11        cases than an approver would.  If you get any

12        cases that get involved, it goes to a senior.

13   Q.   Is there any reason why -- strike that.  At the

14        time that Ms. Gruslan created these notes and

15        these documents, was she a supervisor of yours?

16       A.  No.

17   Q.   How did you receive them, then, when she created

18        them back a few years ago?

19       A.  She put them on my desk.

20   Q.   Did she put them on all the seniors' desks?

21       A.  Yes.

22   Q.   How many seniors are there that work in this

23        office?

24       A.  Right now, in MetLife -- when I was in

25        MetLife, there were five of us.

Kathleen M. M. Medeiros - June 12, 2012

132

 1  Q.   Okay.  All right.  Did you read those notes when
 2       they were given to you?
 3       A.  No, I did not.
 4  Q.   Okay.  Can I ask why?
 5       A.  I had been a senior for quite some time and,
 6       basically, it was put together to help train a new
 7       one.
 8  Q.   The new ones, okay.  All right.  Did Ms. Gruslan
 9       require the seniors to review these?
10       A.  No, she did not.
11  Q.   So, when you handled the claim at issue here, the
12       Dr. Taraszka claim, you hadn't read Plaintiff's
13       28?
14       A.  No, I had not.
15              MR. ROSENTHAL:  Okay.  Let's take a break.
16              (A SHORT RECESS WAS TAKEN FROM 1:07 to
17       1:17 P.M.)
18              MR. ROSENTHAL:  Back on the record.
19  Q.   All right.  We went through all the documents, and
20       I just have a few follow-ups.  I have a whole
21       bunch of questions here that I think I'm going to
22       defer on.  It's a couple of inquiry questions that
23       will help us figure that out.  Once it was
24       referred up to the consultant -- once this case,
25       this file, Dr. Taraszka's policy was referred up

133

1           to the consultant and the legal proceedings were

2           at least proffered, whether they had begun or not,

3           you had no decision-making authority or input as

4           to what was going on in the file; is that correct?

5      A.   Correct.

6   Q.  So, issues about interpleading money, deciding to

7           pay or not to pay, any decision is out of your

8           hands at that point?

9      A.   Correct.

10  Q.  There were two different copies of lawsuits that

11          you received, one back in early February and then

12          one in March.  When did the decision-making

13          authority leave your hands and go up to the

14          consultant?  I'm trying to figure that out.  Was

15          it in February or was it in March?

16     A.   In February.

17  Q.  You still handled some communications in the file,

18          but everything was going up to the consultant?

19     A.   Right.  The mail people don't know where the

20          case is.  So, just -- if it came in

21          electronically, it would still go over to the

22          "senior queue," and we would see it, look at the

23          notes and send it up to Kathy.  It came in, in

24          FedEx, it had my name on it so I took it, typed up

25          a referral, walked it over to Kathy.

134

1   Q.   So, after February 1st when you did that first

2        referral -- or February 4th, maybe, Plaintiff's

3        26, the first page of Plaintiff's 26 at that point

4        was the -- well, let me ask the question this way:

5        MetLife 98, the first page of Plaintiff's 26, it

6        says:  To consultant from Kathleen Medeiros.

7   A.   Uh-huh.

8   Q.   Is the consultant that you're referring to there,

9        Ms. Kurtz?

10  A.   Yes.

11  Q.   When you sent it up to Ms. Kurtz at that point,

12       did she then have all the decision-making

13       authority and responsibility on the case?

14  A.   Whatever had to be done was now her

15       responsibility.

16  Q.   So, you couldn't make a decision at that point to

17       pay or not pay, or do anything?

18  A.   No, it was out of my hands.

19  Q.   So, any of these notes in the file or actions that

20       occurred after this February 4th referral up, they

21       were just administrative in nature?

22  A.   Yes.

23  Q.   Because you, as a senior claims handler, can pay

24       claims and deny claims and all that, but then once

25       you refer it, you don't have that authority?  Once

135

1       you refer it up to the consultant then it goes to

2       them?

3       A.  Right.

4  Q.   Have you ever as -- let me get the title correctly

5       -- as senior claims approver, have you in your

6       years ever made the decision to initiate court

7       action or not?

8       A.  Never.

9  Q.   In regards to paying a claim?

10      A.  Never.

11 Q.   So, interplead or not interplead, that's not a

12      decision you make?

13      A.  No, it is not.

14 Q.   How about a decision to refer a case to legal

15      counsel within MetLife, is that a decision that

16      you make or something that someone else makes?

17      A.  Somebody else.

18 Q.   And is that the consultant or the advisory group,

19      don't know?

20      A.  I don't know.

21 Q.   Have you ever seen -- other than the death

22      certificate that we looked at back in, I believe

23      it's Plaintiff's 10, have you ever seen any other

24      documentation from any law enforcement agency

25      regarding Dr. Taraszka's death?

136

 1        A.  No, I have not.

 2   Q.   Have you seen any documentation from any -- from

 3        the Walton County Coroner's office other than the

 4        death certificate?

 5        A.  No, I have not.

 6   Q.   Anything from the GBI?

 7        A.  No, I have not.

 8   Q.   The Georgia Medical Board?

 9        A.  No.

10   Q.   So, the only sort of official documentation

11        relating to Dr. Taraszka's death that you've seen

12        is that death certificate that we looked at

13        previously?

14        A.  Yes, it is.

15   Q.   At any point in handling this claim, did anyone on

16        behalf of the Taraszka family ever tell you,

17        specifically, why they felt that the payment of

18        the policy proceeds should be withheld from Kellie

19        Graziosi?

20        A.  Not that I recall.

21   Q.   Okay.  Other than the documentation that we've

22        already looked at today, which was letters from

23        the lawyers and these two attachments that were

24        purported lawsuits, did you ever receive any other

25        documentation or proof, or substantive evidence,

Kathleen M. M. Medeiros - June 12, 2012

137

```
 1          that related to why the payments to Ms. Graziosi
 2          should not be paid from the Taraszkas, or anybody
 3          on their behalf?
 4          A.  No, I did not.
 5   Q.     On the correspondence and communications that you
 6          would have with these attorneys representing the
 7          Taraszkas, was there any reason why you wouldn't
 8          cc Ms. Graziosi on those communications, or her
 9          representatives?
10          A.  We don't furnish copies of our correspondence
11          with other claimants.
12   Q.     Okay.  All right.  So, the correspondence with
13          Mr. Johnson and Mr. Moffett, you didn't provide
14          Ms. Graziosi with copies of that correspondence,
15          or her representatives?
16          A.  Correct.
17   Q.     And that's, you're telling me, is sort of your
18          normal course of business, is, you wouldn't
19          provide cc's back and forth of communications?
20          A.  No, we do not.
21   Q.     At any time up -- well, at any time that you
22          handled this claim, at any time that you handled
23          this claim, did you ever work with anyone in the
24          legal department or legal counsel's office on this
25          particular file in processing the insurance claim
```

Kathleen M. M. Medeiros - June 12, 2012

138

1        of Dr. Taraszka?

2        A.  No, I did not.

3    Q.  Conversations, I know I've asked you this before,

4        but I just want to go through specific names.  Do

5        you ever recall having any phone conversations

6        with Kellie Graziosi at any point?

7        A.  No, I do not.

8    Q.  Do you recall having any phone conversations with

9        a Dr. Ken Taraszka, the decedent's brother?

10       A.  No, I did not.

11   Q.  Do you recall ever having any phone conversations

12       with Eugene Taraszka, the decedent's father?

13       A.  No, I did not.

14   Q.  Do you recall having any phone conversations with

15       Ann Taraszka, the decedent's mother?

16       A.  No, I did not.

17   Q.  And other than the notations that you made and the

18       documents that we already looked at, do you recall

19       any other phone conversations with Attorney Burt

20       Johnson?

21       A.  All phone calls I had were in there, so that

22       would be the only call.

23   Q.  Okay.  And, then, other than the calls that are

24       notated in the documents that we've already looked

25       at, do you recall any other phone conversations

Kathleen M. M. Medeiros - June 12, 2012

139

1           with Mr. Glenn Moffett concerning this case?

2           A.  No, I did not.

3    Q.     At any time, did anyone ever tell you that they

4           believed that Kellie Graziosi somehow was involved

5           in Dr. Taraszka's -- Steven Taraszka's death?

6           A.  Not that the recall.

7    Q.     Do you have any knowledge about the calculation of

8           interest payments on this policy, interest

9           calculations?

10          A.  No, I do not.

11               MR. ROSENTHAL:  I think that's all that I

12          have.  I might want to take one break at the end

13          and touch base with co-counsel to see if there's

14          any other questions, but I think I'm done.

15               (SHORT RECESS WAS TAKEN FROM 1:48 TO 2:00)

16               MS. BONDURANT:  The witness wants to read

17          and sign.

18               MR. ROSENTHAL:  Okay, back on the record.

19          All right.  The witness has indicated that they'll

20          read and sign.  Also, additionally, as I

21          indicated, we got a little off in the beginning

22          with our procedural stuff.  This deposition is

23          being taken in the federal case, but by agreement

24          of counsel of Ms. Graziosi and the Taraszkas, the

25          parties have agreed as to those two parties to

Kathleen M. M. Medeiros - June 12, 2012

140

1        allow this deposition to be used in the pending

2        case in the Superior Court of Walton County, State

3        of Georgia, Case Number 11-0354-1, styled Eugene

4        Taraszka and Ann Taraszka, individually, and Ken

5        Taraszka, M.D., as Administrator of the Estate of

6        Dr. Steven Taraszka, Plaintiffs, versus Kellie

7        White Graziosi, Defendant.

8              So, for purposes of agreement between

9        those two parties, we'll use these depositions in

10       that case pending some direction from Ms.

11       Bondurant.

12             MS. BONDURANT:  That's right.  I just need

13       to check with MetLife to see if it has any

14       objection, and I will let you know.

15             MR. ROSENTHAL:  Anything else we need to

16       put on the record, gentlemen, ladies?

17             MR. MOFFETT:  Did you put the case number

18       of the Superior Court case?

19             MR. ROSENTHAL:  Yes, we did.

20             MR. MELNICK:  Nothing further from the

21       Taraszkas.

22             THE COURT REPORTER:  Could I please place

23       your transcript orders on the record?

24             MR. MELNICK:  We'll take an E-Tran with

25       exhibits, please.

Kathleen M. M. Medeiros - June 12, 2012

141

1            MS. BONDURANT:  We want the same.  I want

2       a minuscript, too, E-Tran with exhibits.

3            MR. ROSENTHAL:  We'll need, obviously, the

4       original, a mini, and an E-Tran with exhibits.

5            MR. MELNICK:  Madame Court Reporter, my

6       e-mail address should be in the pleadings, so you

7       can pull it right off there.

8            MR. ROSENTHAL:  That concludes the

9       deposition.

10            (DEPOSITION CONCLUDED AT 2:07 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

142

1                    C-E-R-T-I-F-I-C-A-T-E

2          I, SALLY BRASSARD, a Notary Public in and for
        the State of Rhode Island, duly commissioned and
3       qualified to administer oaths, do hereby certify
        that the foregoing deposition of KATHLEEN M. M.
4       MEDEIROS, a witness in the above-entitled cause,
        was taken before me on behalf of the Plaintiff at
5       the offices of Pierce Atwood, LLP, 10 Weybosset
        Street, Providence, Rhode Island, on June 12,
6       2012, at 10:00 A.M., that previous to the
        examination of said witness, who was of lawful
7       age, she was first sworn by me and duly cautioned
        and sworn to testify the truth, the whole truth,
8       and nothing but the truth, and that she thereupon
        testified as in the foregoing manner as set out in
9       the aforesaid transcript.

10         I further certify that the foregoing
        deposition was taken down by me in machine
11      shorthand and was later transcribed by computer,
        and that the foregoing deposition is a true and
12      accurate record of the testimony of said witness.

13         I have enclosed with a copy of the deposition
        a correction and signature page, which must be
14      signed before a Notary Public.

15         IN WITNESS WHEREOF, I have hereunto set my
        hand this 13th day of June, 2012.

16

17

18

19      _____
        SALLY BRASSARD, NOTARY PUBLIC/CSR-RPR
20      (MY COMMISSION EXPIRES JANUARY 16, 2013)

21

22

23

24

25

**$**

**$50,000 (2)**
26:7;27:12

**0**

**00000-24608-784 (1)**
51:13

**1**

**1 (17)**
34:23,24;35:3;36:6,
13;37:7,9,19;38:17;
73:14;95:25;96:14;97:6;
99:8;103:4;110:18;
121:10
**1/24/11 (1)**
87:12
**1:07 (1)**
132:16
**1:17 (1)**
132:17
**1:48 (1)**
139:15
**1:55 (1)**
114:19
**10 (18)**
64:5,6,7,10,13,22;
65:15;66:17,24;67:7;
68:5,21,25;82:19;83:4;
84:5;99:1;135:23
**10:03 (1)**
5:1
**10:58 (1)**
115:17
**101 (4)**
119:24;120:6,8,16
**102 (3)**
119:18;121:1,13
**103 (1)**
106:9
**104 (5)**
118:9,14;119:3,7;
121:19
**105 (5)**
118:9,15,18;119:3;
121:17
**10th (5)**
65:2,4,10;94:10;96:18
**11 (5)**
70:22,23,24;71:24;
74:16
**11:17 (1)**
58:23
**11:38 (1)**
112:24
**11-0354-1 (1)**
140:3
**11th (7)**
71:5;72:4,15,18;75:5,

**12;77:2**
**12 (7)**
72:9,10,11;73:3;
74:15,16;77:2
**12/22/10 (1)**
53:3
**13 (6)**
77:8,9;78:10,19;79:2,
17
**14 (7)**
79:22,23,24,25;81:22;
82:14;84:2
**14th (1)**
112:24
**15 (4)**
84:17,18,19;85:23
**15th (5)**
18:3;32:4,10;115:17,
24
**16 (5)**
86:11,12,17,24;92:23
**17 (4)**
90:7,8,23;95:18
**18 (5)**
91:10,11,12,13;92:25
**19 (3)**
95:10,11,21
**1976 (2)**
8:23;9:5
**1978 (1)**
8:25
**1988 (1)**
9:16
**1991 (8)**
9:24;11:15;16:20,21;
30:24;32:20;34:2;69:12
**1st (3)**
96:19;97:19;134:1

**2**

**2 (9)**
35:8;40:12,13,15,15;
41:13,14;42:8;60:8
**2:00 (1)**
139:15
**2:07 (1)**
141:10
**20 (2)**
97:1,2
**2001 (1)**
8:12
**2004 (1)**
13:4
**2006 (1)**
35:6
**2010 (13)**
11:25;18:3,13;36:16;
39:6,8;48:15,19;56:14;
66:25;68:20;104:3;
130:12
**2011 (26)**
11:23;18:4,14;32:4,

