## IN THE UNITED STATES DISTRICT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ATHENS DIVISION

| | | |
|---|---|---|
| **EUGENE TARASZKA and ANN** | : | |
| **TARASZKA, Individually, KEN** | : | |
| **TARASZKA, M.D., as Administrator** | : | |
| **of the Estate of DR. STEVEN** | : | |
| **TARASZKA,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **No. 3:11-CV-80 (CAR)** |
| **v.** | : | |
| | : | |
| **KELLIE WHITE GRAZIOSI,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>ORDER ON DEFENDANT'S *DAUBERT* MOTION</u>

Kellie White Graziosi initially brought this action against MetLife Investors USA Insurance Company seeking a disbursement of Dr. Steven Taraszka's MetLife life insurance policy.  MetLife subsequently filed a counterclaim in interpleader against Eugene Taraszka, Ann Taraszka, and Ken Taraszka, M.D., the administrator of the Estate of Dr. Steven Taraszka, to determine who should receive the insurance proceeds.  The Court granted MetLife's counterclaim in interpleader, MetLife paid the benefits into the registry of the Court, and MetLife was subsequently dismissed from this action.  The Taraszkas assert several claims against Graziosi over the disbursement of the insurance

proceeds.   The Court has therefore realigned the parties (the Taraszkas are now the plaintiffs, Graziosi is now the defendant) and reconfigured the caption; all subsequently filings shall conform.

Plaintiffs have identified Ken Taraszka, M.D., decedent's brother, as their expert, and he has offered many opinions, the most important including that decedent died of an overdose of fentanyl, that Defendant Graziosi murdered decedent, and that decedent did not die of an accidental overdose or suicide.   Graziosi filed a *Daubert* Motion [Doc. 61] to exclude all of Dr. Ken Taraszka's opinions.   Plaintiffs responded, Defendant filed a reply brief, and neither party requested a hearing on the matter.   After reviewing the parties' briefs, the expert's deposition, and other matters on file, and having considered the applicable law, the Court **DENIES** Defendant's *Daubert* Motion [Doc. 61] in part and **GRANTS** it in part.

## BACKGROUND

On November 19, 2010, Steven Taraszka died at his home in his bed. The parties dispute the time of his death. Defendant Kellie Graziosi, his domestic partner, was at home with him that night and called 911 when she found him dead.   Decedent had a long history of chronic pain, drug abuse, and depression. Dr. Steven Atkinson, Associate Medical Examiner at the Division of Forensic Sciences at the Georgia Bureau of

Investigation, performed an autopsy and concluded that Steven Taraszka died from the "[t]oxic effects of fentanyl, amphetamine, and fluoxetine," and determined that the cause of death was accidental.[1]

As the primary beneficiary under the policy, Graziosi demanded payment of the $1,000,000 death benefits, but Metlife denied the claim based on the objections of the Plaintiffs, members of decedent's family.   Eugene Taraszka, decedent's father, is the contingent beneficiary under the policy.   In support of Plaintiffs' primary claim that Graziosi murdered decedent and therefore cannot recover under the policy,[2]  decedent's brother, Ken Taraszka, M.D., who is also the administrator of decedent's estate, provides expert testimony to defeat Graziosi's claim.

Graziosi's attorney cross-examined Taraszka for 180 pages and objects to almost all the opinions in his deposition.   The Court will deal with the most important objections directly and also attempt to give some guidelines for other opinions.   First, however, the Court will outline the law on admitting and excluding expert opinion under Federal Rule of Evidence 702.

### LEGAL STANDARD

---

[1]  Official Report from the Georgia Bureau of Investigation [Doc. 65-2].
[2]  *See* O.C.G.A. § 33-25-13.

