# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF GEORGIA
# ATHENS DIVISION

| | | |
|---|---|---|
| EUGENE TARASZKA and ANN TARASZKA, Individually, KEN TARASZKA, M.D., as Administrator of the Estate of DR. STEVEN TARASZKA, | : : : : : : | |
| Plaintiffs, | : : | |
| v. | : : : | No. 3:11-CV-80 (CAR) |
| KELLIE WHITE GRAZIOSI, | : : | |
| Defendant. | : : | |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Eugene Taraszka, Ann Taraszka, and Dr. Ken Taraszka (the "Taraszkas") seek to prevent Defendant Kellie White Graziosi from receiving the insurance proceeds on Dr. Steven Taraszka's life issued by MetLife Investors USA Insurance Company ("MetLife"). Requesting disbursement of the funds from the Court's registry, Defendant filed the instant Motion for Summary Judgment [Doc. 71]. Having considered the relevant facts, applicable law, and the parties' arguments, Defendant's Motion for Summary Judgment [Doc. 71] is **GRANTED in part** and **DENIED in part**. Defendant's Motion is **GRANTED** with respect to all claims asserted by Plaintiffs Ken Taraszka and Ann Taraszka, and with respect to Plaintiffs'

1

negligence, undue influence, wrongful death, and voluntary manslaughter slayer statute claim. Thus, Plaintiffs Ken and Ann Taraszka are hereby **DISMISSED**. However, with respect to Plaintiff Eugene Taraszka's murder slayer statute claim, Defendant's Motion is **DENIED**.

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitles it to a judgment as a matter of law.[2] If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[3]

The Court must view the facts, and any reasonable inferences drawn from those facts, in the light most favorable to the party opposing the motion.[4] "The inferences,

---

[1] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[2] *Catrett,* 477 U.S. at 323 (internal quotation marks omitted).
[3] *See* Fed. R. Civ. P. 56(e); *see also Catrett,* 477 U.S. at 324-26.
[4] *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010); *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir. 1992).

2

however, must be supported by the record, and a genuine dispute of material fact requires more than 'some metaphysical doubt as to the material facts.'"[5] In cases where opposing parties tell different versions of the same events, and one is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."[6] A disputed fact will preclude summary judgment only "if the dispute might affect the outcome of the suit under the governing law."[7] "The court many not resolve any material factual dispute, but must deny the motion and proceed to trial if it finds that such an issue exists."[8]

## BACKGROUND

This action concerns the proper disposition of insurance proceeds on the life of Dr. Steven Taraszka ("Steven"), who died in Monroe, Georgia, on November 19, 2010, from the "toxic effects of fentanyl, amphetamine, and fluoxetine."[9] The MetLife policy names Defendant Kellie Graziosi ("Graziosi") as the primary beneficiary and Plaintiff Eugene Taraszka, Steven's father, as the contingent beneficiary.[10] The Taraszkas, Steven's family, allege that Graziosi killed Steven and that she is therefore precluded

---

[5] *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (quoting *Penley*, 605 F.3d at 848).
[6] *Pourmoghani-Esfahani v. Gee*, 625 F.2d 1313, 1315 (11th Cir. 2010) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).
[7] *Id*. (internal quotation marks omitted).
[8] *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981). In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.
[9] GBI Official Report [Doc. 60-14 at 1].
[10] After filing a counterclaim in interpleader, MetLife paid the benefits into the registry of the Court and was subsequently dismissed from this action. [Doc. 87]. The Court realigned the parties in its March 25, 2013 Order. [Doc. 88].

3

from collecting the insurance proceeds pursuant to Georgia's slayer statute.[11] To provide context for the events immediately before and after Steven's death and thus, the instant Motion, the Court begins over a decade before Steven died.