**10;36:16;65:10;66:17;**
**72:4,15,18;77:19;79:3;**
**84:23;87:12;90:25;**
**91:24;94:10;95:25;**
**96:14;97:6,19;99:8;**
**102:17;104:4;115:17**
**206153 (1)**
87:18
**20615377 (1)**
90:12
**206153777USU (1)**
36:14
**20615377USU (1)**
38:18
**20th (5)**
80:6;81:2;82:13;
88:14;95:15
**21 (11)**
52:11;56:24;102:4,5,
6,10;103:7,17;106:3,16,
20
**21st (3)**
55:14,17;68:20
**22 (3)**
106:7,8,9
**22nd (7)**
42:9,14;55:18;56:9,
14;112:18;116:5
**23 (7)**
107:25;108:1;112:12;
116:11;117:25;123:15;
126:2
**24 (8)**
87:12;113:9;117:9,11,
14,15;118:21,22
**24th (3)**
77:13;89:13;92:4
**25 (6)**
118:8,10,14;119:8;
121:16,20
**25th (3)**
90:25;95:16,17
**26 (7)**
119:17,17,20;121:8;
134:3,3,5
**27 (6)**
122:7,8,9,18;123:16;
126:2
**27th (5)**
53:25;54:13,14;57:21;
93:11
**28 (5)**
127:8,9,10;129:2;
132:13

**3**

**3 (5)**
45:14,15;47:13,18;
48:12
**3:11-CV-80 (1)**
35:9
**31 (1)**

**91:24**
**31st (3)**
92:8;93:11;114:3
**32 (1)**
37:6
**328 (1)**
107:25
**330 (1)**
107:25
**339 (1)**
52:3
**34 (3)**
37:23,24;38:1
**35 (1)**
10:18
**350 (1)**
52:3
**351 (1)**
50:18
**353 (1)**
50:18
**354 (1)**
46:16
**357 (1)**
46:16
**358 (2)**
40:16;41:11
**36 (1)**
9:7
**360 (1)**
40:16
**361 (1)**
41:11
**37 (6)**
35:9;37:6,7,7,24;38:1
**3rd (1)**
118:20

**4**

**4 (10)**
46:14,15,16,17,25,25;
51:8,10,12;60:8
**401 (1)**
80:9
**4th (5)**
86:14;102:16;114:19;
134:2,20

**5**

**5 (5)**
50:16,17,18;51:8;60:9
**5-1 (2)**
35:3,9
**53 (5)**
102:7,9;103:3;106:3,5
**531 (2)**
117:9,12
**549 (1)**
117:13
**552 (1)**
117:11

**553 (1)**
127:10
**554 (1)**
127:10
**555 (2)**
122:9;124:25
**560 (1)**
124:25
**570 (1)**
124:25
**571 (1)**
122:9

**6**

**6 (3)**
51:25;52:1,3
**6th (1)**
47:8

**7**

**7 (12)**
52:16,17,18;56:6,21;
57:11;58:10,19;63:11;
68:20;69:1;78:11
**700 (1)**
53:18
**70s (1)**
10:9
**73 (2)**
102:9;103:3
**74 (3)**
102:6,7,8
**75 (1)**
97:1
**76 (1)**
95:10
**77 (1)**
91:12
**78 (1)**
91:12
**79 (1)**
90:9
**7th (1)**
118:19

**8**

**8 (6)**
55:8,9,10,18;56:10,17
**80 (2)**
86:11,18
**800 (8)**
41:5;42:11;43:6;48:5,
7;52:5;54:22,25
**800-638-5000 (1)**
40:21
**81 (1)**
84:19
**82 (1)**
79:24
**827-2925 (1)**

80:9
**827-3407 (1)**
53:10
**83 (1)**
80:8
**84 (1)**
79:24
**85 (1)**
77:10
**86 (1)**
70:24
**87 (1)**
72:11
**88 (1)**
64:7
**8th (4)**
45:20;46:12;47:15,18

**9**

**9 (9)**
7:12;59:19,22,23;
60:13,14,16;62:6;63:19
**90 (1)**
65:5
**90s (1)**
12:21
**91 (3)**
10:22;11:6;16:18
**92 (1)**
64:7
**93 (1)**
59:22
**94 (1)**
55:10
**95 (1)**
52:18
**96 (1)**
45:16
**98 (3)**
119:18;121:8;134:5
**99 (3)**
119:24;120:6,8

**A**

**able (5)**
7:21;9:12;38:15;
41:24;67:23
**above (4)**
29:9;33:11;57:8;61:20
**accept (1)**
26:7
**access (5)**
20:10;44:22;80:15,17,
18
**accessible (1)**
54:6
**Accident (11)**
68:4,6,10;70:20;
84:12;97:15;98:17,25;
99:3,11;126:8
**account (1)**

9:20
**accounting (2)**
8:9,11
**accurately (1)**
7:25
**acknowledge (1)**
106:12
**acknowledged (1)**
55:14
**acknowledging (1)**
85:12
**acknowledgment (1)**
93:6
**acquired (1)**
11:15
**ACS (2)**
54:1;65:7
**action (13)**
41:17;86:4;96:25;
103:21;105:7,11;
106:12;107:17;114:22;
115:5,12;120:2;135:7
**actions (1)**
134:19
**actively (1)**
8:16
**actual (3)**
36:9;50:10;70:9
**actually (4)**
42:10;57:23;79:21;
105:15
**additional (5)**
26:17;83:6,7;89:14;
118:24
**Additionally (2)**
6:20;139:20
**address (5)**
7:9,11;25:18;53:17;
141:6
**addressed (2)**
82:21;91:17
**admin (5)**
23:3,5,19;94:17,21
**administrative (9)**
20:15,17,19,23;21:4,
22;22:7;41:9;134:21
**Administrator (1)**
140:5
**adverse (10)**
49:14,19;69:20,25;
103:15;113:9;116:18,20,
21;127:14
**advise (1)**
65:23
**advisory (17)**
21:12,15;29:8,10,21;
30:2;33:2;101:20,21;
105:19,23;115:4,12,15;
119:11,16;135:18
**affect (1)**
67:17
**affiliate (1)**
9:5

**aftermath (1)**
88:16
**again (9)**
52:24;61:13;78:2;
79:12,17;92:5;97:12;
115:18;124:25
**against (2)**
92:16;96:8
**agency (2)**
69:17;135:24
**agent (10)**
43:8,10;62:4,9;64:2,
18;82:8;88:6;111:24;
112:25
**ago (9)**
15:13;94:16;127:17,
18;128:19;129:3;
130:21,23;131:18
**agreeable (1)**
14:9
**agreed (1)**
139:25
**agreement (5)**
31:21;66:3;81:14;
139:23;140:8
**air (1)**
64:21
**A-K (1)**
104:12
**al (1)**
6:11
**Alabama (3)**
12:13;13:2,6
**allegation (1)**
81:23
**allow (1)**
140:1
**allows (3)**
74:4,8;109:5
**alluding (1)**
92:9
**almost (2)**
9:7;36:1
**along (1)**
6:20
**alphabetical (1)**
104:12,17
**although (1)**
29:2
**always (1)**
29:3
**amicable (1)**
31:21
**amount (1)**
26:6
**amounts (1)**
44:17
**Ann (2)**
138:15;140:4
**apologize (3)**
35:14;41:12;121:8
**appear (1)**
53:3;122:16;124:9;

130:9
**appears (5)**
49:14;52:10;53:7;
87:5,11
**applicability (1)**
95:8
**applicable (1)**
74:8
**application (5)**
31:13;37:1,2,17;
110:20
**applies (1)**
22:4
**appropriate (4)**
41:9;73:23;85:7,20
**approval (1)**
39:20
**Approver (42)**
8:24;9:25;11:4,9;
17:21;20:9;23:21;28:20;
29:5,25;30:17,23;31:8;
32:16,20,24,25;33:4,5,
16;34:2,14;38:4;40:24;
41:15;42:1;60:9;69:12;
82:24;87:3;94:8,13;
101:8;109:22,25;110:6;
128:10,12,14,17;131:11;
135:5
**approvers (5)**
17:16,17;24:11;
124:23,24
**April (3)**
18:3;32:4,10
**area (4)**
39:17;49:7;80:14;
108:11
**areas (1)**
120:13
**around (7)**
8:12;13:4;46:12;80:6;
87:13;89:12;129:1
**arrested (1)**
14:3
**assigned (3)**
16:5;42:20;44:9
**assignment (1)**
45:9
**Associate (1)**
109:11
**assume (8)**
6:25;10:5;14:8;20:20;
43:9;48:11;87:12;88:15
**assuming (1)**
111:5
**assumption (3)**
6:24;7:2;57:20
**attached (8)**
21:18;35:8,15;103:4;
106:25;107:10,19;118:5
**attachments (1)**
136:23
**attended (1)**
8:4

**attention (1)**
34:19
**attorney (40)**
49:25;50:1;65:18,25;
66:1;70:3,7;71:10,13,17,
20;72:1,14,18;75:25;
80:3;85:1;86:2;88:1,1,5,
5,8,13,14;89:5;90:4,13;
95:14,21;97:4,9;102:13;
105:8;106:11;113:2,17;
118:21,25;138:19
**attorneys (5)**
68:15;76:3;81:9;
113:5;137:6
**attorney's (2)**
49:24;68:12
**August (1)**
8:24
**aunt (2)**
13:14,16
**Aurora (1)**
8:23
**authority (9)**
17:18;33:4,6;39:21;
103:25;133:3,13;134:13,
25
**automatic (1)**
9:20
**available (3)**
21:10;39:15;130:4
**aware (2)**
22:25;40:2
**away (2)**
42:14;73:22

**B**

**Babcock (3)**
110:3,4;114:4
**bachelor's (2)**
8:6,20
**back (26)**
8:7;10:8;56:24;57:17;
61:5,22;68:20;73:14;
85:4;88:3,3,10;99:1,16;
116:4;117:18,25;
118:23;121:11,16;
131:18;132:18;133:11;
135:22;137:19;139:18
**background (1)**
8:3
**base (1)**
139:13
**based (8)**
41:25;57:19;58:9;
68:7;82:1;94:7;98:15;
104:13
**basic (1)**
12:25
**basically (18)**
11:5;14:16;16:20;
34:10;58:4;71:13;74:11,
15;75:8,12;77:3;100:15;

109:4;118:2;120:13;
123:9;131:8;132:6
**basis (10)**
11:20;41:21;75:10,16,
19,25;78:12;79:13;
85:14;99:14
**bat (2)**
6:6;54:8
**Bates (2)**
34:25;35:20
**Bates-stamp (1)**
35:7
**Bates-stamped (1)**
36:2
**became (5)**
9:15;10:22;18:8;
24:23;49:11
**becomes (1)**
116:21
**beginning (3)**
10:16;100:2;139:21
**begun (1)**
133:2
**behalf (10)**
62:16;70:3,12;78:20;
80:23;85:4,24;99:24;
136:16;137:3
**behind (2)**
118:5;125:17
**believes (1)**
126:23
**belong (3)**
119:4,6,25
**beneficiaries (7)**
13:19,21;21:7;25:13;
34:16;37:18;39:21
**beneficiary (61)**
13:7,8,10,15,17,20;
25:2;26:13,19,22;27:5,9,
17,24;28:6,19,22,24;
30:7,19;31:1,7,11,14,20;
32:3,12;33:18;34:5,9;
37:14,15;38:2,6,9,11,12,
16,25;39:9,13,18;40:4;
47:8;62:4,8;63:3;64:2;
65:24;73:4,23;74:19;
93:19,22;97:13;98:14,
18;100:18;110:19;
111:4,12
**beneficiary's (1)**
13:13
**benefits (2)**
58:14;74:11
**best (1)**
84:1
**beyond (5)**
17:18;22:17;42:19;
103:24;121:4
**big (1)**
129:10
**bigger (1)**
113:14
**binder (5)**

129:10,12,16,19;131:3
**binders (1)**
129:16
**birth (1)**
67:19
**bit (2)**
64:8;102:7
**Board (1)**
136:8
**BONDURANT (31)**
6:2;9:11;14:10;19:15;
22:12;23:10;30:11;32:7;
33:20;35:20;42:17;
43:12;57:13;62:22;
63:16;73:25;74:3;75:21;
76:6;79:10;86:8,15;
98:2;105:1;107:12,23;
116:23;139:16;140:11,
12;141:1
**book (3)**
24:16,18,19
**books (2)**
23:23;24:5
**BOSS (14)**
15:4;19:1;44:7,13;
47:24;49:6;54:6;114:9;
122:22;123:17;124:11,
14,17,20
**B-O-S-S (1)**
15:4
**bosses (1)**
124:8
**both (9)**
13:21;15:6;49:6;
65:19;100:11;119:4;
122:1;124:15,18
**bottom (2)**
87:6;90:22
**box (1)**
114:13
**brakes (1)**
86:4
**break (7)**
6:17,19;35:24;57:14;
58:22;132:15;139:12
**breakdown (1)**
104:12
**brief (1)**
8:19
**briefly (3)**
8:2;50:19;112:17
**bring (2)**
37:16,16
**broad (7)**
30:13,13;33:24;42:25;
43:13;116:24;117:6
**broken (1)**
112:23
**broker (5)**
42:5;43:8,10,21;82:8
**brother (1)**
138:9
**brought (2)**

85:18;99:4
**bunch (2)**
123:13;132:21
**Burke (6)**
52:10,25;55:13,19;
56:15;77:20
**Burt (2)**
112:19;138:19
**business (1)**
87:2;137:18

**C**

**calculation (1)**
139:7
**calculations (1)**
139:9
**call (52)**
16:23;17:23;31:9;
40:20;41:4,16,23;42:3,7,
10,11;43:2;44:23;45:7;
46:8,10,19;47:24;48:4,8,
25;49:7;50:19,20,21,21;
51:5,21,21;52:5,10,14;
59:11;60:7;63:20;69:24;
86:20;88:2,3,7,12,17,22;
89:5,7;90:11,12,14,14,
20;111:23;138:22
**called (15)**
15:2;42:5,5;46:5,24;
47:3;85:4;88:1,6,8,10,
13;102:2;112:25;131:7
**caller (1)**
43:4
**calling (3)**
47:2;48:5;84:10
**calls (23)**
19:16;32:8;42:22;
43:5,8;47:10;48:3,6;
59:12;75:22;76:9;82:7,
9;86:20;87:15;89:12,25;
91:3;98:3;105:2;114:1;
138:21,23
**came (41)**
41:23;42:7,13;44:8;
45:2,11,25;46:10;47:22;
50:22;51:18,22;52:8,23;
57:3,23;58:24;59:21;
64:9;65:12,15;66:5,9,17;
68:21,25;76:13;92:25;
103:7,17;106:15,16;
107:1;111:5;114:7;
121:23;124:12;125:24;
129:1;133:20,23
**can (70)**
6:5,19;8:19;12:11;
15:25;17:13;22:16;25:2;
26:7;28:12;31:21;34:25;
36:8;37:21;39:17;40:19;
42:19,23,24;43:1;44:11;
46:18;51:8;52:22;55:24;
56:1,11;58:6;61:17,18,
22;64:13;66:3;73:15,18;