Federal Rule of Evidence 702 governs the admissibility of expert testimony, and it states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. [3]

Simply stated, under Rule 702, the trial court can admit relevant expert testimony only if it finds that: (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology used by the expert to reach his conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue.[4]

As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[5] Rule 702 imposes a duty on trial courts to act as "gatekeepers" to ensure that speculative and unreliable opinions do not reach the jury.[6]   Acting as a gatekeeper, the trial court must make certain that expert witnesses employ in the courtroom the "same level of

---

[3] Fed. R. Evid. 702.

[4] *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (citing *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001)); *J & V Dev., Inc. v. Athens-Clarke Cnty.*, 387 F. Supp. 2d 1214, 1223 (M.D. Ga. 2005).

[5] 509 U.S. 579 (1993).

[6] *Id.* at 589, n.7; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).

intellectual rigor that characterizes the practice of an expert in the relevant field."[7]  The court's gatekeeping role is especially significant, since "the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it."[8]

To fulfill its role, the trial court must determine whether the expert has the requisite qualifications to offer his or her opinions.[9]  The trial court must also "'conduct an exacting analysis' of the <u>foundations</u> of expert opinions to ensure they meet the standards for admissibility under Rule 702."[10]  Finally, the court must ensure the relevancy of expert testimony, meaning that it must determine whether the testimony will assist the trier of fact.[11]

The court performs its gatekeeping role consistent with Rule 104(a), which commits preliminary evidentiary questions to the court's decision and which further empowers courts in answering these questions to rely on evidence without being constrained by the rules of evidence.[12]  In sum, in acting as a gatekeeper, the court must keep "unreliable and irrelevant information from the jury because of its inability to assist

---

[7] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Goebel v. Denver & Rio Grande W. R.R. Co.,* 346 F.3d 987, 992 (10th Cir. 2003).

[8]  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 595) (internal quotations omitted).

[9] *Poulis-Minott v. Smith*, 388 F.3d 354, 359 (1st Cir. 2004); *see also Frazier*, 387 F.3d at 1260.

[10] *Frazier*, 387 F.3d at 1260 (quoting *McCorvey*, 298 F.3d at 1257) (emphasis in original).

[11] *See Daubert*, 509 U.S. at 591.

[12] *Id*. at 592-93 & n. 10; Fed. R. Evid. 104(a). In particular, Rule 104(a) provides that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a).

in factual determinations, its potential to create confusion, and its lack of probative value."[13]   Although *Daubert* involved scientific experts, the Supreme Court has made it clear that the strictures of Rule 702 and *Daubert* apply with equal force to non-scientific expert witnesses.[14]   Also, in all cases the proponent of the expert witness bears the burden of establishing that the expert's testimony satisfies the qualification, reliability, and helpfulness requirements of Rule 702 and *Daubert*.[15]   Finally, "any step that renders the analysis unreliable renders the expert's testimony inadmissible."[16]

Beginning with the qualification requirement, the Eleventh Circuit has explained that "experts may be qualified in various ways."[17]   Certainly, an expert's scientific training or education may provide one means by which an expert may qualify to give certain testimony; however, experience in a particular field may also qualify an expert to offer an opinion on a particular matter.[18]   Indeed, "experts come in various shapes and sizes," and, consequently, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field."[19]   In all cases, the court

---

[13] *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999).
[14] *See Kumho Tire*, 526 U.S. at 147.
[15] *McClain*, 401 F.3d at 1238 & n. 2; *see also Frazier*, 387 F.3d at 1260.
[16] *Goebel*, 346 F.3d at 992 (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 782 (10th Cir. 1999)) (internal alterations omitted).
[17] *Frazier*, 387 F.3d at 1260.
[18] *Id.* at 1260-61.
[19] *Santos v. Posadas de Puerto Rico Assocs. Inc.*, 452 F.3d 59, 63 (1st Cir. 2006).

must focus its inquiry on whether the expert has the requisite skill, experience, training, and education to offer the testimony he intends to introduce.[20]

Regarding the reliability requirement, the Eleventh Circuit directs trial courts to assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology properly can be applied to the facts in issue."[21] This inquiry must focus "solely on the principles and methodology [of the experts], not on the conclusions that they generate."[22]