In the mid-1990's, Steven lost his medical license because of his addiction to and abuse of narcotics.[12] After Steven completed a drug rehabilitation program, the state medical board reinstated Steven's medical license in 1997.[13] That year, Steven began practicing as a pain management physician at Monroe Medical, a chiropractic office where Graziosi worked as practice manager.[14] Steven purchased the office and practice the following year, and Graziosi continued as the practice manager.[15]

Steven and Graziosi eventually began dating, and, in January of 2000, they started living together.[16] Graziosi remained Steven's domestic partner for nearly a decade.[17] Over the years, Steven repeatedly told his brother, Ken Taraszka, that Graziosi was blackmailing him, that she would not leave his house, and that she would ruin his business unless he paid her money.[18] Even a week before his death, Steven told close friend Wayne Czechowski that Graziosi was "intolerable" and that

---

[11] *See* O.C.G.A. § 33-25-13.
[12] A. Taraszka Dep. 21:8-13 [Doc. 65]; K. Taraszka Dep. 60, Nov. 2, 2011 [Doc. 66]; E. Taraszka Dep. 34:20-25 [Doc. 67].
[13] Graziosi Dep. 21:6-11 [Doc. 79]; K. Taraszka Dep. 60, 67, Nov. 2, 2011.
[14] Graziosi Dep. 20:11-21:5, 24:20-21.
[15] *Id.* at 23:16-22.
[16] *Id.* at 54:3-7.
[17] *Id.* at 54.
[18] K. Taraszka Dep. 67-68, Nov. 2, 2011. The Court acknowledges that several statements in the records, including these statements, could be excluded as hearsay. However, because this issue is not sufficiently addressed in the parties' filings, the Court assumes all statements are admissible for purposes of the Motion.

4

she was blackmailing him.[19] He also told Wayne he was scared of Graziosi and if something happened to him that Wayne "better look into [her]."[20] Graziosi denies these allegations.[21]

Although Steven and Graziosi never married, they did purchase MetLife term life insurance policies in 2003 and named each other as primary beneficiaries; Steven named his father, Eugene Taraszka, as his contingent beneficiary.[22] In 2006, both Steven and Graziosi converted their term policies into universal life insurance policies, and their designated beneficiaries remained unchanged.[23] Steven's policy, the policy currently at issue, is in the amount of $1,000,000.00.[24]

Steven was involved in two accidents, one in 1999 and one in 2003, both of which caused severe injury to his spine and back.[25] As a result, Steven suffered from chronic migraines and back and neck pain.[26] At some point before 2005, he began taking prescription pain medicine, including methadone and oxycodone.[27] In 2005, Steven overdosed on pain medication, and he was diagnosed with "altered mental status and methadone poisoning" and tested "positive for benzodiazepines,

---

[19] *Id.* at 16:11-18.
[20] *Id.*
[21] Graziosi Dep. 148.
[22] A. Taraszka Dep. 75-76, Ex. 6.
[23] K. Taraszka Dep. 136-37, Ex. 6, Nov. 2, 2011.
[24] *Id.*
[25] K. Taraszka Dep. 114-16, Nov. 2, 2011.
[26] *Id.* at 114-16, 121
[27] K. Taraszka Dep. 126:18-27:12, May 15, 2012 [Doc. 60].

methadone and THC."[28] Consequently, Steven's medical license was suspended for a second time in 2007.[29] From 2007 until 2009, Steven was unemployed, and Graziosi was their only source of income.[30]

While he was unemployed, Steven participated in another drug rehabilitation program where he was diagnosed with "pain disorder and psychological and physical factor," "Opioid dependence," "Adjustment disorder with anxiety" and "Chronic Pain – cervical and thoracic, migraine headaches."[31] As a result of the program, Steven was no longer prescribed any pain medications.[32] Steven began working again after his medical license was reinstated in 2009 pursuant to a consent order whereby Steven agreed to undergo monthly drug screenings.[33]

In 2010, the final year of his life, Steven was treated by three separate physicians for his chronic pain: Dr. David Jarrett, a psychiatrist and an addictionologist; Dr. Michael Earnhart, a pain management physician; and Dr. Paul Ives, an interventional pain medicine specialist.[34] As ordered, Steven was tested monthly for the presence of drugs.