74:2,5;76:10,11,17;80:2,
8;82:2;84:25;86:17;
87:17;90:9;94:18;98:5;
99:19;102:12;105:4;
106:9;108:8,9;109:1,7,
17;114:10;116:3;
118:17;119:22;122:20;
125:4,7;127:13;130:19;
132:4;134:23;141:7
**capital (1)**
100:8
**care (2)**
43:11;66:14
**Carol (1)**
110:2
**carrier (1)**
111:8
**case (106)**
6:8;11:24;12:23,25;
13:3,6,10,22;14:16,18,
19;16:1,5,11,13;17:17;
18:3;19:8;27:11;28:13,
17,22;29:2;31:12;32:4;
33:24;34:8,20;35:4,9;
36:10,12;37:13;38:13;
39:24;41:21;43:22,25;
44:3;8;46:7;47:21;48:3,
4,17,25;49:4,5,8,12,13,
17;51:2,3;60:4,21,24,24;
65:17;69:23,25;70:1,2;
77:24;80:25;82:2,4;
83:5;86:20,22;90:15;
94:2,8;95:8;100:10,13,
14;104:6,7,25;105:15;
108:13,15;109:6;110:22,
23;114:5,23;115:4,11,
19;122:12,21,23;129:21;
132:24;133:20;134:13;
135:14;139:1,23;140:2,
3,10,17,18
**cases (6)**
18:5;69:19;104:8;
119:15;131:11,12
**casual (1)**
24:13
**categorized (1)**
44:16
**cause (8)**
68:9;69:4,8;70:18;
93:8,14;98:24;99:2
**causes (1)**
69:15
**cc (1)**
137:8
**cc's (1)**
137:19
**CDI (10)**
15:2;19:1;49:6;
108:11;116:10;123:16;
124:10,11,12,20
**center (3)**
40:21;42:11;46:20
**certain (4)**

20:25;21:5;110:23;
120:13
**certificate (35)**
8:9,10,15;25:10,19,25;
26:4,5,11,25;27:12;
64:15;66:6,22;67:12,15,
18,25;68:3,7,9,22;73:6;
82:15,18;84:7,8,8,9,11;
99:2;126:9;135:22;
136:4,12
**certification (1)**
26:20
**certified (11)**
25:9,11;26:1,3,8,11;
27:11;53:9;67:11;73:6;
82:22
**chain (4)**
33:1;107:1;122:2,4
**Chances (1)**
85:11
**Change (18)**
8:25;9:1,15;10:8;
13:15,20;21:16,20;22:8,
23;38:12;39:12,21;40:4;
62:6;79:5,7;93:19
**changed (2)**
21:17;124:16
**changes (3)**
9:2;31:14;98:19
**characterized (2)**
23:12;33:21
**chart (1)**
22:21
**check (5)**
38:9;67:21;110:25;
111:12;140:13
**checking (1)**
9:20
**Check-o-Matic (2)**
9:16,19
**Check-o-Matic/Metromatic (1)**
10:12
**Chicopee (1)**
8:5
**circumstances (14)**
32:15;43:16;57:10;
58:12;63:12;68:17;69:2;
81:11,17,24;82:5;89:15;
117:8;129:1
**civil (3)**
103:20;105:7,11
**Claim (98)**
11:4;9:12;12,13,19,22;
13:2,6,16;1:9;22:4,6;
27:8;28:4,19,23;36:25;
38:22;42:21;43:7,8,9,14;
44:2;45:9,10;47:7,10,19;
52:7;54:17;57:1;62:8,
18;64:16;65:12;66:2,5,6,
22;67:7,17;68:21;69:14;
71:9,18,21;72:2,4,19;
73:4,6,7,8,12,21;75:1;
76:17;78:6;79:8;82:25;

86:5;94:1,4;95:5;
96:11,18;97:15;98:17;
103:15;106:21;107:11;
111:14,15,16,17,21,25;
113:1,10;114:14;116:18,
20,22;120:9,12,17;
127:14;129:25;130:5;
132:11,12;135:9;
136:15;137:22,23,25
**claimant (6)**
25:6,8,13,20;26:24;
27:10
**claimants (2)**
26:10;137:11
**claims (78)**
9:24;10:1,2,23;11:2,
13,14,20;12:2;15:7,9,10;
16:6,8,17,19;17:2,5,21,
21;18:22;19:25;20:9;
21:1,11,14,24;23:2,8,20,
22;24:19;27:16,23;29:8,
9,21,25;30:2,17,21,23;
31:8;32:15,20;33:2,16;
34:2,14;38:4;40:23;
41:15;42:1;47:15,17;
53:13;60:9;61:22;69:12;
82:24;87:2;94:8,13,19;
101:8,20,20;105:18,23;
113:23;115:15;123:6;
127:25;128:7;134:23,24,
24;135:5
**clarification (1)**
41:11
**Clarify (1)**
21:2
**classroom (2)**
18:25;19:3
**clean (1)**
108:7
**clear (4)**
7:7;35:12;43:17;74:7
**clerks (1)**
17:16
**client (1)**
113:7
**client's (1)**
96:11
**co-counsel (1)**
139:13
**College (2)**
8:4,8
**column (1)**
109:11
**columns (1)**
109:2
**coming (11)**
24:1;41:16;42:4;48:7;
54:15;70:3,5;86:3;
93:17;106:20;114:14
**COMMENCED (1)**
5:1
**comment (5)**
116:8,11;122:21;

125:18,19
**comments (5)**
49:7;82:2;86:8;
122:23;125:21
**communicated (2)**
62:7;77:21
**communicating (1)**
64:1
**communications (5)**
92:9;133:17;137:5,8,
19
**Community (1)**
8:8
**company (8)**
16:23;18:7;19:8,9,14;
44:19;104:24;106:4
**compare (1)**
51:9
**competent (1)**
22:15
**complaint (4)**
35:4,8;76:13,20
**complete (2)**
25:6,7
**completed (3)**
25:14,21;26:21
**complex (1)**
131:10
**computer (14)**
14:22,24;20:21,24;
21:4;54:9;59:16;61:11;
63:20;108:20;112:13;
123:10;129:13,14
**concerned (1)**
65:25
**concerning (3)**
41:23;89:14;139:1
**concerns (6)**
62:17;65:22;68:13;
70:5;73:11;113:6
**CONCLUDED (1)**
141:10
**concludes (1)**
141:8
**conclusion (5)**
32:9;75:22;76:9;98:4;
105:3
**conclusions (1)**
19:17
**conduct (1)**
30:7
**conducted (2)**
12:15;30:20
**confirm (4)**
82:2;95:22,22;99:5
**confirmation (1)**
97:10
**confirmed (1)**
98:18
**confirming (1)**
85:1
**Congratulations (2)**
9:9,13

**connection (1)**
24:14
**considered (1)**
49:8
**Consolidated (1)**
15:3
**construed (2)**
86:9,10
**consultant (40)**
16:21,22;17:10,11,14,
19,22;18:4,8;29:6,7,9,
15;30:1;33:1;101:14,16,
25;102:2;103:9;104:1,2,
4,18;105:21;110:9;
114:23,25;117:24;
120:1;128:1,7;132:24;
133:1,14,18;134:6,8;
135:1,18
**consultants (4)**
104:10;119:14,15;
127:24
**contact (3)**
51:3,6;62:2
**contacted (3)**
65:24;71:13;96:4
**contain (1)**
78:10
**contained (6)**
20:13;41:13;58:10,19;
73:18;106:4
**contended (1)**
13:15
**contents (1)**
76:20
**contestable (1)**
26:24;27:2
**context (1)**
76:8
**contingent (1)**
39:18
**continue (18)**
75:11;78:9,15;85:24;
86:5;93:2,5;97:10,20;
99:21;103:10,11,13,16;
114:18,24,25;120:4
**continued (1)**
81:13
**continues (1)**
86:4
**continuing (3)**
78:1,13;85:13
**continuously (1)**
9:5
**contractual (2)**
62:19,24
**conversation (14)**
59:1;60:25;61:2,4,7;
63:14;85:2;92:21;95:16,
17,18,23;126:11,22
**conversations (17)**
14:12;15:19,21;50:13;
54:21,23;55:3;77:20;
82:3;123:22;138:3,5,8,

11,14,19,25
**conversions (1)**
9:3
**convoluted (1)**
108:5
**copies (6)**
24:9;97:17;121:23;
133:10;137:10,14
**copy (22)**
25:9;26:1,3,8;27:10,
11;35:21;64:19,21;
67:12;82:22;90:17;
102:25;105:9,9;107:5;
114:20,22;120:2,3;
121:9;130:17
**corner (1)**
37:6
**coroner (3)**
69:16;84:16;98:25
**coroner's (5)**
82:22;83:3;84:4,6;
136:3
**corporate (4)**
29:8,9,19;113:21
**Correction (1)**
25:7
**correctly (5)**
33:14;51:11;60:22;
104:16;135:4
**correspondence (15)**
31:9;36:19;44:14;
45:11;47:22;48:10,11;
57:3;114:5,11;118:24;
137:5,10,12,14
**correspondent (1)**
44:18
**Cote (1)**
109:19
**C-o-t-e (1)**
109:20
**counsel (9)**
6:18;14:13;15:20;
75:18;82:12;96:15;
101:18;135:15;139:24
**counsel's (1)**
137:24
**County (2)**
136:3;140:2
**couple (7)**
6:15;24:7;39:19;
100:22;101:22;124:13;
132:22
**course (3)**
16:4;87:2;137:18
**COURT (25)**
5:5;6:9,10;7:7;33:9;
77:3,5,6;85:7,18,20;
86:3;97:11;101:5,6;
103:16;105:7,8,12;
120:3;135:6;140:2,18,
22;141:5
**courtesy (1)**
102:25

**courts (2)**
103:21;114:23
**cover (5)**
22:22;35:15;47:13,18;
120:1
**coverage (3)**
25:10;26:6;111:1
**create (4)**
86:23;87:1,24;119:13
**created (15)**
24:5,18,22;90:19;
91:1;109:9,13;122:1;
127:20,22;128:1,3,5;
131:14,17
**creating (1)**
87:13
**creation (1)**
108:23
**Creative (1)**
18:19
**credit (1)**
47:25
**crossing (1)**
76:15
**CSR (1)**
51:24
**curiosity (1)**
129:4
**current (2)**
11:2,11
**currently (2)**
7:16;11:13
**customary (1)**
111:25
**customer (6)**
39:16;40:21;41:6;
46:19;61:3,20

**D**

**Dan (3)**
18:6;104:11,12
**Daniel (1)**
17:6
**data (1)**
127:2
**database (5)**
20:3,4,7,10,14
**date (15)**
42:7;67:18,20;71:4;
87:11,14,15;90:25,25;
91:3,21;92:7;102:16,18;
109:8
**dated (5)**
55:14,18;72:15;92:8;
95:25
**dates (1)**
57:19
**David (13)**
42:5;43:21;46:8,11,
24;47:6;50:9;51:5;61:3,
7;63:20;111:24;112:24
**day (5)**

46:10;48:24;64:21;
72:15;74:17
**days (1)**
48:2
**deal (1)**
69:13
**dealing (2)**
84:3;87:21
**dealt (4)**
30:24;36:15;43:24;
69:13
**Death (98)**
8:23;11:13,14,20;
12:1,12;13:2,5;16:3;
17:1,5;19:24;21:1,23;
22:4;25:10,19,24;26:5,
11,25;27:3,6,12;36:16;
39:8;41:23;42:6;43:5;
52:7;57:10;58:12;63:13;
64:15;66:6,22;67:11,12,
15,18,20,21,24,24;68:2,
3,5,6,9,10,18,22;69:2,4,
9,15;70:6,9,12,18;71:16;
72:7;73:6;74:10;78:2,
14,22;79:4;81:11,17,25;
82:6,15,18;83:14;84:7,8,
8,9,11;89:16,21;93:8,14;
97:14;98:16,24;99:2,2,
11;126:9;130:1;135:21,
25;136:4,11,12;139:5
**deaths (1)**
69:18
**deceased (3)**
31:17;81:9;111:1
**decedent's (3)**
138:9,12,15
**December (22)**
40:10;45:20;46:12;
47:15,18;48:15,19;
52:11;53:25;54:12,14;
55:16,18;56:9,14,24;
57:21;68:20;110:18;
112:18;116:4,5
**decide (1)**
107:16
**decided (1)**
128:8
**deciding (1)**
133:6
**decision (15)**
28:21;29:6,7,24;
32:22;33:7;58:9;67:17;
85:24;133:7;134:16;
135:6,12,14,15
**decision-making (4)**
29:10;133:3,12;
134:12
**decisions (1)**
106:21
**deduction (1)**
9:22
**defendant (3)**
19:7;104:25;140:7

**defer (32)**
53:1;56:3,8;58:6,14,
18;63:13;68:19;70:6;
71:15;72:23;75:3,11;
76:24;78:3,9,15,23;79:6,
13,18;81:13;85:13,24;
86:5;90:6;93:2,5;97:11,
20;126:18;132:22
**deferred (11)**
55:23;56:1,10,17,20;
68:8;75:7;85:15;89:20;
116:3,12
**deferring (2)**
78:12;106:22
**definitely (1)**
26:16
**degree (1)**
8:6
**demanded (1)**
80:23
**demanding (1)**
81:3
**demarcation (1)**
26:2
**denial (1)**
13:1
**deny (1)**
134:24
**Department (2)**
115:19;137:24
**depend (2)**
29:1;43:4
**dependent (1)**
29:4
**depending (3)**
25:10;26:12;43:16
**depends (2)**
26:16;28:25
**deposed (5)**
12:16;13:25;15:12;
100:3;129:21
**DEPOSITION (11)**
5:1;6:8;12:9,14;14:15;
15:17,22;139:22;140:1;
141:9,10
**depositions (3)**
12:15;100:22;140:9
**Describe (5)**
25:2;36:8;40:19;
52:21;119:22
**designated (2)**
13:9;37:18
**designation (2)**
13:8;65:6
**desk (9)**
23:24;24:3,4;57:24;
59:16;129:18;130:7,9;
131:19
**desks (1)**
131:20
**detail (1)**
109:2
**details (1)**

90:1
**determination (2)**
58:18;84:11
**determine (11)**
25:11;38:5,15;44:17;
49:19;57:4,25;66:18;
67:16,23;69:8
**determining (1)**
28:16
**developed (1)**
22:16
**dial (2)**
48:12;54:22
**Diane (4)**
17:7;24:21,25;127:23
**died (13)**
25:18;26:15;39:6;
40:8;43:2;44:4;82:21;
83:2;84:4,12,14;126:8,
13
**dies (1)**
25:5
**difference (2)**
19:12;107:15
**different (20)**
13:18,19;18:11;29:2,
4;31:13;37:2;44:21,22,
22;46:22;59:20;75:25;
78:11;79:7;94:19;117:7;
121:23;125:2;133:10
**differently (3)**
43:15;57:9;93:1
**direct (10)**
17:22,23,24;18:11,14;
19:9,11;37:21;48:12;
54:22
**directing (1)**
34:14
**direction (4)**
20:25;23:21;28:4;
140:10
**directives (1)**
28:3
**directly (8)**
47:11;48:6;50:3,6,13;
63:21;91:18;101:15
**Disability (8)**
8:23;10:15;12:12,19;
16:23,24;24:8,10
**disagreeing (1)**
13:7
**Disbursement (1)**
15:3
**discretion (2)**
28:16;73:20
**discussed (3)**
18:20;83:23;95:24
**discussion (2)**
78:1;107:24
**discussions (2)**
89:18;95:6
**disputed (1)**
69:14