*Daubert* offers four non-exclusive factors that courts may consider in evaluating the reliability of an expert's testimony: (1) testability; (2) error rate; (3) peer review and publication; and (4) general acceptance.[23] These four factors most readily apply in cases involving scientific testimony and may offer little help in other cases, particularly those involving non-scientific experts.[24] Accordingly, these factors merely illustrate rather than exhaust the factors or tests available to the trial court. The trial court has "considerable leeway" in deciding which tests or factors to use to assess the reliability of an expert's methodology.[25]

---

[20] *Poulis-Minott*, 388 F.3d at 359.

[21] *Frazier*, 387 F.3d at 1262 (quoting *Daubert*, 509 U.S. at 592-93) (internal alterations omitted).

[22] *Daubert*, 509 U.S. at 595; *see also Goebel*, 346 F.3d at 992.

[23] 509 U.S. at 593-95; *see also J & V Dev., Inc.*, 387 F. Supp. 2d at 1224.

[24] *See Kumho Tire*, 526 U.S. at 150-52.

[25] *Id.* at 151-52.

The advisory committee's notes for Rule 702 offer an additional list of factors or tests. These tests are:

(1)    Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

(2)    Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3)    Whether the expert has adequately accounted for obvious alternative explanations;

(4)    Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(5)    Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.[26]

Like the four *Daubert* factors, these factors do not comprise a definitive checklist, nor is any single factor dispositive of reliability; instead, the tests articulated in the advisory committee's notes merely illustrate the issues a court may consider in evaluating an expert's testimony.[27]

Finally, for admission, the expert testimony must assist the trier of fact.  Expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person."[28]  "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue

---

[26] Fed. R. Evid. 702 advisory committee's note (2000 amendments).

[27] *See id.*

[28] *Frazier*, 387 F.3d at 1262.

in closing arguments."[29]   Nor does expert testimony help the trier of fact if it fails to "fit" with the facts of the case.[30]  Expert testimony lacks "fit" when "a large analytical leap must be made between the facts and the opinion."[31]   "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[32]   Thus, the court may exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand to warrant a determination that it [is 'helpful' to the trier of fact]."[33] At all times when scrutinizing the reliability and relevance of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate fact-finder.   A district court's "gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury."[34]  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[35]   A court may not "evaluate the credibility of opposing experts" or the

---

[29]  *Id.* at 1262-63.

[30]  *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).

[31]  *Id.*; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[32]  *General Electric*, 522 U.S. at 146.

[33]  *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1121 (10th Cir. 2004).

[34]  *Allison*, 184 F.3d at 1311.

[35]  *Daubert*, 509 U.S. at 596.

"persuasiveness of competing scientific studies;"[36] instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence."[37]

## ANALYSIS OF DR. TARASZKA'S OPINIONS

Graziosi contends that Ken Taraszka, M.D. is not qualified to give expert opinions in this case. Dr. Taraszka, however, is board certified in anesthesiology and earned his medical degree at St. Louis School of Medicine.   He has practiced anesthesiology since 1997.   He explained in his deposition that he is "testifying as an expert witness in this case based on my 20-plus years of experience in pain and anesthesia, and with essentially daily use and administration of fentanyl in my patients."[38]   He further testified that he is "intimately acquainted with the administration effects, duration of action, and side effects of fentanyl."[39]   Moreover, on an average day, he probably gives fentanyl to 20-30 of his patients.[40]   And he has also had experience with people who have abused fentanyl.[41]

Defendant's counsel attacks Dr. Taraszka's qualifications on many fronts, but the Court believes that the objections go to the weight of his opinions and not their

---

[36] *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK, Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).
[37] *Frazier*, 387 F.3d at 1272.
[38] [Doc. 60 at 19].
[39] *Id.*
[40] [Doc. 60 at 22].
[41] *Id.* at 22-27.

admissibility.   The Court will not address each contention, but, for example, the Court does not believe that only a forensic pathologist or a forensic toxicologist can serve as an expert in this case.   Nor does an expert in this case need to be a pathologist or know how to perform or have experience performing autopsies.