---

[28] K. Taraszka Dep. 72-78, Ex. 14, Nov. 2, 2011.
[29] Graziosi Dep. 123:1-3.
[30] *Id*. at 127, 142, 187.
[31] K. Taraszka Dep. 133:10-34:4, May 15, 2012.
[32] Graziosi Dep. 131.
[33] Consent Order [Doc. 60-7].
[34] Graziosi Dep. 129:15-132:3; K. Taraszka Dep. 130:6-32:24, 140:18-42:22, 145:18-49:15, May 15, 2012, Exs. 9, 10, 11, & 12.

That fall, Steven's chronic pain and migraines worsened and his coping mechanisms gradually deteriorated,[35] despite receiving two cervical epidural steroid injections less than one month apart to alleviate his pain.[36] Working at the office became increasingly difficult as Steven's nights were spent sleepless and in pain.[37] At various times he lashed out at the office staff, and, at one point, he administered the wrong hormone injection to two patients.[38] On October 7, 2010, about one month before he died, Steven tested positive for the presence of methadone, a pain medication he was not prescribed.[39]

In the final month, Steven's pain became "excruciating."[40] He was limping and "yelling out in pain,"[41] and he was "on edge," "agitated," and "aggravated."[42] Because Steven could no longer sleep through the night, Graziosi went to work without him and came home later in the morning to wake him up.[43] One morning, Steven was so tired, Graziosi had to leave the office twice to wake him up.[44] The week of his death, Steven had difficulty keeping patients' appointments despite an adjusted schedule,[45] and during those patients' appointments that he did keep, he would either fall asleep

---

[35] *See* K. Taraszka Dep. 130:6-10, 131:13-22, Ex. 4, May 5, 2012; Graziosi Dep. 125-27, 128-32.
[36] Dr. Ives's Record Sept. 28, 2010 [Doc. 60-11]; Dr. Ives's Record Oct. 14, 2010 [Doc. 60-12].
[37] Graziosi Dep. 166.
[38] *Id*. at 129.
[39] K. Taraszka Dep. 100:14-102:20, May 15, 2012, Ex. 2.
[40] Graziosi Dep. 155:18-20.
[41] *Id*.
[42] *Id*. at 163:13-15.
[43] *Id*. at 166.
[44] *Id*.
[45] *Id*. at 155:22-25, 163:17-19, 167:19-25.

7

or slur his words.[46] The staff closed the office early on Monday, Tuesday, and Wednesday due to Steven's condition.[47]

On Thursday, the day before he died, the office was routinely closed.[48] After sleeping in, Steven went to Dr. Earnhart's office for his monthly drug test.[49] That evening, Graziosi, who was running errands, called Steven and offered to bring him a Dairy Queen ice cream Blizzard.[50] Steven, who "loved sugar,"[51] happily accepted.[52] When Graziosi arrived at the house, Steven limped to the door to meet her where he kissed and thanked her for his Blizzard.[53] Steven was "happy" to receive the ice cream, and for those "15 seconds … he wasn't depressed."[54] Steven and Graziosi talked briefly about their day, and Steven remarked that his day had been "okay."[55] Steven then lay down in bed to eat his Blizzard and watch television.[56]

At some point that evening, Steven came out of the bedroom and threw his Blizzard cup in the kitchen trash can.[57] He told Graziosi that Dr. Earnhart had given him "a bunch of" pain medication samples at his drug test, that he had taken them,

---

[46] *Id.* at 21-23, 169:6-9.
[47] *Id.* at 167-69.
[48] *Id.* at 174:16-17.
[49] *Id.* at 174-75. The record is silent as to the results of this test.
[50] *Id.* at 178:23-25.
[51] *Id.* at 173:8, 178.
[52] *Id.* at 180.
[53] *Id.*
[54] *Id.* at 180, 181:15-17.
[55] *Id.* at 177:10.
[56] *Id.* at 180.
[57] *Id.* at 185.