**distinction (1)**
26:3
**distributed (1)**
25:13
**District (5)**
6:9,10;105:8,11,12
**divided (1)**
104:11
**division (2)**
10:10,20
**divisions (1)**
9:18
**divorce (1)**
21:8
**document (81)**
35:1,3,9,19;36:6,8;
38:6;40:17,19,22;41:2,2,
3,4,19,22,25;45:17;
46:18;49:1,2;50:21;
52:4,21;53:22,23;60:16,
19;61:9;66:16,18;70:25;
71:2,4,6;72:12;77:4,5,6,
10,14;79:25;80:2;84:20,
25;86:17,23;87:1,13,23;
90:9;91:1,16,22;92:2;
97:3;102:20,22,23;
104:19,22;106:10;107:9,
10;108:9,20,24;109:1;
112:4,5,12;116:10;
127:11,13,16,20;128:6,
20;130:2,4,9
**documentation (18)**
40:20;62:6;73:24;
81:22;82:20;83:1;84:3;
93:12;99:9;114:12;
116:15;121:18;126:6;
135:24;136:2,10,21,25
**documenting (1)**
86:19
**documents (17)**
15:5;17:12;34:21;
35:21;41:20;50:20;66:8;
97:11;122:10,11,15,20;
125:24;131:15;132:19;
138:18,24
**Don (1)**
17:6
**done (12)**
15:16;31:8;61:18,23;
65:15,20;68:19;105:21;
109:6;112:20;134:14;
139:14
**door (1)**
31:18
**double (1)**
81:13
**down (23)**
7:8;16:22;21:11,14,
16,20;41:5;43:7;46:21;
51:18;52:6,9;59:9;60:6;
61:4,21,25;67:21;83:22;
89:8;102:16;114:19;
125:8

**Dr (55)**
16:3;39:24;40:3,7;
41:24;42:14;44:3;45:10;
47:20;54:18;62:20;63:1,
7,12;64:15;68:2,17;69:3,
4,8;70:12,18;73:17;78:2,
7;79:4;81:17,24;82:5,
21;83:2,14;84:4;87:20;
89:15;90:12;93:8,14;
99:10;104:15;108:16;
122:24;126:7,12,16,23;
130:1;132:12,25;
135:25;136:11;138:1,9;
139:5;140:6
**drafts (1)**
9:20
**duly (1)**
5:3
**duplicate (1)**
120:3
**duplicates (1)**
124:19
**duplicative (1)**
124:3
**during (3)**
12:3;18:14,23
**duties (2)**
40:23;42:1

## E

**earlier (5)**
38:21;62:25;82:16;
94:10;100:2
**early (2)**
66:25;133:11
**educational (1)**
8:3
**either (5)**
12:18;25:9;59:18;
100:24;121:3
**electronic (1)**
19:2;20:20;38:9;
114:12;126:3
**electronically (2)**
54:23;133:21
**Elms (1)**
8:5
**else (22)**
15:16;19:4;23:20;
26:13;38:23;51:3;56:5;
61:1;67:1;70:21;76:3;
78:20;84:14;85:7;99:24;
104:8;109:15;114:1;
117:21;135:16,17;
140:15
**e-mail (5)**
20:12;31:9;52:13;
120:22;141:6
**employ (1)**
18:23
**employed (3)**
8:16;9:4;24:25

**employer (2)**
19:10,11
**employment (2)**
8:19;12:16
**enclosed (1)**
118:5
**encourage (1)**
31:20
**end (5)**
40:9;55:22;61:16;
71:19;139:12
**ended (1)**
88:11
**enforcement (2)**
69:17;135:24
**engage (1)**
63:14
**England (5)**
11:14,19,22;44:20;
80:13
**Enter (3)**
16:8;43:7,9
**entered (2)**
60:23;124:14
**entering (1)**
111:6
**entire (2)**
10:18;22:20
**entries (3)**
116:1,6;127:3
**entry (12)**
111:10,20;112:24;
114:4,20;115:4,17,20,
22,25;116:4;118:1
**especially (1)**
23:25
**establish (2)**
49:14,16
**established (3)**
113:10,13,18
**estate (5)**
71:14;88:5,19;116:6;
140:5
**estimate (1)**
130:19
**et (1)**
6:11
**E-Tran (3)**
140:24;141:2,4
**Eugene (2)**
138:12;140:3
**evaluate (1)**
15:10
**even (2)**
76:7;116:2
**everybody (1)**
34:10,16;80:15;
108:13;130:16
**everyone (1)**
109:18
**evidence (1)**
93:12;99:9;126:6;
136:25

**exact (1)**
74:17
**exactly (4)**
35:25;64:4;117:7;
131:8
**EXAMINATION (1)**
5:17
**examiner (2)**
97:14;98:16
**example (3)**
22:8,9,19
**except (5)**
10:15;14:8;58:18;
72:5;92:8
**EXHIBIT (30)**
34:24;35:13,15;40:13;
45:15;46:15;50:17;52:1,
17;55:9;59:23;64:6;
70:23;72:10;77:9;79:23;
84:18;86:12;90:8;91:11;
95:11;97:2;102:5;106:8;
108:1;117:14;118:10;
119:20;122:8;127:9
**exhibits (3)**
140:25;141:2,4
**exist (1)**
19:23
**existence (1)**
124:12
**exists (1)**
20:1
**expedite (1)**
90:18
**expertise (1)**
17:25
**explain (6)**
44:11;61:18;109:1;
116:3;117:6;131:8
**Explained (6)**
61:17;90:15;91:6;
97:12;112:25;113:4
**explanation (3)**
99:18,20,23
**expound (1)**
83:12
**Express (1)**
102:14
**extensive (1)**
49:10
**extent (14)**
19:16;22:13;23:13;
32:8;33:21;42:18;74:4;
75:22;76:7;79:11;98:3;
105:2;107:13;116:24

**F**

**face (2)**
26:6,12
**facilitate (2)**
28:12;42:15
**fact (6)**
30:12;39:3;56:6;72:5;

79:8;93:24
**factors (2)**
26:17,18
**facts (2)**
33:23;69:2
**factual (1)**
89:14
**fair (3)**
7:2;16:6;57:20
**familiar (2)**
39:3;94:14
**family (25)**
31:16;43:5;50:5,12;
62:13,16,20;63:7;69:23;
70:4,8;75:14,18;81:9;
82:10;86:2;88:4,9,19;
93:3,21;113:5;118:25;
126:23;136:16
**far (3)**
40:6;56:12;79:20
**father (1)**
138:12
**fax (16)**
53:3,6,11,13,19;58:1,
2,3;80:9,10,12,13,14,16,
18;90:17
**faxed (1)**
54:10
**faxes (1)**
54:4
**February (20)**
95:25;96:14,19;97:6,
19;99:8,17;102:16;
103:4;106:20;114:19;
115:17,24;121:9;133:11,
15,16;134:1,2,20
**federal (5)**
35:4;100:10,13;
102:14;139:23
**FedEx (2)**
64:20;133:24
**feedback (1)**
5:12
**felt (1)**
136:17
**Ferencko (1)**
17:6
**F-e-r-e-n-c-k-o (1)**
17:7
**few (9)**
6:14;59:12;103:24;
104:22;124:5,19;
130:25;131:18;132:20
**field (1)**
47:5
**figure (4)**
9:12;109:17;132:23;
133:14
**file (65)**
13:21;14:21,23;15:16;
16:7;38:20,21,23;48:20,
22;49:5,8,15,16,18;
55:20;57:2,25;59:2,3,5,

7,8,10,15,17;61:13;64:3;
65:12,18;69:13;70:10;
77:15,16;86:21;93:1;
98:23;103:1;105:10;
110:14;112:11;113:10,
13,14,15,18;114:2,9;
115:9,13;116:9;120:2;
123:7,24;125:25;126:1,
5,7,12;127:3;132:5;
133:4,17;134:19;137:25
**filed (8)**
35:4;96:7;103:21;
105:15;106:13;114:23;
120:2;121:24
**files (4)**
44:13;97:17;111:3;
115:8
**filing (4)**
88:9,23;89:10;113:17
**fill (3)**
27:9;39:17;119:15
**Financial (4)**
11:15,19,22;80:14
**find (3)**
38:23;83:25;124:18
**fine (3)**
6:19;7:11;68:14
**finish (1)**
7:5
**firm (2)**
82:10;88:4
**first (29)**
5:3;6:16;7:8;12:19;
15:11;27:3,7;31:15;
44:2;45:8;49:22,25;
53:24;55:15;60:19,23;
72:25;104:22;110:22;
111:21;117:11;119:7,
13;121:19;124:12;
129:2;134:1,3,5
**five (4)**
37:7;64:13;130:23;
131:25
**fix (1)**
111:10
**fixed (1)**
111:8
**Flip (1)**
37:5
**flipping (2)**
109:24;129:19
**flow (1)**
29:3
**follow (1)**
103:3
**follows (2)**
5:4;102:9
**follow-up (4)**
48:2;105:14;119:11,
12
**follow-ups (1)**
132:20
**form (41)**

7,8,10,15,17;61:13;64:3;
65:12,18;69:13;70:10;
77:15,16;86:21;93:1;
98:23;103:1;105:10;
110:14;112:11;113:10,
13,14,15,18;114:2,9;
115:9,13;116:9;120:2;
123:7,24;125:25;126:1,
5,7,12;127:3;132:5;
133:4,17;134:19;137:25

13:20;14:8;19:16;
22:13;23:11;26:20;
30:12,16;32:7;33:20;
37:11,12;39:15;42:18;
47:7;59:20;62:22;63:16;
64:16;65:12;66:5,6,23;
67:7;68:21;73:6,25;
74:3;76:6;79:10;93:19;
94:4,9;98:2;105:1;
107:12;108:5;111:21;
112:7;116:23;119:14
**formal (1)**
18:21
**format (1)**
41:3
**forms (4)**
13:18;22:6;43:8,11
**forth (1)**
137:19
**forward (1)**
6:23
**found (1)**
129:23
**four (1)**
41:12
**franchise (1)**
11:14
**franchises (1)**
111:2
**fraud (1)**
100:20
**fraudulent (1)**
13:16
**frequent (1)**
31:3
**frequently (1)**
32:19
**front (1)**
123:25
**full (2)**
31:13;120:3
**fully (1)**
25:21
**furnish (2)**
99:14;137:10
**further (2)**
93:7;140:20
**FYI (1)**
21:21

**G**

**gave (2)**
113:7;130:16
**GBI (1)**
136:6
**general (4)**
31:12,21;94:25;95:2
**Generally (11)**
11:8;15:24;16:11,14;
34:7;39:11;42:22;43:14,
18,19;100:4
**gentlemen (1)**

140:16

**Georgia (9)**
21:25;22:11,25;94:13,
14;95:7;105:12;136:8;
140:3

**Georgia-based (1)**
23:2

**gets (1)**
114:1

**given (2)**
12:8;132:2

**gives (2)**
47:25;109:8

**giving (2)**
62:15;108:6

**Glenn (2)**
88:17;139:1

**goes (7)**
17:19;32:25;105:18,
19;109:19;131:12;135:1

**Good (7)**
5:18,19;14:6;72:2,4,
20;73:4

**graduated (2)**
8:6,20

**Graziosi (51)**
6:10;16:2;32:6,13;
38:3,10,19;39:1,10;40:5;
45:22;46:24;47:11;50:2,
11;63:4;64:16;67:2;
68:23;71:7,11;72:20;
74:24;75:7,20;76:5;
78:6;79:9,19;80:4,23;
81:5;85:6,25;93:22;
94:1;96:14;97:12;98:14;
110:19;126:16,24;
129:25;136:19;137:1,8,
14;138:6;139:4,24;
140:7

**Graziosi's (3)**
72:4;75:1;92:10

**Great (1)**
53:19

**greater (1)**
27:12

**ground (2)**
6:15,16

**group (1)**
135:18

**Gruslan (7)**
17:7;24:21,25;127:23;
128:23;131:14;132:8

**guess (5)**
10:15;16:18;117:23;
130:6,8

**guideline (2)**
28:8;34:13

**guidelines (15)**
19:23;20:1,2,10,13,18,
24;21:5;23:1,13,14,16;
28:3;128:22,24

**Guys (1)**
5:9

**H**

**half (1)**
73:1

**half-an-hour (1)**
115:3

**handbooks (1)**
19:23

**handle (9)**
20:25;23:7,21;28:4;
44:17;101:9,19;110:23;
113:23

**handled (13)**
43:15;51:24;114:16;
116:17;120:24;121:2,3;
125:25;126:1;132:11;
133:17;137:22,22

**handler (1)**
134:23

**handles (3)**
54:3;101:21;131:10

**handling (26)**
16:17;17:5;18:22;
19:24;27:16,23;28:9,10,
17;38:22;49:10;51:2;
54:16;69:10;76:16;
82:24;83:5;94:8;95:5;
106:21;115:8;120:5;
123:5;129:25;130:5;
136:15

**hands (10)**
77:7,8;106:17;107:2;
115:1,2;119:2;133:8,13;
134:18

**handwriting (1)**
53:4

**handwritten (1)**
53:2

**hang (2)**
102:6;117:10

**happened (1)**
106:1

**happening (1)**
92:10

**happens (4)**
43:3,14;105:24;122:5

**happy (1)**
113:1

**hard (1)**
117:6

**Hawaii (2)**
21:17;22:9

**head (1)**
59:13

**hear (1)**
6:3

**heard (3)**
17:11;123:13;131:5

**HELD (1)**
107:24

**help (5)**
11:19;128:9,12;132:6,
23

**hereby (1)**
58:13

**here's (3)**
25:18,18;105:9

**Hey (1)**
57:13

**high (2)**
8:3,4

**history (1)**
8:19

**hit (3)**
16:8;44:7;52:24

**hold (4)**
114:6,8,13;120:23

**holds (1)**
15:5

**home (2)**
7:10,11

**homicide (1)**
67:22

**honest (1)**
105:18

**honestly (5)**
7:22,25;77:22;117:17;
126:20

**Houle (3)**
17:6;18:7;104:11

**H-o-u-l-e (1)**
17:6

**husband (1)**
25:18

**I**

**icon (2)**
20:11,14

**ID (28)**
34:24;40:13;45:15;
46:15;50:17;52:1,17;
55:9;59:23;64:6;70:23;
72:10;77:9;79:23;84:18;
86:12;90:8;91:11;95:11;
97:2;102:5;106:8;108:1;
117:14;118:10;119:20;
122:8;127:9

**identified (4)**
36:13;37:6;38:1;73:16

**identifier (1)**
35:1

**identify (15)**
35:25;64:13;80:2;
84:25;86:17;87:17;90:9;
102:12;106:9;108:9;
110:1;118:17;119:22;
122:20;127:13

**ignore (1)**
61:15

**Illinois (1)**
8:23

**image (2)**
54:9,11

**imagine (1)**

30:14

**included (1)**
37:19

**independently (1)**
69:16

**indexed (1)**
44:15

**indicate (11)**
38:24;41:23;42:3,7;
48:23;52:12;83:11;
88:22;89:9;96:3;99:10

**indicated (15)**
7:4;34:3;56:9,15;
67:24;68:2,6,9;83:2,3;
85:25;92:14,19;139:19,
21

**indicates (3)**
73:19;77:25;126:7

**indicating (3)**
86:3;88:18;126:22

**indication (4)**
54:1;68:8;87:11;115:9

**individual (5)**
26:22,23,23;27:6;
125:23

**individually (2)**
100:25;140:4

**individuals (2)**
64:1;74:20

**individual's (1)**
17:8

**infamous (1)**
86:7

**inform (2)**
33:18;96:14

**information (28)**
21:23;22:8,10,14;
26:17;41:13,16;42:4,13;
43:6;62:3;68:11;78:11,
21;79:4;82:20;83:1,6,8,
20,22;89:14,18,22,24;
94:18,21;99:9