A trained medical doctor who uses fentanyl daily and sees the drug's effects on patients can certainly offer an opinion that an overdose of fentanyl caused decedent's death. This is especially the case where, as here, the autopsy report showed high levels of fentanyl in decedent's body. (This autopsy finding also supports the sufficiency of Dr. Taraszka's data, the reliability of his opinions, and his proper application of principles and methods to the case.)   The Court also believes that he is qualified to talk about other drugs discussed in his deposition, including Methadone, Demerol, and Stadol, based on his general medical training and experience.[42]

Moreover, based on his experience as briefly outlined above, the Court finds that Dr. Taraszka is qualified generally to give medical opinions about the use, misuse, and abuse of fentanyl and to describe its chemical properties, effects on the human body, how it causes death, and its availability in the medical community.   All such testimony goes to one or more issues in the case and will assist the jury. He can also give opinions about the time of his brother's death based on his general medical training, which is also

---

[42] [Doc. 60 at 117,120].

admissible and helpful to the jury on the question of the time of death. His factual basis for these opinions is somewhat thin, but not thin enough to rule it out under Rule 702.[43]

Consequently, on the issue of qualification, the Court finds that Dr. Taraszka can offer the opinions outlined on page 1 of the Plaintiffs' expert disclosures under Section II. Autopsy/Toxicology Results and the opinions outlined on page 2, Section III. Fentanyl. The three paragraphs under Section III. provide background information about fentanyl that the Court would expect an anesthesiologist with Dr. Taraszka's experience to know. There are no serious reliability questions here.   Also, among other issues his opinion about fentanyl will assist the jury in deciding on the cause of death.

But when we move to the next section of the Plaintiffs' expert disclosures, Section IV. Opinions Provided and Basis for Same, the Court finds serious problems.   Speaking broadly, as long as Dr. Taraszka offers medical opinions as a medical expert, he is qualified to give those opinions.   But in Section IV., he too often stops being a medical expert and becomes a homicide detective.   His credentials don't carry him that far.

As a result, he is not qualified and cannot testify that Kellie Graziosi is responsible for or caused decedent's death, that Graziosi supplied decedent with a lethal dose of fentanyl or that she put fentanyl in the Dairy Queen Blizzard he ate shortly before he went to sleep the night he died.   These opinions are in the first three paragraphs under

---

43  [Doc. 60 at 85, 92-93].

Section IV.  The Court also does not understand how Dr. Taraszka's training and experience as an anesthesiologist authorizes him to testify that Graziosi murdered his brother or that his brother did not commit suicide.  This is especially true when he testified that he had no special training in suicide, could cite no authoritative texts on suicide, and had never investigated a suicide.[44]

In the fourth paragraph under Section IV., he again becomes a medical expert when he opines that decedent was not abusing drugs before the time of his death. He primarily bases this opinion on his review of his brother's drug screens that were designed to detect drug abuse. This is good data, can be reliably applied to the case, and assists the jury on the cause of death question. His opinions about decedent's emotional state, however, will require further review by the Court because these opinions may amount to nothing more than lay opinions admissible under Rule 701.[45]  (If the Court admits his opinions under Rule 701, qualifications do not matter, but at the same time he cannot testify that decedent's emotional state did not cause or contribute to his death. Moreover, this opinion is at least partially moot based on the rulings below).

On the other hand, he can testify that death would have occurred within 15-20 minutes after decedent ingested a lethal dose of fentanyl.  This naturally follows from

---

[44] [Doc. 60 at 83].
[45] Fed. R. Evid. 701.

his training and experience with fentanyl, is based on the amount of fentanyl in decedent's body, and helps the jury decide the important issue of the time of death. But to the degree that he accuses Graziosi of wrongdoing in this paragraph, he has lapsed back into the homicide detective mode, and the Court excludes those opinions.  The Court will allow, however, the opinion that fentanyl is salty based on his knowledge as an anesthesiologist that fentanyl comes in a saline solution.[46]  This testimony may help the jury decide how decedent may have ingested fentanyl.