8

and that he was going to bed.[58] Shortly thereafter, around 10:00 p.m., Steven fell asleep with the television on; Graziosi, who heard Steven snoring, did not want to wake Steven and fell asleep on the living room couch.[59] Graziosi and Steven were the only individuals at the house that evening.[60]

Around 3:00 a.m. the next morning, the noise from Steven's television awoke Graziosi.[61] After turning off his television, Graziosi noticed that Steven was not snoring like usual.[62] Graziosi felt Steven who was "so cold" and discovered "there was vomit everywhere."[63] At 3:18 a.m. Graziosi called 911 and reported that her boyfriend had aspirated and there was vomit in the bed.[64]

Deputy J. Shumate arrived at the house first.[65] EMS personnel arrived shortly thereafter but did not perform any resuscitative measures, Steven was pronounced dead at the scene at 4:00 a.m. by Deputy Coroner Richard Jenkins.[66] Graziosi's version of events as recounted to Deputy Shumate and the EMS that morning differ in two respects. First, as written in the EMT report, Graziosi stated that Steven ate his Blizzard "shortly before Midnight,"[67] but in her interview with Deputy Shumate and

---

[58] *Id.* at 185:9.
[59] *Id.* at 193, 196.
[60] *Id.* at 177-202.
[61] *Id.* at 202.
[62] *Id.*
[63] *Id.*
[64] *Id.* at 205-06.
[65] *Id.* at 209
[66] *Id.* at 211; GBI Record [Doc. 60-13 at 1].
[67] Walton Cnty. Sheriff's Office Supp. Narrative by Shumate ("Supp. Narrative") at 2 [Doc. 77-3 at 2].

9

later in her deposition, Graziosi stated that Steven ate his Blizzard around 8:00 or 8:30 p.m.[68] Second, in the EMT report, Graziosi stated that she last saw Steven alive "shortly before Midnight,"[69] yet in the police report, she stated that she last saw Steven around 10:00 p.m. that evening when he went to bed.[70] Additionally, despite Graziosi's testimony that Steven threw the Blizzard cup away in the kitchen trash can,[71] the Blizzard cup was never found.[72]

After speaking to Deputy Shumate and EMT personnel, Graziosi called Steven's family, the Taraszkas, in New Jersey. Eugene, Steven's father and a pharmacist;[73] Ann, Steven's mother; and Ken, Steven's brother and an anesthesiologist,[74] immediately came to stay in Steven's house.[75] Shortly after arriving, the Taraszkas began going through Steven's personal belongings, including his personal safe that only Steven and Eugene knew the combination to.[76] Inside, Ken and Eugene found and destroyed unidentified pills in pill bottles, old fentanyl patches, and opioid pain medication.[77] They also found a stack of documents that they burned over an outdoor grill to

---

[68] Audio of Interview at 07:28-07:31 [Doc. 77-2]; Graziosi Dep. 182-183.
[69] EMT Report [Doc. 77-2 at 2].
[70] Supp. Narrative at 2 [Doc. 77-3 at 2].
[71] Graziosi Dep. 185.
[72] K. Taraszka Dep. 31, Nov. 2, 2011.
[73] A. Taraszka Dep. 14.
[74] K. Taraszka Dep. 68, Nov. 2, 2011.
[75] Graziosi Dep. 238-39; K. Taraszka Dep. 34-35, Nov. 2, 2011.
[76] A. Taraszka Dep. 29-31; K. Taraszka Dep. 35-36, Nov. 2, 2011.
[77] K. Taraszka Dep. 36, 37, 43-44, Nov. 2, 2011; E. Taraszka Dep. 43-44, 46.