**informed (2)**
96:5,19

**in-house (1)**
101:15

**initial (1)**
44:18

**initialed (1)**
49:5

**Initially (1)**
32:24

**initials (4)**
87:5,7,9;90:22

**initiate (2)**
69:3;135:6

**Initiative (1)**
15:3

**input (1)**
133:3

**inquiries (2)**
69:21;71:16

**inquiry (3)**

52:6,8;132:22

**installed (2)**
18:24,24

**instances (1)**
30:24

**instant (1)**
6:8

**instead (2)**
93:22;112:5

**instructed (1)**
124:15

**instruction (1)**
40:3

**insurable (1)**
100:15

**insurance (36)**
10:2,5,9,13,19;16:2,
17;18:23;19:8,9,13;
21:24;23:2,8,22;25:3,12;
26:14;27:16,23;28:4;
30:6;32:17;36:17,25;
39:22;47:20;54:17;
58:14;73:17;78:3;94:2;
104:24;106:4;123:24;
137:25

**insured (12)**
13:14;25:5;26:15;
39:3;42:6;67:19;71:17;
73:22;88:20;100:19;
117:3;118:25

**insured's (4)**
13:14;25:9;62:13;
71:14

**insuring (2)**
44:4;65:13

**intend (4)**
66:2,4;86:10;105:10

**intended (1)**
76:17

**interest (14)**
21:17,18;22:9,20;
31:16,17;70:4;100:18;
117:1,2,4,5;139:8,8

**interested (1)**
62:16

**interesting (1)**
39:14

**interests (1)**
21:8

**interplead (3)**
33:9;135:11,11

**interpleading (1)**
133:6

**interpret (1)**
76:12

**interpretation (1)**
76:19

**into (22)**
6:16;16:12,12,18;
22:5;30:20;33:9;42:11,
13;48:7;49:3;53:11;
54:5;71:16;88:6;91:19;
111:7;114:10,12;123:3;

124:12;129:16
**investigate (7)**
57:7;69:15,18;70:15,
18;78:1,14
**investigated (2)**
69:19;70:12
**investigating (10)**
57:9;63:11;68:17;
69:1;70:9;72:7;78:22;
83:14,16;89:21
**investigation (11)**
30:8,20;56:4,7;57:4;
58:11,15;63:15;69:4;
78:4;93:7
**investigative (1)**
69:21
**Investor (1)**
19:9
**Investors (4)**
19:8,13;104:24;106:4
**invite (1)**
111:25
**involved (4)**
100:5,23;131:12;
139:4
**Island (4)**
7:13;8:8;53:16,18
**issue (24)**
13:9,12;16:1;18:2;
34:20;36:10;44:3;45:10;
49:11;58:14;64:1;67:3;
80:24;83:13;93:18;94:2;
98:1,15;100:14;104:3;
108:16,16;122:24;
132:11
**issued (1)**
96:8
**issues (6)**
12:22,25;13:5;30:8;
93:3;133:6

## J

**January (34)**
65:1,4,10;66:17,25;
71:5;72:3,15,18;75:5,12;
77:1,12,19;79:3;80:6;
81:2;82:13;84:23;86:14;
87:12;88:14;89:13;
90:25;91:24;92:3,8;
93:11,11;94:10;96:18;
112:24;113:9;114:3
**Jersey (4)**
29:19;30:3;105:23;
115:14
**job (3)**
101:24;109:21;110:5
**Johnson (35)**
52:11,25;55:14,19;
56:15,25;58:5;59:1;
68:16;71:10,14,18,20;
72:1,5,14,18;74:25;75:4,
13;76:23;77:20,23;

78:20;81:19,20;83:13;
88:1,5,13;112:19;116:5;
126:15;137:13;138:20
**Johnson's (2)**
56:20;113:7
**join (1)**
5:14
**Jones (1)**
25:17
**jumbled (1)**
46:23
**jump (1)**
94:17
**June (1)**
36:16
**jurisdiction (2)**
85:8,21

## K

**KATHLEEN (3)**
5:2,7;134:6
**Kathryn (1)**
110:8
**Kathy (15)**
18:7,8;104:5,6,7,11,
13,18;115:21;119:1,9;
120:20,23;133:23,25
**keep (4)**
5:12;59:4;108:12;
125:8
**keeper (1)**
100:8
**Kellie (21)**
32:6,13;38:3,19;39:1,
10;40:5;45:22;50:2;
63:4;71:7;80:4;93:25;
98:14;110:18;126:16,
24;136:18;138:6;139:4;
140:6
**Ken (2)**
138:9;140:4
**kept (1)**
107:11
**Kilburn (11)**
80:3,22;81:21;82:14;
88:1,14;90:13;91:6;
95:14,21;96:15
**killed (3)**
90:2;126:16,24
**kind (13)**
6:15;21:15;29:3;35:1;
51:9;75:10;77:3;107:16;
108:5;112:23;124:3,9;
128:8
**knowing (1)**
129:20
**knowledge (15)**
19:18;42:19;50:14,15;
51:22;52:13;56:19;
70:11;94:7,12,24,25;
95:2;105:22;139:7
**knowledgeable (1)**

22:15
**knows (4)**
22:17;42:24;76:7;
108:13
**Kurtz (11)**
18:8;104:5,18;110:7;
115:3,21;121:13,20;
122:2;134:9,11

## L

**labeled (1)**
35:20
**ladies (1)**
140:16
**Lady (2)**
8:5,20
**Lane (1)**
53:18
**large (6)**
111:14,15,17;120:9,
12,17
**last (15)**
5:6;11:23;12:5;37:7;
46:25;64:19;71:20;73:1;
77:1;99:13,17;104:13;
125:6,6;130:10
**late (3)**
10:9;79:3;84:22
**later (3)**
5:11;86:9;115:3
**law (8)**
21:5;69:16;74:4,8;
82:9;88:4;115:19;
135:24
**laws (2)**
21:20;22:10
**lawsuit (13)**
101:4;102:25;103:18;
105:10;106:25;107:6,9,
10,19;118:5;121:10,18,
23
**lawsuits (4)**
101:9;113:23;133:10;
136:24
**lawyer (7)**
74:22;73;76:16;79:5,
12;101:16;116:20
**lawyers (10)**
50:8;79:17;92:9;93:3,
13,17;101:6;106:22;
113:23;136:23
**learn (3)**
11:18;15:11;44:2
**learned (1)**
16:23
**least (2)**
130:25;133:2
**leave (1)**
133:13
**left (3)**
9:15;88:2,7
**legal (32)**

14:12;15:19;19:17;
32:8;62:12;75:10,16,19,
22;76:9,18;82:11;92:10,
15;93:3;96:6,24;98:3;
100:5,24;101:9,12,18,
24;105:2;115:5,12;
120:23;133:1;135:14;
137:24,24
**legally (10)**
32:2,11;73:2;75:4,6;
76:8,12,19,23,25
**letter (114)**
25:17;45:18,19,21,23;
46:1;47:14;49:22,23,24,
25;52:23,25;54:15,19;
55:11,12,13,16,17;56:2,
9,16,20,23,24;57:2;58:4,
24;65:18,19;66:11,15;
68:12;69:1,24;71:1,8,10,
12,23,25;72:3,14,17;
75:5,24;76:1;77:1,12,25;
78:5,24;79:2,16;80:3,5,
19,22;81:2,21;82:13;
83:13;85:1,10,11,14,22;
86:13;87:25;88:11,14;
90:17;92:3,5,8,14,25;
93:6,10,11;95:14,15,20;
96:3;97:4,8;102:13;
103:5;105:9;106:11,12,
15,20,25;107:8,14,16,
18;111:21,25;112:18,19;
113:12,16;114:21,22;
116:5,5;117:23;118:3,
19,20;121:10
**letters (19)**
14:20,20;15:14,15;
54:7;57:19;76:2;77:21;
81:18,20;89:23,25;
93:13,17;97:10;102:24;
112:6,8;136:22
**level (4)**
17:20,25;107:21;
121:14
**levels (1)**
17:15
**Levesque (1)**
7:12
**L-e-v-e-s-q-u-e (1)**
7:12
**library (13)**
20:15,17,19,23;21:4,
22;22:7,16;23:3,5,19;
94:17,21
**life (38)**
10:2,5,9,13,14,16,19;
16:2,17;18:22;21:24;
23:2,8,22;25:3,12;26:14;
27:16,23;28:4;30:6;
32:17;36:17,25;39:22;
44:5;45:10;47:19;54:17;
58:14;65:13;67:3,13;
73:16;78:3,7;94:2;
123:23

**line (5)**
10:19;26:2;45:6;
51:13;76:16
**lines (2)**
10:5,13
**Lisa (1)**
7:4
**listed (1)**
35:8
**listing (2)**
13:18,21
**litigation (2)**
88:6;113:19
**little (5)**
59:20;64:8;74:10;
102:7;139:21
**live (2)**
100:11,21
**lived (1)**
7:14
**loaded (1)**
123:20
**located (1)**
29:12,21;129:17
**location (1)**
53:14
**log (4)**
42:3;48:8;50:20,20
**logs (1)**
60:7
**long (5)**
7:14;11:21;16:15;
94:16;125:14
**longer (3)**
16:22;127:25;130:14
**look (42)**
24:13;34:22;37:9;
38:11;40:11;45:16;
56:17;57:25;59:24;60:11;
64:5,10;70:24;72:11;
73:14;77:10;79:21;80:8;
82:2;83:19;91:12;95:12;
97:18;103:23;108:2,8;
112:11,11;117:15;
119:18;122:7,15;124:2,
4;127:7;129:9;133:22
**looked (18)**
48:8;82:15,19;92:23;
94:9;105:10;121:10;
124:8,10;125:24;126:2,
4;127:4;135:22;136:12,
22;138:18,24
**looking (14)**
38:5;46:20;50:9;
59:15,16,20;60:7;70:4;
109:7;112:14;117:25;
129:7,8,16
**looks (8)**
52:6;60:2,13,14;
64:16;107:10;115:3;
119:10
**lot (5)**

124:3,19;125:24;
131:9,10
**Lotus (2)**
20:11,14
**Lyons (3)**
109:18,19;110:18
**L-Z (1)**
104:13

**M**

**machine (4)**
80:13,14,16,18
**Madame (1)**
141:5
**mail (6)**
53:9;54:4,10;88:25;
100:20;133:19
**mails (1)**
89:13
**major (2)**
8:6;9:11
**makes (5)**
28:21;29:5,6;32:22;
135:16
**making (11)**
31:23,25;71:16;90:5;
96:16,20,22;97:22,25;
98:9;106:21
**Mallard (2)**
109:24;110:2
**manage (1)**
15:7
**manner (5)**
67:21,24;68:2,5;98:16
**manuals (2)**
128:21,24
**many (7)**
30:24;31:2,3;32:21;
45:1;117:7;131:22
**March (6)**
117:19;118:19,20;
121:18;133:12,15
**mark (1)**
46:14
**marked (30)**
34:23,24;40:12,13;
45:15;46:15;50:17;52:1,
17;55:9;59:23;64:6;
70:23;72:10;77:9;79:23;
84:18;86:12;90:8;91:11;
95:11;97:2;102:5;106:8;
108:1;117:14;118:10;
119:20;122:8;127:9
**marking (2)**
45:13;54:1
**Mary (1)**
25:17
**Massachusetts (1)**
8:5
**math (3)**
8:7,21;9:11
**matter (9)**

5:10;14:1;55:24;56:1,
11,17;58:6;85:18;90:6
**may (13)**
19:18;22:13;23:15;
42:18;63:22;64:8;83:24;
84:10;118:11;119:5;
123:20;124:5,21
**maybe (3)**
59:6;103:24;134:2
**MD (1)**
140:5
**mean (27)**
14:19;27:1;28:10;
30:13;42:19,24;45:5;
47:23;59:15;71:22;73:3;
76:25;95:22;98:12,22;
99:15;103:11;109:3;
111:15,22;112:22;
113:11;114:8,24;
115:11;117:2,5
**meaning (1)**
18:12
**means (6)**
46:21;61:18;76:8;
91:18;103:14;111:23
**meant (4)**
76:19;77:6;83:15;
112:13
**meat (1)**
6:16
**MEDEIROS (19)**
5:2,7,18,21,22;14:11;
36:5;40:14;58:24;64:9;
76:22;95:13;97:3;98:7;
108:2;109:12;117:16;
127:11;134:6
**M-e-d-e-i-r-o-s (1)**
5:8
**medical (3)**
97:14;98:16;136:8
**medication (2)**
7:17,19
**MELNICK (11)**
5:15;34:25;35:10,12,
17;36:3;122:13,14;
140:20,24;141:5
**member (3)**
31:16;43:6;50:6
**members (5)**
50:12;63:7;69:23;
82:11;93:21
**memo (12)**
21:13,14,16,19;22:22,
22;49:6;63:24;90:11,19;
91:5;123:21
**memorandum (1)**
34:13
**memory (1)**
82:1
**memos (7)**
21:11;28:3;77:23;
83:22;86:21;124:22;
126:4

**mention (1)**
91:5
**mentioned (2)**
18:10;20:5
**message (4)**
51:7;88:2,7,25
**met (3)**
73:5;112:5,6
**MetLife (148)**
6:11;8:22;9:4;10:4,19;
11:3,10,20;12:2,16;
14:22,24;15:7;16:15;
17:14;18:23;19:7,8,9,11,
12,13,13,21;24:25;25:3,
21;27:15;30:7;31:24;
32:5,11,16;33:16;34:14;
35:6,21;38:4;39:11,12,
22;40:2,7,16;42:13,15,
22;44:4,20;45:16;46:16;
48:17,18;50:18;52:3,3,
18;53:13;55:10;56:18;
58:13;59:22;62:20;63:6;
64:7;65:5,21;69:7,13;
70:11,17,24;72:11;
73:20;74:5,8;75:5,14,15,
19;76:4,21;77:10;78:3,
22;79:24;80:8;81:4;
84:19;85:24;86:11,18;
87:3;88:24;89:10;90:9;
91:7,12;92:7,16;95:7,10;
96:8;97:1,25;98:8,9;
100:9,10,24;101:4;
102:6,6,8,8;103:3;
104:24;105:6,17;106:3,
4,5,9;107:25;117:9,11,
12;118:9,14,18;119:7,
18,24;121:8,13,17,19;
122:9;124:24,25,25;
126:12;127:10;131:24,
25;134:5;135:15;140:13
**metLifecom (1)**
39:16
**MetLife's (3)**
70:12,15;125:25
**Metromatic (2)**
9:17,21
**Metropolitan (1)**
81:12
**Middle (3)**
6:9;65:6;105:12
**mid-to-late (1)**
12:21
**might (8)**
40:9;103:19;105:21,
22;107:14;111:10;
119:10;139:12
**million (1)**
111:16
**mind (1)**
5:11
**mini (1)**
141:4
**minor (1)**