On this issue of accusing Graziosi of murder, but based on another legal principle, the Court finds he has another problem acting as a homicide investigator.  Specifically, he makes many credibility assumptions about what Graziosi told investigators after his brother's death.  An expert witness should neither offer opinions about another witness's credibility nor base his opinions on another witness's credibility.  As the Second Circuit Court of Appeals held: "[w]e believe that expert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony.  The credibility of a witness is exclusively for the determination of the jury."[47]  Dr. Taraszka repeatedly offers opinions about Graziosi's bad credibility and bases his opinions on her lack of credibility.   Hence, the Court finds

---

[46] [Doc. 60 at 108].
[47] *United States v. Scop*, 846 F.2d 135, 142 (1988).

14

another basis to exclude those opinions that it has already excluded for lack of qualifications.

At this point, the Court has admitted Dr. Taraszka's opinion that a fentanyl overdose killed decedent but has excluded his opinions that Graziosi murdered decedent and that he did not commit suicide.   The real question in this case is who killed decedent, his domestic partner or did he die by his own hand, either intentionally or accidentally.   Having excluded Dr. Taraszka's murder opinion and his suicide opinion, that leaves the Court with one more major issue: does Dr. Taraszka's data and methodology authorize the opinion that his brother did not die accidently either from an overdose of fentanyl or a combination of fentanyl, Prozac, and amphetamines?   The answer is no.

The Court finds two problems with this opinion.   First, Dr. Taraszka's opinion that his brother did not overdose relies on data that the Court has already excluded.   He testified that "[i]f it was an overdose, Steven's a – was a very bright guy.   To overdose to that level would be insane and again, it points back to Ms. Graziosi's testimony."[48]   The Court has already ruled that he cannot rely on a credibility assessment of Graziosi's testimony, so he is using improper data to support this opinion.   Here again, the Court finds a problem with him acting as a homicide investigator.

_____

[48] [Doc. 60 at 92].

Second, the Court takes issue with his methodology. Dr. Taraszkas testified that he used the differential diagnosis approach to reach his opinion that Graziosi murdered decedent and to exclude the other causes of death—suicide and accidental overdose. He described the differential diagnosis approach in this way: "It's a matter of taking all the potentials and then using data at hand or getting more data at hand to rule out what is not probable versus what is most likely. When you rule out everything else, and you have one thing left, that's your answer."[49]   Simply stated, an expert can't have a valid differential diagnosis when the Court has excluded two-thirds of his opinions that flow from that differential diagnosis.   The Court has already excluded the murder opinion and the no suicide opinion.   Having kicked out two legs of this three-legged stool that makes up these three critical opinions, the remaining leg of the opinion—no accidental overdose—cannot stand alone.   The Court thus excludes Dr. Taraszka's opinion that decedent did not die of an overdose.

### Advisory Committee Notes Factors

In routine medical question cases or cases involving medical opinions given by medical doctors, the Court usually finds the factors outlined in the advisory committee notes more helpful than the *Daubert* factors.   The Court will apply these one at a time.

---

[49] [Doc. 60 at 160].

**1) Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying.**

Dr. Taraszka is not testifying about matters growing naturally and directly out of research that he conducted independent of this litigation for his opinions about suicide, murder, accidental overdose, and his brother's drug addiction.   Clearly, he developed his opinions solely for this litigation. On the other hand, his general opinions about fentanyl and other drugs arise directly from his work as a medical doctor. This information is part of the working knowledge he must rely on every day to treat patients and would have known this information and held these opinions if this case had never been filed. Hence as to the latter opinion, he passes this test and to the former he fails.