10

prevent identity theft.[78]  Finally, they found a handwritten note dated 2002 from Steven to Ken that stated, in part:[79]

> She [Graziosi] is just using personal stuff I revealed to fucking blackmail me into staying.  Oh well, I wish it would have turned out differently.
> …
> Only so many times I can hear how she will ruin me and the practice.[80]

The Taraszkas also opened several safes in Steven's office that contained various other narcotics.[81]  Unlike the drugs found in Steven's safe at home, the Taraszkas gave these drugs to the Georgia Bureau of Investigation ("GBI") which was examining the circumstances of Steven's death.[82]

An autopsy conducted by the GBI revealed that Steven died from the "toxic effects of fentanyl, amphetamine and fluoxetine."[83]  Dr. Ken Taraszka ("Dr. Ken"), the Taraszkas' identified expert in this matter, testified that Steven died from a "massive overdose of fentanyl," a "very short acting [opiate] with a rapid onset of action," and that the other "therapeutic" drug levels found were consistent with Steven's prescriptions.[84]  According to Dr. Ken, the level of fentanyl in Steven's system was "off

---

[78] E. Taraszka Dep. 45; K. Taraszka Dep. 41, Nov. 2, 2011.
[79] Graziosi Dep. 266-67, Ex. 5.
[80] Graziosi Dep. Ex. 5.
[81] K. Taraszka Dep. 48, Nov. 2, 2011.
[82] *Id.*
[83] GBI Report [Doc. 60-15 at 1].
[84] K. Taraszka Dep. 153:5-13, 70:1-11, 151:18-22, May 15, 2012.  Dr. Taraszka's opinions discussed in this Order are those that the Court admitted in its March 25, 2013 *Daubert* Order.  [Doc. 88].

11

the charts high," eight times the normal dose,[85] and thus, Dr. Ken opined that Steven would have died within 15-30 minutes of ingesting the dose.[86]

There are several "direct delivery methods" or ways to administer fentanyl, the most common being an intravenous injection, although it is also administered in transdermal patches, lollipops, lozenges, or buccal tablets.[87] The method by which Steven ingested the fentanyl was never found, including wrappers, syringes, patches, or any pill remnants in his stomach.[88] Consistent with the Taraszkas theory that Steven's Blizzard was laced with fentanyl, Dr. Ken testified that fentanyl has a strong salty taste that can be masked when mixed with a dairy product.[89]

There is also no evidence in the record that Steven had legitimate access to fentanyl, prescription or otherwise, aside from the few old fentanyl patches found in his safe.[90] With respect to patches specifically, Dr. Ken estimated that it would take approximately fifteen of the strongest fentanyl patches to reach the levels found in Steven.[91] As noted above, however, no delivery method was discovered.

---

[85] K. Taraszka Dep. 70:1-11, May 15, 2012; Rule 26 Report of Dr. Kenneth Taraszka at 1, 3 [Doc. 60-1 at 10].
[86] K. Taraszka Dep. 70:1-11, May 15, 2012; Rule 26 Report of Dr. Kenneth Taraszka at 1, 3 [Doc. 60-1 at 8, 10].
[87] Rule 26 Report of Dr. Kenneth Taraszka at 2 [Doc. 60-1 at 9].
[88] K. Taraszka Dep. 89, May 15, 2012.
[89] Rule 26 Report of Dr. Kenneth Taraszka at 2 [Doc. 60-1 at 9].
[90] *See* K. Taraszka Dep. 36, Nov. 2, 2011. There is also no evidence that Graziosi had access to fentanyl. Graziosi Dep. 79-80.
[91] K. Taraszka Dep. 52-54, May 15, 2012

Although the GBI and the Sheriff's Department investigated the circumstances of his death, they ultimately determined that Steven's death was "accidental."[92] As of the date of this Order, no criminal charges have been filed against Graziosi or anyone else for Steven's death.