21:6
**minuscript (1)**
141:2
**minute (2)**
16:13;57:16
**mischaracterized (1)**
23:14
**missing (5)**
66:10,20;98:21,22;
117:10
**MLI (6)**
44:6,12,21,25;45:3;
111:6
**Moffett (29)**
85:1,23;88:4,8,18;
89:5,9;92:5,14,19;96:4,
5;97:5,19;99:16,24;
102:13;106:11;113:13,
17;114:21,22;118:21;
122:12;126:21,22;
137:13;139:1;140:17
**Moffett's (1)**
97:9
**money (3)**
33:8,8;133:6
**more (8)**
14:2;21:3;85:14;
111:16;130:20,23;131:9,
10
**Morgan (15)**
42:5;43:21;46:8,11;
47:2,3,7,10;50:9;51:6;
61:3,7;63:20;111:24;
112:24
**morning (2)**
5:18,19
**Most (1)**
35:6
**mother (2)**
13:15;138:15
**mother's (1)**
13:14
**move (1)**
34:21
**moved (1)**
17:1
**moving (1)**
125:8
**Mrs (1)**
14:11
**much (1)**
105:24
**multiple (1)**
122:16
**murder (1)**
100:8
**must (2)**
80:7;119:9
**mute (2)**
5:11,14

**N**

**name (12)**
5:6,22;14:25;25:17;
39:17;91:17;109:11;
111:24;113:2,7;131:3;
133:24
**named (7)**
62:3,8;64:2;91:7;
98:14;104:24;105:6
**names (4)**
13:13;104:13;109:17;
138:4
**naming (2)**
88:24;89:10
**nature (1)**
134:21
**near (2)**
66:16;90:19
**necessarily (2)**
95:3;119:4
**necessary (1)**
41:6
**need (24)**
5:13;6:17,18;7:6;21:9;
25:11;26:25;33:23;
59:14;66:13,13;67:6;
69:22;72:23;75:3,5;
76:24;112:10,11;123:14,
14;140:12,15;141:3
**needed (7)**
23:23;24:2;26:17;
66:20;67:2;74:13;88:10
**needing (1)**
41:17
**needs (3)**
26:20;101:18;113:15
**network (1)**
11:22
**New (17)**
11:14,18,21;18:24;
23:25;24:12;29:19;30:2;
44:20;47:4;78:10;79:3;
80:13;105:23;115:14;
132:6,8
**next (21)**
17:20,25;31:18;42:15;
43:3;44:8;47:19,21;
52:24;56:25;57:3;65:14;
81:15;89:6;107:20;
109:12,24;111:20;
121:14;125:4,5
**nobody (1)**
114:10
**nomenclature (1)**
131:6
**none (1)**
62:24
**Nope (1)**
15:18
**normal (8)**
16:4;41:14;49:13;
69:18;87:1;114:14;
116:8;137:18
**Notary**

5:3
**notated (1)**
138:24
**notation (2)**
115:7;116:18
**notations (1)**
138:17
**note (19)**
49:6;52:13;61:2;
98:13;108:11;109:8,9,9,
12;110:18,20;112:2;
113:25;114:7;118:1;
122:21;125:10,11,17
**noted (3)**
22:5;59:3;61:20
**notes (62)**
14:21,22;15:15;20:11,
14;23:24;48:22;53:2;
60:4,25;61:6,6,16;83:19;
88:22;89:7,25;92:23;
95:17;98:23;108:12,15;
109:5,8,14;110:13,16;
112:11,14,15,19;123:7,
9,14,15,17,17,22;124:8,
9,15,17,19,21,23;125:2,
13,21;126:3;127:2;
128:9,11;129:5,5;
130:15,18;131:2,5,14;
132:1;133:23;134:19
**notice (16)**
21:21;62:12;65:21;
68:11,13,16;72:19;81:8;
85:17;90:4;91:6;96:24;
111:21;113:4;120:13;
125:3
**notification (6)**
111:14,15,17;120:9,
12,17
**notified (2)**
40:7;71:21
**notify (1)**
34:4
**notifying (1)**
71:17
**November (14)**
11:23,23,25;12:5;
18:3,13;36:16;39:6,8;
40:9;42:9,13;104:3;
130:12
**nowhere (1)**
116:10
**number (35)**
31:2,3;32:21;35:1,13;
36:12,13,19;41:5;43:6;
44:15;46:18;48:5,7,9;
51:15,17;52:5;53:6,7,11,
13;54:22,25;56:16;80:9,
10,12;87:19,20;113:2,8;
118:21;140:3,17
**numbers (3)**
37:22;87:17,17

# O

**object (24)**
19:15;22:12;23:10;
30:11,15;31:10;32:7;
33:20;34:4;42:17,25;
43:13;63:16;73:9,25;
74:3;76:6;85:6,16;90:5;
98:2;105:1;107:12;
116:23
**objected (4)**
28:23;30:18,25;31:6
**objecting (6)**
28:6,18;31:15;74:19;
89:20;92:6
**objection (6)**
22:18;62:22;75:2,21;
79:10;140:14
**objectionable (1)**
43:20
**objections (2)**
14:8;72:22
**objector (3)**
32:1,18;75:13
**objects (4)**
27:17,25;30:5;33:17
**obligated (2)**
32:2;73:2
**obligation (1)**
74:5
**obligations (2)**
62:19;73:5
**obtain (2)**
25:4;26:14
**obtained (1)**
120:3
**obviously (4)**
16:14;45:24;72:20;
141:3
**occasion (1)**
32:16
**occasions (1)**
25:16
**occur (2)**
25:16;27:6
**occurred (4)**
32:19;91:3;130:20;
134:20
**occurs (1)**
27:3
**off (13)**
5:13;6:5,16;7:8;21:3;
48:9;54:8;59:13;107:23,
24;113:20;139:21;141:7
**office (12)**
29:12;53:12,14,20;
65:1;103:8;117:21;
129:17;131:7,23;136:3;
137:24
**official (1)**
136:10
**once (13)**

26:15;42:13,20;68:8,
21,25;105:18;106:15,25;
132:23,24;134:24,25
**one (48)**
11:25;12:12,12,19;
14:2;15:2;18:9;20:4,16;
21:10;24:6,6,10,13;35:7;
38:7;44:8;46:18;50:19;
52:24;58:1;59:18,21;
60:24;61:14;63:22;
69:10;74:19,19;82:8;
83:21;92:22;93:20;94:9;
100:8;112:23;115:18;
116:20;117:10;121:10;
124:14;125:15;127:24;
128:11;132:7;133:11,
12;139:12
**one-line (1)**
125:18
**one-on-one (2)**
16:21;18:19
**ones (10)**
24:7,8;50:24,25;
54:21,22;112:16;125:14,
23;132:8
**ongoing (3)**
56:3,7;58:11
**only (16)**
24:12,14;27:7;56:12;
60:23;69:10;84:2;88:5;
94:8;100:19;116:16;
124:16;125:4,7;136:10;
138:22
**open (3)**
54:4;125:11,13
**operations (1)**
41:15
**opportunity (3)**
62:15;65:23;66:11
**order (27)**
9:13;25:4;64:8;66:19,
21;67:2,2;70:21;72:2,4,
21;73:5;74:24;75:1;
76:24;79:8;86:1;92:16;
96:7;97:15,21,24;98:8,
17;102:8;118:11;121:8
**orders (3)**
85:8,21;140:23
**ordinary (1)**
87:2
**original (6)**
58:1,2,3;80:7;102:15;
141:4
**Orlandi (1)**
18:16
**O-r-l-a-n-d-i (1)**
18:16
**otherwise (2)**
26:8;100:24
**out (44)**
8:24;9:12;11:19;
25:22;27:9;31:19;39:17;
43:7,10;45:18,19;46:1,9;

47:4,11,14,17,25;51:8;
64:8;66:14;74:17;77:7,
8;83:25;85:11;90:16;
102:7;106:17;107:2;
109:18;115:1,2;119:1,
15;121:7;125:24;
128:22,23;129:4;
132:23;133:7,14;134:18
**outcome (2)**
58:15;78:4
**outside (4)**
48:16,18;95:6;126:12
**over (16)**
6:15;14:16,18,19;
17:1;37:5;41:9;73:14;
90:17;91:21;100:16;
109:11,24;111:7;133:21,
25
**overall (1)**
16:14
**overly (5)**
30:13;33:24;42:25;
43:13;116:24
**overnight (1)**
111:9
**overnighted (1)**
64:17
**own (5)**
15:24;17:13;24:8;
30:8;69:15
**owner (3)**
39:23,24;62:25
**ownership (1)**
114:16

# P

**pack (2)**
112:6,6
**packet (4)**
47:4,10,15,17
**page (28)**
34:11,17;37:17,19,23,
24;38:1;46:25,25;64:19;
65:5;80:8;87:6;92:19;
105:5;106:3;109:24;
112:23;115:18;117:10,
11,12;119:7,13;120:16;
121:19;134:3,5
**pages (15)**
24:9;35:8;37:6,7,9;
39:19;41:12;59:9;64:13;
103:3,4,24;104:22;
118:14;122:16
**paid (9)**
12:23;33:8;72:5;73:7,
8;75:1;86:1;113:3;137:2
**paper (14)**
49:4,5,8,12,15,16;
59:17;86:21;113:10,13,
15,18;114:2;115:13
**paperless (1)**
124:14

**papers (1)**
103:16
**paperwork (2)**
67:1;93:20
**paragraph (7)**
55:22;71:19;73:1;
89:6;97:18;98:13;99:13
**parents (1)**
85:5
**part (2)**
67:5;120:16
**participate (1)**
108:23
**particular (16)**
14:25;16:7,13;24:16,
18;37:12;41:21;63:24;
65:17;67:16;70:1,2;
104:6,7;126:1;137:25
**parties (10)**
31:22,24;34:3,9,15;
50:10;65:19;139:25,25;
140:9
**party (7)**
31:15,16;62:16;70:4;
105:6;117:4,5
**passed (2)**
42:14;73:22
**patient (1)**
74:25
**Paul (2)**
5:23;57:13
**pay (18)**
15:10;25:19;28:22;
69:24;72:6;73:10,21;
74:11;75:14,20;79:19;
116:21,22;133:7,7;
134:17,17,23
**paycheck (1)**
19:21
**paying (7)**
32:5,11;67:17;76:4;
92:17;94:18;135:9
**payment (98)**
9:21;22:4,5;23:8;25:4;
26:14;27:8,18,25;28:6,
18,23;30:5,19,25;31:6,
10,23,25;32:3,17,17,22;
33:17;36:17;42:15;53:1;
55:23,25;56:3,8,10,15,
19;57:5;58:6,14,18;
62:14;63:13;65:25;67:3,
8,13;68:8,19,23;70:6;
72:21,23;73:2,24;74:14;
78:3,9,12,16,23;79:6,8,
13,18;81:3,4,13,14;85:6,
15,25;89:19;90:1,5;
92:11;93:2;94:1,5;
95:22;96:16,20,22;
97:11,16,20,22,25;98:9,
17;99:15,22;106:22;
109:4;111:18;116:2;
120:15;126:18,19,25;
136:17

**payments (14)**
34:4;71:15;75:3,7;
76:24;80:24;92:6;
115:19,25;116:2,7,12;
137:1;139:8
**payroll (1)**
9:22
**pays (1)**
25:21
**pended (2)**
47:21;57:2
**pending (11)**
6:9;58:15;67:22;78:4;
96:24;97:11,21;115:5,
12;140:1,10
**people (5)**
23:25;48:4;110:13;
123:7;133:19
**per (2)**
110:19;125:7
**period (6)**
11:24;18:2,12,15;
29:16;30:17
**periods (2)**
125:11,14
**person (7)**
16:6,8;33:17;100:15;
109:15;110:1,22
**personal (3)**
86:19;114:6,8
**personally (1)**
53:23
**persons (1)**
62:7
**pertained (1)**
129:6
**phone (40)**
41:16;48:25;50:12;
52:13;54:20,23,24;55:3,
4;58:25;59:12;60:25;
61:7;77:19;82:3,7,9;
83:22;86:6,7,19,21;
88:22,25;89:25;90:20;
92:21;113:2,8;123:21;
124:22;126:4;138:5,8,
11,14,19,21,25
**photocopy (3)**
25:25;26:4,7
**physical (5)**
14:23;36:9;44:13;
59:8,17
**physically (1)**
54:8
**picks (2)**
108:13;109:6
**piece (4)**
45:11;47:22;48:10;
57:3
**place (5)**
20:16;21:10;27:15,22;
140:22
**Plaintiffs (1)**
140:6

**Plaintiff's (177)**
34:23,24;35:3;36:6,
13;37:7,9,19;38:17;
40:12,13,15,15;41:13,
14;42:8;45:14,15;46:14,
15,16,17;47:13,18;
48:12;50:16,17,18;51:8,
10,12,25;52:1,3,16,17,
18;55:8,9,10,18;56:6,10,
17,21;57:11;58:10,19;
59:19,22,23;60:8,8,8,13,
15;62:6;63:11,19;64:5,6,
7,10,13,22;65:15;66:17,
24;67:7;68:5,20,21,25;
69:1;70:22,23,24;71:24;
72:9,10,11;73:3,14;
74:15,16,16;77:2,8,9;
78:10,11,19;79:2,17,21,
22,23,24,25;81:21;
82:14,19;83:4;84:2,5,17,
18,19;85:23;86:12,17,
24;90:7,8,23;91:10,11,
12,13;92:23,25;95:10,
11,18,21;97:1,2;99:1;
102:4,5,6,10;103:7,17;
106:3,7,8,9,16;107:25;
108:1;112:12;116:11;
117:9,10,14,14,15,25;
118:8,10,14,22;119:3,8,
17,17,20;121:8,16,20;
122:7,8,9,18;123:15,16;
126:2,2;127:7,9,10;
129:2;132:12;134:2,3,5;
135:23
**plan (1)**
5:10
**pleadings (3)**
101:10,12;141:6
**Please (20)**
5:5;6:17,21;7:9;37:21;
47:7;64:14;72:6;74:25;
75:2;79:6;98:13;99:14;
103:9,11,13,16;119:23;
140:22,25
**pleased (1)**
113:6
**pleasure (1)**
92:20
**plus (1)**
10:18
**pm (3)**
114:19;132:17;141:10
**point (25)**
43:17;56:14,23;57:14;
70:15;73:16,18;82:14;
85:9;93:10,25;99:7;
105:25;106:18;107:4;
113:12,16,18;115:1;
133:8;134:3,11,16;
136:15;138:6
**policies (11)**
12:2;15:7;21:24;23:6,
9,22;24:9;27:22;28:1;

45:1;111:6
**policy (94)**
9:2;24:1;25:3,4,22;
26:12,14,24;27:1,3,7,9,
11,18,25;28:7;30:6,19;
31:1,6;32:5,12;33:19;
34:12;35:6,18,21;36:9,9,
10,12,15,21,25;37:3;
38:2,16,16,17,25;39:4,9,
13,22,23,24;40:4;42:16;
44:4,15,16;45:3;49:11,
20;56:16;62:20,25;63:3;
65:13,22;66:1;67:3,9,13;
73:17,19;74:6;77:15;
80:24;81:3,4;87:19,20;
90:11;91:8;92:11;94:2;
96:16;97:21,25;98:10,
15;100:15;108:16,17;
111:13;116:16;120:4;
122:24,25;123:24;
132:25;136:18;139:8
**portion (1)**
122:11
**position (2)**
11:2;81:12
**possibility (1)**
49:9,21;86:3
**possible (2)**
47:2;81:13
**possibly (2)**
93:5;130:24
**practice (3)**
33:15,15;49:13
**precedes (1)**
21:15
**predates (1)**
21:20
**preliminary (4)**
5:10;6:14;14:2,7
**premium (3)**
9:21;13:1;16:24
**preparation (1)**
15:17
**prepare (3)**
14:14;38:21;96:6
**preparing (2)**
92:15;102:25
**prescription (1)**
7:16
**present (1)**
20:3
**presented (2)**
89:22,24
**presently (1)**
39:15
**pretty (2)**
31:3;105:24
**prevent (1)**
7:20
**previous (2)**
92:23;102:24
**previously (1)**
136:13