The opinion that his brother died of an overdose of fentanyl falls into a unique category. First, he only reached that opinion so he could offer it in this case.   But he based the opinion on another doctor's autopsy findings who did reach the conclusion naturally and directly out of his work as a medical examiner.   Relying on this work, Dr. Taraszka's opinion about cause of death is only a very short and logical step to that opinion.   Consequently, the Court finds he satisfied this factor for this specific opinion.

The Court notes that this question in significant part goes to an expert's credibility. A jury will have no problem understanding the credibility problems of an

expert who is the decedent's brother and the son of the contingent beneficiary under the insurance policy.   Moreover, Graziosi did a thorough job of exposing these credibility issues on Dr. Taraszka's deposition.

**2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.**

In considering this factor, the Court will have to break down its analysis into subparts according to the opinions Dr. Taraszka offered.   First, Dr. Taraszka's opinion that an overdose of fentanyl caused decedent's death is not an unjustifiable extrapolation from an accepted premise in the case.   The autopsy report shows fentanyl in decedent's blood at the time of his death, fentanyl is lethal at high doses, and decedent had a high dose of the drug in his body.

Second, the Court finds that Dr. Taraszka's opinion does not unjustifiably extrapolate in reaching his general opinions and background explanations about the use, misuse, abuse, and properties of fentanyl.   These opinions are based on his experience with the drug in his medical practice.

Third, Dr. Taraszka justifiably extrapolated that decedent was not addicted to drugs at the time of his death.   He based this opinion in substantial part on decedent's drug screens from the weeks preceding his death. (The Court is not commenting on the truth of this opinion or any other.)

The Court has already excluded other opinions that would also fail under this analysis, including the murder opinion, the no suicide opinion, and the no overdose opinion.

**3) Whether the expert has adequately accounted for obvious alternative explanations.**

Graziosi's attorney cross-examined Dr. Taraszka for 180 pages, sometimes going back over the same issues.   Dr. Taraszka commonly gave detailed explanations for the alternative explanations of his opinions that the Court has admitted in the case.

**4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.**

Regarding the background opinions contained in Section III. <u>Fentanyl</u>, the Court finds that those opinions arose out of his routine medical practice and so the question of care is not an issue.   Regarding the opinions that originated from what the Court has characterized as a homicide investigator, Dr. Taraszka cannot satisfy this factor because anesthesiologists don't work as homicide detectives, so there is no way for the Court to know how careful he should be.   Stated another way, there is no standard of care for an anesthesiologist working as a homicide detective.   An apple can't be an orange no matter how good an apple it is.

On the opinion about death by fentanyl overdose, by basing his opinion primarily on the work of another doctor and then by drawing a logical conclusion from that work,

combined with strong knowledge and treatment with fentanyl and its effects, the Court finds that he acted with enough care to have this opinion admitted under this factor.

**5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.**

Anesthesiologists don't work as homicide detectives and when an anesthesiologist bases his opinions on such work the Court cannot conclude that he can reach reliable results about most of the opinions in Section IV. Opinions Provided and Basis for Same.   On the other hand, the opinions stated in Section III. Fentanyl would reliably follow from his work as a medical doctor practicing anesthesiology.

Finally, for all Dr. Taraszka's opinions that the Court has admitted, the Court follows what the Supreme Court advised in *Daubert*: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence."[50]

## CONCLUSION

Upon due consideration of the arguments of counsel, the relevant legal authorities, and the evidence in the record of the case, and for the reasons set forth above, the Court finds that Dr. Taraszka's opinions are admitted in part and excluded in

---

[50] *Daubert*, 509 U.S. at 596.

part.   Consequently, Defendant's *Daubert* Motion [Doc. 61] is accordingly **DENIED** in

part and **GRANTED** in part as outlined above.

      **SO ORDERED**, this 25th day of March, 2013.

S/   C. Ashley Royal
C. ASHLEY ROYAL,
UNITED STATES DISTRICT JUDGE