Based on this evidence, the Taraszkas allege several claims against Graziosi. First, the Taraszkas allege that Graziosi failed to convert a second, unrelated life insurance policy from a term to a whole policy and failed to ensure that the Taraszkas were listed as beneficiaries ("negligence claims").[93] The Taraszkas also allege Graziosi unduly influenced Steven to list her as the primary beneficiary for the MetLife policy ("undue influence claims") and that Graziosi negligently or intentionally killed Steven ("wrongful death"). Although not specifically pleaded, the Taraszkas also claim that Graziosi intentionally administered a lethal dose of fentanyl to Steven in his Blizzard and that she is precluded from receiving the proceeds of the MetLife policy under Georgia's slayer statute. Graziosi filed the instant Motion contending that she is entitled to disbursement of the insurance proceeds as a matter of law.

## DISCUSSION

As a preliminary matter, the Taraszkas do not pursue their negligence, unfair influence, and wrongful death claims on summary judgment, despite the fact that

---

[92] K. Taraszka Dep. 88, Nov. 2, 2011.
[93] *See* "I cannot believe that my son would leave it to her (Graziosi) as opposed to me....I'm his father." E. Taraszka Dep. 17:11-14.

13

Graziosi explicitly and thoroughly seeks summary judgment as to all of these claims. Instead, the Taraszkas only address their independent slayer statute claim. Consequently, summary judgment with respect to their negligence, unfair influence, and wrongful death claims is **GRANTED**.[94]

The Taraszkas' remaining claim is that Graziosi killed Steven and is precluded from recovering the benefits of the insurance proceeds under Georgia's slayer statute. Georgia's slayer statute provides:

> No person who commits murder or voluntary manslaughter … shall receive any benefits from any insurance policy on the life of the deceased, even though the person so killing … be named beneficiary in the insurance policy…. All right, interest, estate, and proceeds in such an insurance policy shall go to the other heirs of the deceased who may be entitled thereto by the laws of descent and distribution of this state, unless secondary beneficiaries be named in the policy, in which event such secondary beneficiaries shall take.[95]

Under this statute, "an individual may be barred from receiving the benefits of a life insurance policy even in the absence of a criminal conviction if it is determined under the appropriate standard of proof that the individual committed murder or voluntary manslaughter."[96]

---

[94] *See Wilkerson v. Grinnel Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned where plaintiff did not address claim on summary judgment); *Wu v. SE-Atlantic Bev. Corp.*, 321 F. Supp. 2d 1317, 1333 (N.D. Ga. 2004) (finding claim abandoned where plaintiff failed to address claim in response to a motion for summary judgment).

[95] O.C.G.A. § 33-25-13.

[96] *Slakman v. Cont'l Cas. Co.*, 277 Ga. 189, 190 (2003); *Cont'l Cas. Co. v. Adamo*, 286 F. App'x 625, 627 (11th Cir. 2008). If Graziosi had been convicted and exhausted her appeals, her conviction would be prima facie evidence of her preclusion from the benefits. *Slackman*, 277 Ga. at 190.

Here, although Graziosi has not been criminally convicted of either murder or voluntary manslaughter, there is no dispute that the slayer statute applies to Graziosi even if she is only civilly convicted of killing Steven.[97] There is also no dispute amongst the parties that the slayer statute is itself a vehicle by which to prove that a beneficiary committed murder or voluntary manslaughter and, thus, that the beneficiary is precluded from receiving the policy proceeds.[98] To defeat summary judgment then, the Taraszkas must show "any competent evidence to create a genuine issue of fact as to whether [Graziosi] committed murder or voluntary manslaughter."[99]

First, the Taraszkas must rebut the presumption created by the certified death certificate that Steven's death was accidental.[100] Under Georgia law, "it is a question solely for decision by the fact finding body as to whether the conflicting evidence was sufficient to rebut [a] presumption" created by a death certificate.[101] To rebut this

---

[97] *See, e.g.*, *Kraus v. Vance*, 207 Ga. App. 615, 622 (1993) (considering evidentiary rulings of a slayer's rule or civil murder action in which family alleged husband killed wife and was thus precluded from insurance proceeds); *Cantera v. Am. Heritage Life Ins. Co.*, 274 Ga. App. 307, 311-12 (2005).