**primarily (3)**
18:9;69:10;70:10
**primary (23)**
12:3,6;13:19;27:17,
24;28:5,19,22,24;30:6,
19;31:1,7,11;32:12;38:2,
6,16,25;39:9;40:4;63:3;
110:19
**print (1)**
113:19
**printed (1)**
59:9
**printouts (1)**
122:17
**prior (12)**
32:4,10;43:24;55:16,
17;106:20;116:1;
127:18;128:19;129:25;
130:4,12
**probability (1)**
68:24
**probably (9)**
8:12;33:22;37:14;
44:6,24;54:19;58:2;
60:21;85:18
**problem (3)**
5:15;6:7;111:6
**procedural (1)**
139:22
**procedure (5)**
21:11,13,16;22:21;
34:12
**procedures (6)**
23:7,12,15;27:15,19;
28:1
**proceed (10)**
6:23;32:17;62:17;
66:3,4;71:22,23;72:22;
75:9;96:11
**proceedings (8)**
92:10,15;93:4;96:6;
100:5,24;101:24;133:1
**proceeds (15)**
16:2,18;18:23;25:12;
30:6;32:6,12;36:18;
47:20;54:17;76:4;91:8;
92:17;96:5;136:18
**process (5)**
23:7,11,22;41:7;
113:22
**processed (2)**
68:23;93:20
**processing (13)**
12:1;15:25;16:17;
17:4;18:1,22;19:24;
21:23;23:2;54:16;57:1;
78:6;137:25
**processor (1)**
44:18
**produce (1)**
123:25
**produced (4)**
24:5;35:22;59:6;

122:10
**producing (1)**
26:11
**product (1)**
111:13
**products (1)**
9:22
**proffered (1)**
133:2
**program (1)**
49:3
**programmed (1)**
22:5
**promise (1)**
57:18
**prompt (1)**
48:2
**prompted (1)**
46:8
**pronunciation (1)**
5:20
**proof (1)**
136:25
**prosecute (1)**
100:19
**protesting (3)**
62:14;116:25;117:1
**provide (5)**
6:25;75:19;85:14;
137:13,19
**provided (2)**
89:19;113:2
**Providence (3)**
29:13,17;30:1
**providing (1)**
62:2
**provision (1)**
24:10
**Public (1)**
5:3
**pull (2)**
20:20,23;51:8;141:7
**pure (1)**
107:13
**purported (3)**
107:6,19;136:24
**purports (2)**
53:7;118:4
**purpose (1)**
97:8
**purposes (1)**
140:8
**put (45)**
21:21;23:25;24:6,7,
11,11,21;33:23;34:10,
16;49:5;65:21;68:16;
72:19;81:12;83:22;
85:17;86:4,21;95:23;
109:5,9;111:3;113:25;
114:6;116:8,14;120:13;
123:7,25;124:15,17,17;
125:4;128:8,12;129:10;
130:15,18;131:2,19,20;

Graziosi vs
Metlife Investors USA Insurance Company

Kathleen M. M. Medeiros
June 12, 2012

132:6;140:16,17

## Q

**Quaker (1)**
53:18
**queue (6)**
44:7,12,25;45:5,6;
133:22
**queues (3)**
44:23,23;45:7
**quicker (1)**
57:20
**quickly (1)**
34:21
**quite (1)**
132:5
**quote (1)**
55:1

## R

**raised (5)**
30:8,21;83:13;93:3,18
**Random (2)**
44:10;45:2
**randomly (1)**
44:9
**rate (4)**
21:18,19;22:9,20
**rather (2)**
66:12;83:18
**reach (1)**
66:3
**reached (2)**
31:22;81:14
**read (7)**
103:18,23;121:25;
132:1,12;139:16,20
**reading (1)**
80:19
**ready (10)**
71:22,23;72:21;73:7,
8;75:1;79:9;86:1;92:11;
97:15
**real (1)**
5:22
**really (2)**
8:14;105:19
**realm (2)**
17:18;103:25
**re-ask (1)**
6:22
**reason (15)**
7:24;56:5,8,13;58:17;
68:7;70:14,17;79:19;
96:22;97:13;104:7;
107:4;131:13;137:7
**reasoning (1)**
85:15
**reasons (1)**
78:12
**recall (57)**

8:14;12:14;13:6,23;
17:3;43:25;44:1;46:5,
10;47:2;48:16,20;50:4;
53:22;54:12;56:12;
58:25;59:13;64:4,25;
66:21;71:2;77:14;79:20;
80:5,19,22;82:23;83:5,
18,19;84:3,22;87:13;
92:1;93:23;117:17,18;
118:2,4;123:23;126:11,
15,20,21;127:1,5;128:4,
25;136:20;138:5,8,11,
14,18,25;139:6
**receipt (6)**
71:9;85:12;92:7;
97:11,21;106:12
**receive (10)**
48:1;76:3;82:25;
97:24;98:8;99:23;
102:23;110:22;131:17;
136:24
**received (65)**
14:20;15:15;16:16;
17:4;18:20;34:13;40:3;
45:8;53:3,22,23;56:23;
58:5;59:11;61:9,11;
62:5;63:19;64:24;65:1;
66:2,24;71:18,21;72:19;
73:12;77:12;79:16;
80:20;81:2,21,22;82:13;
85:9;88:3,17;89:2,12;
90:11,13,13;91:18,20;
92:1;93:10,11,12;
102:11,14,15,18,20;
103:2,15;107:5;108:6,7;
114:5;116:4;117:21;
118:20;121:18;122:11;
128:16;133:11
**receiving (11)**
55:16;77:14;78:5,19;
80:5;83:6;84:2,22;
114:20,21;117:18
**recently (2)**
12:5;92:21
**RECESS (3)**
58:23;132:16;139:15
**recognize (26)**
36:6,21;37:10,11;
45:17;46:18;52:4;53:4,
6;55:10;59:24;64:11;
70:25;72:12;77:11;
80:10;87:6;91:14,16;
95:12;102:9;108:3;
117:16;118:15;119:19;
122:17
**recollection (1)**
84:1
**record (24)**
5:6;6:5;7:7,9;19:6;
22:18;40:15;43:12,17;
45:16;46:16;49:2;58:18;
52:2;74:7;107:23,24;
108:8;112:25;126:4;

132:18;139:18;140:16,
23
**recorded (2)**
54:23;55:5
**records (9)**
31:15;48:23;52:11;
67:20;86:6,7;100:9;
123:4;124:10
**rectified (5)**
55:24;56:1,11,18;58:7
**redacted (1)**
123:2
**refer (16)**
17:11;18:4;19:6;24:3;
29:8;101:14,15,20;
103:25;119:15;123:14,
15;131:5;134:25;135:1,
14
**reference (3)**
94:18;97:13;98:24
**referenced (6)**
23:3,5;24:20;56:16,
20;57:11
**references (2)**
111:19;127:2
**referral (24)**
41:5,9;46:21,22;51:5,
13,17,19,20;60:5,10,12;
61:17,21;118:18,19;
119:5,10;120:1,21;
122:1;133:25;134:2,20
**referred (22)**
20:19;30:2;51:7;60:1,
14;103:9;104:19;
105:13;106:14;107:20;
114:17,25;115:4,12;
117:24;119:1;121:9,13,
17,20;132:24,25
**referring (7)**
19:7;49:23;92:22;
106:16;118:23;120:4;
134:8
**regarding (7)**
17:4;21:23;24:9;
36:16;91:7;96:4;135:25
**regardless (1)**
63:10
**regards (10)**
16:16;17:25;18:21;
21:5;54:16;66:22;78:6;
81:10;107:18;135:9
**Regina (2)**
120:20,22
**regular (3)**
11:20;41:20;54:10
**regularly (4)**
40:22;101:9;115:7;
123:5
**rehash (1)**
112:16
**reinstatements (1)**
9:3
**relate (1)**

120:6
**related (7)**
16:3;19:24;23:8,22;
48:4;117:2;137:1
**relates (1)**
51:16
**relating (5)**
20:18;27:23;36:18;
62:7;136:11
**relationship (2)**
63:6;111:4
**relationships (1)**
19:17
**relative (1)**
22:10
**relevant (4)**
11:24;18:2,11;29:16
**remained (1)**
11:5
**remember (4)**
12:20;18:6;60:22;
104:16
**rep (3)**
41:6;61:3,20
**repeat (1)**
124:4
**rephrase (4)**
6:22;23:18;33:25;
79:14
**replaced (1)**
44:13
**reply (1)**
48:2
**report (6)**
42:6;43:5;82:22;83:3;
84:4,6
**reported (1)**
104:4
**REPORTER (4)**
5:5;7:8;140:22;141:5
**reports (1)**
84:15
**representation (1)**
88:11
**representative (3)**
47:6;62:13;101:4
**representatives (2)**
137:9,15
**represented (1)**
82:11
**representing (5)**
70:7;71:14;83:10,12;
137:6
**represents (1)**
80:4
**request (8)**
46:3;53:1;58:13;
92:16;94:4;96:7;97:16;
99:14
**requested (2)**
90:17;113:1
**requesting (2)**
46:5;78:2

**require (4)**
22:14;39:11,12;132:9
**required (5)**
25:3,6;26:4,13;27:8
**requirements (1)**
74:13
**requires (1)**
26:8
**reserve (1)**
14:8
**reserves (1)**
120:14
**resolved (1)**
90:6
**responded (4)**
58:5;61:14;78:8;97:16
**responding (1)**
58:3
**response (8)**
55:13;63:23;71:9;
87:25;95:15;97:9;
102:24;111:23
**responsibilities (5)**
11:9,11;12:1;110:24,
24
**responsibility (5)**
12:3;17:15,19;33:5,6,
10;103:12;131:10;
134:13,15
**rest (2)**
36:1;57:14
**restrained (14)**
31:23,25;32:5,11;
72:24;75:4,6;76:4,8,12,
13,19,23,25
**restraining (5)**
92:16;96:7;97:21,24;
98:9
**result (3)**
54:15;78:5;129:20
**results (1)**
29:3
**retained (3)**
88:4,9,19
**returned (3)**
89:4;7;90:14
**review (22)**
19:3;31:13,14;38:20,
23;41:24;46:7;66:6,7,9,
13,18;67:15,18;75:25;
77:16;104:21,23;105:5;
111:3;123:5;132:9
**reviewed (8)**
14:20;36:24;37:1,12;
38:21;103:19;104:21;
105:7
**reviewing (1)**
15:14
**Rhode (4)**
7:13;8:8;53:16,18
**right (80)**
6:5;8:18;13:22;14:2;
15:14;16:10;18:10;

23:17;34:19;37:5;40:14;
41:1,4,22;44:14;46:4,23;
47:5,17;48:15;54:8;
55:3,7,21;58:8,21;59:19;
60:18;72:8,8;74:5,16;
77:25;84:1,13;85:22;
86:2,13;87:16;88:16;
91:20;95:19,20;96:21;
99:4,7;100:21;102:22;
103:2;107:25;108:19;
109:1,16,23;111:20;
112:21;114:3,14;117:9;
119:11;120:11,16,22;
121:1;122:23;124:2,18;
125:20;127:7;128:21;
131:24;132:1,8,19;
133:19;135:3;137:12;
139:19;140:12;141:7
**right-hand (2)**
   37:5;91:22
**role (5)**
   12:6;15:25;23:20;
   32:19;40:23
**roles (4)**
   11:8;12:1;17:9;42:1
**room (1)**
   57:14
**ROSENTHAL (28)**
   5:9,16,17,23;6:7;14:7;
   23:17;33:25;35:2,11,14,
   24;36:4;46:13;52:2;
   57:15;58:21;79:14;98:5;
   105:4;132:15,18;139:11,
   18;140:15,19;141:3,8
**ruled (3)**
   70:20;97:14;98:24
**rules (2)**
   6:15,17
**ruling (1)**
   98:15

## S

**same (9)**
   11:5;23:15;29:3;
   34:10,17;72:15;74:17;
   124:9;141:1
**Sandra (1)**
   110:4
**Sandy (1)**
   114:16
**sat (1)**
   16:21
**satisfactory (1)**
   67:8
**saw (6)**
   41:21;51:12;53:23;
   54:12;60:21,24
**saying (11)**
   28:1;31:10;47:5,6;
   59:4;69:24;70:5;79:6;
   85:12;88:3;105:9
**scanned (7)**

44:15;54:5,9;57:23;
91:19;102:15;103:19
**scanned-in (1)**
   54:11
**scenario (1)**
   30:15
**school (3)**
   8:3,4,7
**screen (11)**
   108:20;109:4;112:13;
   122:16;123:9;125:1,3,5,
   7,7,15
**screens (1)**
   122:21
**search (1)**
   111:13
**second (16)**
   55:22;64:21;71:19;
   72:25;73:14;80:8;88:23;
   92:19;97:18;98:12,13;
   99:13;106:2;111:2;
   117:10,12
**section (1)**
   123:2
**seeing (2)**
   118:4,12
**seeks (1)**
   79:11
**seem (1)**
   52:11
**send (21)**
   41:8;43:7;45:19,21,
   23;46:9;47:7,11;61:17,
   21;71:6,8;72:1,17;
   95:20;101:16,25;
   111:17;112:1;128:23;
   133:23
**sending (7)**
   47:14;61:4,24;71:2;
   73:5;105:8;122:2
**senior (54)**
   9:25;11:4,9;17:17,21;
   20:9;23:20;24:11,19,23;
   28:20;29:5,25;30:17,23;
   31:8;32:15,20,24,25;
   33:4,5,16;34:2,14;38:4;
   40:23;41:15;42:1;44:19;
   60:9;69:12;82:24;87:2;
   94:8,12;101:8;109:22,
   25;110:6;116:17;128:9,
   12,14,16;129:5;131:5,9,
   9,12;132:5;133:22;
   134:23;135:5
**seniors (3)**
   24:12;131:22;132:9
**seniors' (1)**
   131:20
**senses (1)**
   7:20
**sent (39)**
   15:15;45:18;46:1,2,
   21;47:4,17;51:4;52:6;
   53:7,8;54:19;57:2;

61:25;69:24;71:1,3;
72:3,14;74:17;85:11;
93:5;95:14;96:1;99:16;
106:11;107:1;111:13,21,
25;112:3;114:7,12;
115:13;120:12,19,20;
128:22;134:11
**sentence (10)**
   55:15,22,25;71:20;
   72:25;77:1;88:23;98:12;
   99:13,16
**separate (2)**
   20:7;120:18
**September (2)**
   8:22;9:5
**sequence (1)**
   125:10
**service (6)**
   39:17;40:21;41:6;
   46:20;61:3,20
**set (1)**
   47:24
**settled (1)**
   14:1
**settlement (2)**
   21:7,18
**several (3)**
   26:16,18;59:5
**Sharon (1)**
   18:16
**sheet (2)**
   35:15;120:1
**sheets (1)**
   122:1
**Shelby (3)**
   109:19,19;111:9
**shifted (1)**
   12:6
**SHORT (3)**
   58:23;132:16;139:15
**shortly (4)**
   50:21;51:21;58:4;
   65:10
**shots (3)**
   123:9;125:1,3
**show (7)**
   45:13;46:13;54:9;
   55:7;59:19;102:4;118:8
**showed (1)**
   84:14
**showing (4)**
   34:20;40:14;79:6,12
**shown (2)**
   106:22;126:8
**shows (2)**
   38:10;116:20
**side (1)**
   91:22
**sign (5)**
   39:19;112:8,9;139:17,
   20
**significance (1)**
   51:15