[98] *See, e.g.*, *Long v. Hewitt*, No. 408cv014, 2008 WL 2185458, at *1 (S.D. Ga. May 23, 2008) (recognizing that "interpled question … is whether [defendant] murdered her husband and thus whether Georgia law prevents her from recovering under [husband's life insurance] policy"); *Cantera*, 274 Ga. App. at 311-12; *Kraus*, 207 Ga. App. at 622.

[99] *Cantera*, 274 Ga. App. at 311-12 (noting that burden of proof was different than a criminal trial and applying civil summary judgment standard). The Court acknowledges that the burden in a similar slayer's rule relating to inheritance of decedent's estate is clearly stated as clear and convincing evidence in the statute. *See* O.C.G.A. § 53-1-5(d); *O'Brien v. Bruscato*, 289 Ga. 739, 743 n.2 (2011) (citing *Levenson v. Word*, 286 Ga. 114, 116 (2009)).

[100] *All Am. Ins. Co. v. Puckett Bros. Mfg. Co. Inc.*, 139 F. Supp. 2d 1386, 1393 (N.D. Ga. 2001). To the extent the Taraszkas contend that the death certificate is uncertified, the record proves otherwise. *See* Certified Death Certificate [Doc. 60-15 at 2].

[101] *Ingraham v. Atl. Co.*, 97 Ga. App. 359, 361 (1958); *Allstate Ins. Co. v. Holcombe*, 132 Ga. App. 111, 114-15 (1974); *Lathan v. Murrah, Inc.*, 121 Ga. App. 554, 559 (1970).

presumption, the Taraszkas offer the following: (1) Dr. Taraszka's opinion that Steven died of a lethal dose of fentanyl and that Steven's death occurred within 15-30 minutes after Steven ingested the lethal dose; (2) Graziosi's inconsistent statements to the EMT and Deputy Shumate; (3) the unknown whereabouts of the Blizzard cup; (4) the lack of any physical evidence as to the fentanyl delivery mechanism; (5) Steven's handwritten note to Ken Taraszka that Graziosi was blackmailing him; and (6) his statements to Wayne Czechowski that Graziosi was blackmailing him and that he was afraid of Graziosi. Here, the Court finds that the Taraszkas offer competent, conflicting evidence sufficient to create a genuine issue of material fact that Steven's death was accidental. Thus, under Georgia law, the issue of whether this evidence sufficiently rebuts the cause of death is a matter to be determined by a jury.

The Court next considers whether the Taraszkas have produced sufficient evidence to establish a genuine issue of material fact that Graziosi killed Steven, by either committing voluntary manslaughter or murder.[102] Reading the facts in the light most favorable to the Taraszkas, the Court finds that the Taraszkas have failed to present sufficient evidence that Graziosi committed voluntary manslaughter.

Under Georgia law, a person commits voluntary manslaughter when "[she] causes the death of another human being under circumstances which would otherwise

---

[102] *Cantera*, 274 Ga. App. at 311-12 (where undisputed manner of death was "murder," the "only" issue before the Court is "whether there is any competent evidence to create a genuine issue of fact as to whether [defendant] committed murder or voluntary manslaughter").

be murder, and if [she] acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person."[103] Here, there is no evidence that Graziosi committed voluntary manslaughter. Quite simply, there is no evidence that Graziosi possessed the sudden, violent, and irresistible passion that is contemplated by the statute.[104] Because "[a] court need not permit a case to go to a jury … when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible,"[105] the Taraszkas' slayer voluntary manslaughter claim fails as a matter of law. In this respect, Graziosi's Motion is **GRANTED**.