**similar (2)**
   116:4,6
**simple (1)**
   5:22
**simply (2)**
   21:3;106:2
**single (2)**
   30:14;43:14
**sit (1)**
   103:23
**sits (2)**
   101:4,5
**situation (6)**
   29:4;49:14,20;114:15,
   17;127:15
**situations (3)**
   21:1;31:5;32:23
**skip (1)**
   79:22
**Slayer (7)**
   94:13,14,15,22,24,25;
   95:7
**slit (1)**
   115:18
**Snoopy (1)**
   19:22
**softwares (1)**
   20:4
**sold (1)**
   9:22
**solely (1)**
   58:9
**somebody (9)**
   23:24;31:17,18;42:22;
   61:5;109:6,15;116:25;
   135:17
**somehow (2)**
   117:3;139:4
**someone (9)**
   33:11;39:12;43:2,5;
   46:3;61:1;104:8;117:21;
   135:16
**Sometime (7)**
   53:25;54:14;65:9;
   66:25;79:3;80:5;84:22
**sometimes (2)**
   25:25;26:1
**Somewhere (1)**
   46:12
**sorry (10)**
   6:4;10:4;11:16;30:11;
   35:11;36:4;84:8;94:16;
   106:15;128:22
**sort (20)**
   26:2;30:20;33:7;
   34:12;41:17;42:11;46:2;
   48:22;51:15;52:12;69:3,
   14,16;75:15;93:20;
   101:10;125:1;131:6;
   136:10;137:17
**sorts (1)**
   66:7
**speak (3)**

48:16,18;119:9
**speaking (1)**
   6:4
**specific (7)**
   20:18;22:3,10;23:1;
   78:21;82:3;138:4
**specifically (7)**
   10:1;16:11;17:3;
   22:25;34:8;60:15;
   136:17
**specifics (1)**
   16:12
**speculation (1)**
   107:13
**spell (1)**
   5:6
**split (1)**
   104:17
**spoke (6)**
   48:20,23;59:13;63:25;
   77:24;83:21
**spoken (5)**
   50:2,5,8;55:19;82:10
**staff (1)**
   69:21
**stamp (3)**
   91:17,21;102:19
**stamped (1)**
   65:4
**standard (6)**
   33:14,15,22,24;43:18,
   19
**standing (1)**
   45:5
**stands (1)**
   15:4
**start (3)**
   12:18;21:3;57:4
**started (2)**
   8:22;17:1
**state (19)**
   5:5;21:5,6,7,8,9,17,22,
   24;22:3,19,23;23:1;
   89:9;95:3,3,4,4;140:2
**stated (4)**
   25:24;71:25;89:9;
   125:15
**statement (9)**
   25:7,8,14,20;26:10;
   27:10;58:19;73:3;75:8
**statements (2)**
   56:2;58:10
**States (7)**
   6:10;21:19;22:21,24;
   24:14;73:19;94:19
**status (2)**
   112:25;113:1
**statute (7)**
   22:3;94:13,15,15,24;
   95:1,7
**statutes (5)**
   21:6,7,8,9;94:22
**step (2)**

38:7;81:15

**steps (7)**
28:12,14,17;38:8;
59:10;101:22,23

**Steven (34)**
16:3;36:17;39:4,24;
40:3,8;41:24;44:3;
45:10;47:20;54:18;
57:10;58:12;62:21;63:1,
7,12;65:13;68:3,18;69:3,
5,8;70:13,18;81:25;
82:21;83:2;85:5;89:15;
122:24;123:23;139:5;
140:6

**still (15)**
11:19;18:7;24:25;
25:21;38:10;72:22;73:8;
78:15;81:8,10,16;
107:11;124:17;133:17,
21

**stopping (1)**
57:14

**Street (1)**
7:12

**Strictly (2)**
10:14;16:25

**strike (8)**
20:18;23:17;34:1;
55:17;62:5;78:18;83:11;
131:13

**stuff (7)**
18:6;21:9;24:3,4;
129:10,14;139:22

**styled (1)**
140:3

**submission (1)**
67:1

**submit (5)**
25:8;27:8,10;39:19;
94:5

**submitted (6)**
16:1;73:23;78:7;94:1,
9;96:18

**substance (1)**
13:23

**substantiate (1)**
81:23

**substantiated (1)**
83:1

**substantive (1)**
136:25

**sued (2)**
100:25;101:1

**sufficient (4)**
26:5;67:8,12;79:13

**suggest (1)**
79:12

**suggested (2)**
28:9,10

**suggestions (2)**
130:16,18

**suit (5)**
88:10,23;89:10;91:7;

113:17

**summer (2)**
18:13;104:4

**Superior (2)**
140:2,18

**supervisor (9)**
9:16;17:22,23,24;
18:11,14,18;57:7;131:15

**supplement (1)**
92:3

**sure (17)**
5:20;22:18;33:13;
35:25;38:10;43:17;51:9,
11;59:21;63:24;67:19,
21;74:7;83:19;110:25;
120:14;121:7

**surrounding (11)**
57:10;58:12;63:12;
68:17;69:2;70:6;81:16,
24;82:5,5;89:15

**sworn (1)**
5:3

**system (37)**
14:23,24,25;19:1,1;
20:12;22:5;37:16;38:10;
43:7;44:7,13;47:24;
52:24;54:5,6;55:11;
59:16;61:11;63:20;
91:19;108:11;109:5;
111:3,7;112:1,2;113:25;
114:9;122:22;123:10,
16;124:13,14;129:13,14,
15

**systems (8)**
15:6,9;18:25;19:2;
110:25;124:11,16,18

## T

**table (2)**
101:5,6

**talk (5)**
6:18;63:21,22,25;
92:20

**talked (9)**
33:1;77:22;94:16;
100:23;112:10,17;
120:10;125:22;129:13

**talking (7)**
5:10;6:4;35:17,19;
92:5;114:20;116:11

**talks (1)**
62:2

**Taraszka (55)**
16:3;36:17;39:4,25;
40:3,8;41:24;42:14;
44:3;47:20;50:5,11;
54:18;57:11;58:13;
62:21;63:1,7;64:15;
65:14;69:3,5;70:13,19;
73:17;75:14,18;77:15;
78:2,7;79:4;82:21;83:2,
14;84:4;85:5;87:20;

90:12;93:21;104:15;
123:23;126:7,13,17,24;
132:12;136:16;138:1,9,
12,15;140:4,4,5,6

**Taraszkas (10)**
78:20;83:10,12;93:18;
94:4;99:25;137:2,7;
139:24;140:21

**Taraszka's (20)**
45:10;63:13;68:3,18;
69:8;81:17,25;82:6;
89:15;93:8,14;99:10;
108:16;122:25;130:1;
132:25;135:25;136:11;
139:5,5

**telephone (1)**
92:20

**teleservicing (1)**
60:4

**telling (3)**
75:12;85:5;137:17

**ten (5)**
125:4,4,5,6,7

**tendering (1)**
67:11

**term (2)**
17:11;70:1

**terms (7)**
29:10;42:3;50:10;
57:1,9;67:1;70:9

**testified (4)**
5:4;12:8;100:8,9

**testify (6)**
7:21,24;22:16;35:5;
42:23;74:6

**testimonies (1)**
100:22

**testimony (4)**
23:14;33:14;51:11;
100:11

**that'd (1)**
107:13

**theoretical (2)**
8:7;9:11

**thereafter (1)**
117:12

**therefore (1)**
96:10

**thereto (1)**
36:18

**third (7)**
12:13;13:22;31:24;
34:3,9,15;65:5

**third-parties (1)**
31:5

**third-party (18)**
27:16,24;28:5,18,23;
30:5,9,18,21,25;31:9;
32:1,18;33:17,18;73:21;
74:20;75:13

**Thirty (2)**
7:15;48:2

**Thirty-six (1)**

9:8

**though (1)**
116:2

**thought (3)**
12:13;55:1;76:14

**three (2)**
16:25;100:4

**ticket (1)**
64:20

**timely (1)**
12:23

**times (4)**
12:11;25:12,20;100:4

**title (8)**
11:5;18:17;24:16;
102:3;109:21;110:5;
131:3;135:4

**titles (1)**
17:8

**today (12)**
6:1,12,24;7:21,25;
11:25;15:22;38:22;
123:14,18;127:4;136:22

**today's (2)**
14:14;15:17

**together (15)**
23:25;24:6,7,11,12,21;
119:4,6;128:8,12;
129:11;130:16,19;
131:2;132:6

**told (15)**
38:20;61:20;62:25;
76:23;90:16;97:19;99:1;
100:3

**took (5)**
49:7;65:23;89:8;
115:13;133:24

**top (16)**
37:5,22;46:20;53:2,8;
54:2;59:13;65:6;80:9;
87:16;102:8;103:23;
104:22;105:5;119:12;
121:15

**touch (1)**
139:13

**towards (2)**
53:8;55:22

**train (3)**
24:12;128:12;132:6

**training (15)**
11:13,16,17,18,21;
12:6;16:16,20;17:4;
18:20,21;19:1;24:19;
128:9,16

**transaction (1)**
41:8

**transcript (1)**
140:23

**transferred (2)**
8:24;9:24

**trick (1)**
57:18

**trip (1)**

57:18

**trouble (1)**
124:7

**trust (3)**
26:19,20;39:18

**trustee (1)**
26:20

**truthfully (2)**
7:21,25

**try (1)**
34:21

**trying (6)**
43:1;48:5;57:17;
83:25;118:13;133:14

**turn (1)**
34:19

**two (24)**
13:13,18,18;15:2,9,13;
16:25;27:3,7;97:9;
100:3,16,21;104:9,10;
118:14;119:25;121:23;
124:11;130:20;133:10;
136:23;139:25;140:9

**type (9)**
7:19;40:22;44:16;
63:6;69:23;114:17;
115:7;116:15,16

**typed (3)**
49:6;126:4;133:24

**typed-up (1)**
123:21

**types (3)**
20:25;123:4;128:11

**typo (1)**
47:3

## U

**unable (2)**
41:6;96:11

**unannounced (1)**
46:2

**under (16)**
6:23;26:6;27:9,18;
32:15;42:15;47:18;51:2,
3,6;53:8;62:19;67:9,13;
92:11;94:1

**underlined (1)**
125:16

**underlining (1)**
36:24

**understood (3)**
7:1;33:13;116:19

**Unit (17)**
8:25;9:1,2,15,19,21,
24;10:1,8,23;11:3;15:9;
16:19;41:10;61:22;
127:25;128:7

**United (1)**
6:10

**Unless (1)**
57:23

**up (55)**

17:16,20;20:20,23;
24:13;29:8;30:2,15;
32:25;37:16,16;44:8;
45:2;47:25;51:4;53:8;
54:9;57:18;79:6,12;
99:4;101:23;103:25;
104:19;105:13,23;
106:14,16,23;107:1,20;
108:13;109:7;112:23;
113:20;114:25;116:21;
121:4,9,14,17,21;122:2,
4;125:4;132:24,25;
133:13,18,23,24;134:11,
20;135:1;137:21

**update (3)**
22:20;88:2,7
**updated (4)**
21:18;22:20,23,24
**updates (1)**
39:15
**upon (8)**
26:12;29:1;41:25;
57:19;58:9;68:7;83:12;
94:7
**UPS (1)**
64:21
**up-to-date (1)**
109:7
**USA (11)**
19:8,9,13;44:6,12,21,
25;45:3;104:24;106:4;
111:6
**use (9)**
15:1;19:3;24:8,15;
37:22;70:2;75:20;
128:21;140:9
**used (6)**
15:6,9;22:19;76:22;
118:11;140:1
**using (3)**
76:9,22;98:7
**usually (4)**
21:15;43:9;44:25;77:3

## V

**valid (2)**
117:1,2
**value (1)**
26:12
**vendor (1)**
54:3
**verify (2)**
37:14,15
**version (1)**
108:20
**versus (7)**
6:10;26:4;48:5,7;
50:25;104:8;140:6
**vested (1)**
100:18
**via (5)**
53:3,8;68:19;77:21;

102:14
**view (2)**
51:2;70:15
**vis-à-vis (1)**
76:21
**voice (1)**
89:13
**voicemail (4)**
89:2,4,8;90:14
**volume (1)**
103:22
**voluntary (1)**
92:6

## W

**wait (2)**
66:12;73:20
**waiver (3)**
13:1;16:23,24
**walked (1)**
133:25
**Walton (2)**
136:3;140:2
**wants (2)**
61:5;139:16
**Warwick (3)**
7:13;53:16,18
**way (23)**
6:5;7:7;8:18;29:3;
55:21;60:5;61:14;62:7;
66:12;77:18;83:2;86:9,
19;89:3;93:16,24;
100:19;106:2;113:22;
123:12;126:7,8;134:4
**Wayne (1)**
35:14
**week (5)**
127:17,18;128:19;
129:3;130:10
**weeks (1)**
15:13
**What's (8)**
21:3;53:14,17;71:4;
73:18;108:12;111:24;
123:8
**whenever (2)**
25:5;130:15
**where's (1)**
58:1
**White (1)**
140:7
**whole (2)**
123:13;132:20
**who's (4)**
7:8;16:22;108:13;
109:18
**wish (1)**
75:9
**wished (1)**
75:6
**wishes (2)**
72:23;75:3

**withheld (2)**
32:17;136:18
**withhold (2)**
32:22;99:21
**withholding (1)**
99:15
**within (7)**
17:14;20:13,17;27:3,
6;41:13;135:15
**without (1)**
25:13
**WITNESS (4)**
5:7;100:22;139:16,19
**Word (3)**
112:3,4,5
**words (8)**
15:24;17:13;71:23;
75:20;76:22,23;98:7;
106:3
**work (21)**
8:22;10:15;11:18;
16:4,5;18:1;24:24;
29:15;44:6,24,25;48:1;
53:12,15;54:3;101:8;
103:22;104:11;105:14;
131:22;137:23
**worked (10)**
8:25;10:8,19;14:17;
18:9;45:12;60:24;70:10;
124:12;127:4
**working (8)**
49:4;60:20;77:15;
94:12;108:14;112:2,3;
114:6
**works (1)**
95:3
**world (1)**
7:6
**worried (1)**
123:3
**Wow (1)**
9:7
**write (5)**
31:19;55:12,25;66:14;
90:18
**writing (4)**
55:17;66:11;90:16;
95:23
**written (8)**
23:6;27:22;28:2;
34:12;65:19;82:20,25;
84:3
**wrong (2)**
47:1;84:10
**wrote (6)**
47:25;55:11;56:24;
66:1;89:3;97:4

## Y

**ya'll (3)**
5:10,11,13
**year (2)**

12:6;99:17
**years (14)**
7:15;9:7,8;10:18;
16:25;27:4,7;100:16;
124:13;130:21,23,25;
131:18;135:6
**yesterday (2)**
41:21;122:12