The Court, however, comes to a different conclusion with respect to the Taraszkas' claim that Graziosi murdered Steven. Under Georgia law, a person commits murder when "he unlawfully and with malice aforethought, either express or implied, causes the death of another human being."[106] Malice can be either express or implied: "Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof. Malice shall be

---

[103] O.C.G.A. § 16-5-2.
[104] *See Mims v. State*, 180 Ga. App. 3, 3 (1986).
[105] *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (internal quotation marks omitted); *Mitchell v. Globe Life & Acc. Ins. Co.*, 548 F. Supp. 2d 1385, 1399 (N.D. Ga. 2007) (finding genuine issue of material fact with respect to whether plaintiff was barred by slayer statute from recovering death benefits); *Puckett Bros.*, 139 F. Supp. 2d at 1393 (concluding that evidence, including subjective statements of those close to decedent that suicide was unlikely, failed to create "even a suggestion" that decedent's death was accidental and inference was "implausible").
[106] O.C.G.A. § 16-5-1(a).

implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart."[107]

The record reflects that in the months immediately preceding his death, Steven was angry, agitated, and frustrated. A week before Steven died, he told Wayne that he was scared of Graziosi and that if something happened to him to "look into" her.[108] Steven also told Wayne and his brother Ken that Graziosi was blackmailing him, and the Taraszkas have presented a note written by Steven to corroborate these statements.

Importantly, Graziosi was the only other individual in the house the evening Steven died and neither the delivery method for the fentanyl nor the Blizzard cup was ever found.[109] Further, it is reasonable to infer that the salty taste of fentanyl would be masked by the ice cream in Steven's Blizzard. Such evidence leads this Court to conclude that a reasonable trier of fact could determine that Graziosi murdered Steven.

Based on the foregoing, the Court concludes that a genuine issue of material fact also exists as to whether Graziosi is entitled to receive the benefits. If a jury finds that Graziosi did murder Steven, the proceeds under the MetLife policy would be properly disbursed to Eugene Taraszka, the contingent beneficiary. Accordingly, the Court concludes that Graziosi has failed to establish that she is entitled to recover the

---

[107] *Id.* at § 16-5-1(b).
[108] K. Taraszka Dep. 16:11-18, Nov. 2, 2011.
[109] *See, e.g.*, *Hulsey v. Protective Life Ins. Co.*, No. 1:08-CV-854-CAP, Doc. 48 (N.D. Ga. July 14, 2009) (finding genuine issue of material fact existed as to cause of death when death certificate stated suicide but there was no physical evidence linking the manner of suicide with decedent)

insurance proceeds as a matter of law, and Defendant's Motion with respect to Plaintiffs' slayer statute claim is therefore **DENIED**.

As a final matter, the Court agrees with Graziosi that Plaintiffs Ann and Ken Taraszka should be dismissed from the instant action because they are not proper parties to assert the remaining slayer statute claim. Neither Plaintiff is a contingent beneficiary to the disputed proceeds, and, thus, neither Plaintiff is entitled to the funds under O.C.G.A. § 33-25-13. The Taraszkas do not object to this argument in their response. Accordingly, Defendant's Motion is **GRANTED** with respect to Plaintiffs Ken and Ann Taraszka, and they are hereby dismissed.

## CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment [Doc. 71] is **GRANTED in part** and **DENIED in part**. Defendant's Motion is **GRANTED** with respect to all claims asserted by Plaintiffs Ken Taraszka and Ann Taraszka, and with respect to Plaintiffs' negligence, undue influence, wrongful death, and voluntary manslaughter slayer statute claim. Thus, Plaintiffs Ken and Ann Taraszka are hereby **DISMISSED**. However, with respect to Plaintiff Eugene Taraszka's murder slayer statute claim, Defendant's Motion is **DENIED**.

**SO ORDERED,** this 17th day of April, 2013.

S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

LMH/bbp/ssh